UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

      -against-                          04 Cr. 690 (SAS)

JOHN A. GOTTI, *et al.*,

                     *Defendants.*
-------------------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF JOHN A. GOTTI'S MOTION TO GAG WITNESS CURTIS SLIWA

**LAW OFFICES OF JEFFREY LICHTMAN**
1790 Broadway
Suite 1501
New York, New York 10019
(212) 581-1001

**LAW OFFICE OF MARC FERNICH**
570 Lexington Avenue
16th Floor
New York, New York 10022
(212) 446-2346

*Attorneys for Defendant John A. Gotti*

*On the Memorandum:*

    Marc Fernich, Esq.
    Jeffrey Lichtman, Esq.
    Seth Ginsberg, Esq.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

I.     INTRODUCTION ..................................................................................................... 1

II.    A BRIEF STRUCTURAL NOTE .............................................................................. 4

III.   LOCAL CRIMINAL RULE 23.1 AND ITS DOCTRINAL ORIGINS ................................ 4

IV.    SLIWA'S PRESUMPTIVELY PREJUDICIAL BEHAVIOR ............................................ 7

  Opinions as to Gotti's Guilt and the Case's Merits, Often Based on Inadmissible Information
  (Local Criminal Rule 23.1(d)(6)-(7)) .......................................................................... 9

  Statements Concerning Potential Evidence in the Case (Local Criminal Rule 23.1(d)(7)) ...... 12

  Statements Concerning Gotti's Character, Reputation and Credibility (Local Criminal Rule
  23.1(d)(1), (4)) ......................................................................................................... 13

V.     THE PERTINENT LEGAL FRAMEWORK .................................................................. 15

VI.    A GAG ORDER IS JUSTIFIED HERE ....................................................................... 21

VII.   CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Case**                                                                          *Page*

Bridges v. Cal., 62 S. Ct. 190 (1941) ................................................................. 6

Centl. So. Car. Chapter, Soc. of Prof'l Journalists, Sigma Delta Chi v. Martin, 431 F. Supp. 1182
    (D.S.C. ), aff'd 556 F.2d 706 (4th Cir. 1977) ............................................ 17

Estes v. Texas, 85 S. Ct. 1628 (1965) ............................................................... 6

Farr v. Pitchess, 522 F.2d 464 (9th Cir. 1975) ................................................. 16

Gannett Co., Inc. v. DePasquale, 99 S. Ct. 2898 (1979) ............................... 5, 15

Gentile v. State Bar of Nev., 501 U.S. 1030 (1991) ...................................... 6, 19

Houchins v. KQED, 438 U.S. 1 (1978) ............................................................. 20

In re Dow Jones & Co., Inc., 842 F.2d 603 (2d Cir. 1988) ................ 5, 6, 15, 18, 19, 21

In re New York Times Co., 878 F.2d 67 (2d Cir. 1989) .................................. 15

In re State-Record Co., 917 F.2d 124 (4th Cir. 1990) ................................. 6, 16

In re Russell, 726 F.2d 1007 (4th Cir. 1984) ................................... 17, 20, 22

KPNX Broadcasting Co. v. Az. Sup. Ct., 459 U.S. 1302 (1982) ............... 6, 20

Neb. Press Assn. v. Stuart, 427 U.S. 539 (1976) ............................... 15, 16, 18

New York Times Co. v. U.S., 403 U.S. 713 (1971) ...................................... 18

News-Journal Corp. v. Foxman, 939 F.2d 1499 (11th Cir. 1991) ...... 15, 17, 18, 19, 20

Nixon v. Warner Comms., Inc., 435 U.S. 589 (1978) ................................... 20

Pedini v. Bowles, 940 F. Supp. 1020 (N.D. Tex. 1996) .................... 6, 17, 18, 23

Sheppard v. Maxwell, 384 U.S. 333 (1966) ..................................................... 4

Simmons v. United States, 390 U.S. 377 (1968) .......................................... 22

United States v. Amuso, 21 F.3d 1251 (2d Cir. 1994) .................................. 23

United States v. Brown, 218 F.3d 415 (5th Cir. 2000) .............................................. 5, 8, 17, 20, 21

United States v. Carmichael, 326 F. Supp. 2d 1267 (M.D. Ala. ) ...................................... 5, 16, 20

United States v. Cutler, 58 F.3d 825 (2d Cir. 1995) .............................................................. 7, 9, 21

United States v. Cutler, 815 F. Supp. 599 (E.D.N.Y. 1993) ......................................................... 15

United States v. Davis, 902 F. Supp. 98 (E.D. La. 1995), aff'd 132 F.3d 1454 (5th Cir. 1997)... 18

United States v. Davis, 904 F. Supp. 564 (E.D. La. 1995) ............................................................ 22

United States v. Figueroa, 618 F.2d 934 (2d Cir. 1980) ............................................................... 23

United States v. King, 192 F.R.D. 527 (E.D. Va. 2000) ................................................... 17, 21, 22

United States v. La. Clinic, No. Civ.A.99-1767, 2002 WL 32850 (E.D. La. Jan. 10, 2002) .. 5, 18, 20, 22

United States v. Lehder-Rivas, 669 F. Supp. 1563 (M.D. Fla. 1987) ........................................... 20

United States v. McDermott, 245 F.3d 133 (2d Cir. 2001) ........................................................... 22

United States v. Noriega, 917 F.2d 1543 (11th Cir. 1990) ...................................................... 5, 16

United States v. Salameh, 992 F.2d 445 (2d Cir. 1993) ............................................................... 15

United States v. Tijerina, 412 F.2d 661 (10th Cir. 1969) ............................................................. 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-                           04 Cr. 690 (SAS)

JOHN A. GOTTI, *et al.*,

                           *Defendants.*
-----------------------------------------------------------------X

### MEMORANDUM IN SUPPORT OF JOHN A. GOTTI'S MOTION TO GAG WITNESS CURTIS SLIWA

## I.   INTRODUCTION

Defendant John A. Gotti respectfully requests a "special order," pursuant to Local Criminal Rule 23.1(h), restraining highly inflammatory, "extrajudicial" speech by Curtis Sliwa, a public figure and principal witness in this case. By way of background, Sliwa was the alleged target of a 1992 homicide plot charged in Racketeering Act One of the indictment. He also co-hosts "Curtis and Kuby in the Morning," a popular radio program on WABC AM 77 that reaches some 1.2 million listeners in peak drive time.

For the past several months, Sliwa has been using the airwaves as a classic bully pulpit, poisoning the jury pool by scoring Gotti with personal invective. Among other mischief, he has attacked Gotti's character, credibility and reputation; relentlessly distorted and misrepresented the case's merits and the expected trial evidence; and shrilly proclaimed Gotti's guilt – boasting "inside" access to inadmissible information – of all charges against him. To cite just a few unseemly examples, Sliwa has

- derided Gotti and his immediate relatives as a gang of "debased" and "degenerate ... thug[s]," "murderer[s]" and "knuckle draggers" who tried to "whack" him;

- insisted that Gotti must be guilty because he was supposedly willing to accept a 10 year plea[1] to the Sliwa attempted murder charge;

- accused Gotti and several friends – **never so much as charged in this case** – of violent crimes against Sliwa that are **not even alleged in the indictment**;

- bragged that senior FBI and NYPD officials constantly update him on case developments – feeding him confidential if not classified intelligence – thereby enhancing his perceived credibility as a quasi-law enforcement agent;[2]

- accused defense counsel Jeffrey Lichtman of criminally unethical behavior and suggested that Gotti may try to harm him; and

- falsely implicated Gotti in uncharged and unsubstantiated schemes to obstruct justice by improperly investigating government witness Michael DiLeonardo and intimidating Sliwa and his family.

---

[1]    Besides violating LCR 23.1(d)(3) – which prohibits divulging the "possibility of a plea of guilty to the offense charged or a lesser offense" – the government will confirm that this assertion is factually inaccurate.

[2]    Consider, for example, this excerpt from Sliwa's July 30 broadcast:

> **I've had conversations with the FBI** while I've been in Japan, uh, visiting from city to city to different Guardian Angel chapters. **They assure me they got the guy [Nicholas Corozzo] watched 24-7, 3-6-5.** As you know, **New York intelligence the police department**'s intelligence division has provided security for me when I'm in New York City and they **assure me that he is being watched morning, noon and night**.... [H]opefully at some point I'll get the good news if my prayers are answered and find out that Nicky Corozzo himself has been indicted for the attempted murder and kidnap of myself back on June 19th of 1992.

2

As we show below, Sliwa's smear campaign is not only "presumptively" prejudicial, but cynically calculated and overwhelmingly "likely" to thwart Gotti's right to "a fair trial by an impartial jury." *See* Local Criminal Rule 23.1(d), (h). For these reasons, amplified *infra*, the Court should bring it to an abrupt halt with a prospective gag order.

Indeed, if witness Sliwa is permitted to lacerate Gotti with impunity, millions of New Yorkers – potential jurors all – will be exposed to his venom by the time trial begins in August 2005. Due to its intensity, its ubiquity and its injection of "facts" that may never see the inside of a courtroom, Sliwa's importuning will make a fair trial elusive if not impossible. Can a searching *voir dire* and emphatic cautionary instructions erase hundreds of hours of insidious propaganda being steadily drummed into jurors' heads on a daily, weekly and monthly basis? Is it plausible that jury deliberations will **not** be colored by this stream of extraneous bile?

Against this backdrop, the risk of jury contamination here is truly unprecedented – in the Southern District if not the nation itself. After all, how many cases feature a vituperative, quasi-law enforcement witness bent on convicting the defendant by means of a wildly popular radio program heard, according to WABC's Web site, in 38 states and Canada?

Though he might wish it otherwise, a prominent trial participant like Curtis Sliwa cannot have it both ways. As a complaining witness, Sliwa opted to pursue his grievances against Gotti, by government proxy, through conventional judicial channels. That was his prerogative, but it carries a universal price. For in seeking legal recourse, Sliwa unequivocally surrendered to this Court's inherent authority – embodied in Rule 23.1 and elsewhere – to place reasonable restrictions on out-of-court speech by **all** who appear

before it. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (instructing courts to take steps "that will protect their processes from outside interferences").

In short, by his own will and deed, Sliwa has chosen the witness stand over the bully pulpit, forfeiting any right to try his claims through the media. A narrowly tailored gag order would merely give effect to Sliwa's choice, fairly and appropriately holding him to it. More vitally, such an order would maintain our justice system's integrity, vindicate this Court's dignity and ensure the impaneling of an objective jury – one free from corrosive taint, bias or sympathy.

## II.    A BRIEF STRUCTURAL NOTE

Before turning to the merits, we outline this memorandum's structure for clarity's sake.

We begin, in section III, by summarizing Local Criminal Rule 23.1 and its doctrinal underpinnings.

We continue, in section IV, by sampling some of Sliwa's vitriolic remarks about Gotti during the three month period since the indictment's return.

Next, in section V, we explore the governing law in greater detail.

Finally, in section VI, we apply the law to Sliwa's offending statements, explaining why a gag order is necessary and appropriate.

## III.    LOCAL CRIMINAL RULE 23.1 AND ITS DOCTRINAL ORIGINS

Local Criminal Rule 23.1(h) empowers this Court to issue a

> special order governing ... extrajudicial statements by ... witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury.... In determining whether to impose such a special order, the court shall consider whether such an order will be necessary to ensure an impartial jury and must find that other ... available remedies, singly or collectively, are not feasible or would not effectively mitigate the pretrial publicity and bring about a fair trial. Among the alternative remedies to be

4

considered are: change of venue, postponing the trial, a searching voir
dire, emphatic jury instructions, and sequestration of jurors.

In turn, Local Criminal Rule 23.1(d) provides that certain statements "**presumptively** involve a substantial likelihood" of "interfer[ing] with a fair trial" within Rule 23.1's "meaning." (Emphasis supplied.) These include statements regarding the accused's "character or reputation," the "credibility of prospective witnesses" and "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." Local Criminal Rule 23.1(d)(1),(4),(7); *cf. United States v. La. Clinic*, No. Civ.A.99-1767, 2002 WL 32850, at *2 (E.D. La. Jan. 10, 2002) (construing similar Louisiana rule deeming "likely" prejudicial statements concerning party's "character, credibility, or reputation") (citation, alteration and internal quotes omitted).

In essence, Rule 23.1 codifies a string of longstanding judicial principles that resolve the epic collision between the First and Sixth Amendments – *i.e.*, the "tension between the media's ... right to publish and the accused['s] ... right to a fair trial"[3] – in celebrated criminal cases. By way of illustration:

**First**, district courts have an "affirmative constitutional duty," *Gannett Co., Inc. v. DePasquale*, 99 S. Ct. 2898, 2904 (1979), to "guard against prejudicial pretrial publicity" in criminal prosecutions. *United States v. Noriega*, 917 F.2d 1543, 1549 (11th Cir. 1990).

**Second**, that duty confers "inherent authority to control actions of parties, attorneys, and witnesses," *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1274 (M.D. Ala.), *supplemented*, 326 F. Supp. 2d 1303 (M.D. Ala. 2004), by appropriate "case management order[s]." *United States v. Brown*, 218 F.3d 415, 422 n.7 (5th Cir. 2000).

---

[3]       *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 609 (2d Cir. 1988).

5

**Third**, as the Supreme Court has stressed for over 60 years, **"Legal trials are not like elections, to be won through the use of ... the radio."** *Bridges v. Cal.*, 62 S. Ct. 190, 197 (1941) (emphasis supplied). Thus, the First Amendment right to free speech must "yield" to the Sixth Amendment right to a fair trial, *Dow Jones*, 842 F.2d at 609 – **"the most fundamental of all freedoms."** *Estes v. Texas*, 85 S. Ct. 1628, 1632 (1965) (emphasis supplied).

**Fourth**, as a corollary to principles two and three, witness gag orders are the most "practical and **recommended** procedure" for striking the proper balance between fair trials and free expression. *In re State-Record Co.*, 917 F.2d 124, 128 (4th Cir. 1990) ("*State-Recd. Co.*") (citation omitted) (emphasis supplied).

**Fifth**, and concomitantly, such orders are also a "preferred alternative to [direct] restraints on the media," commanding "considerably more deference." *Pedini v. Bowles*, 940 F. Supp. 1020, 1023 (N.D. Tex. 1996); *accord, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074 (1991) (speech of trial participants "may be regulated under a **less demanding standard** than that established for regulation of the press") (emphasis supplied). This is because witness gag orders do not inhibit "the reporting of any facts on the public record. The trial [is not] closed, and all the proceedings may be reported and commented upon." *KPNX Broadcasting Co. v. Az. Sup. Ct.*, 459 U.S. 1302, 1306 (1982).

With these broad tenets in mind, we examine a smattering of Sliwa's recent remarks in light of Local Criminal Rule 23.1(h).

## IV.    SLIWA'S PRESUMPTIVELY PREJUDICIAL BEHAVIOR

As noted in our **INTRODUCTION**, Sliwa has blasted Gotti on his WABC radio show almost daily since the July 2004 indictment in this case. In fact, the five hour program, airing from 5-10 a.m.,

features a 30 minute "Mob Talk" segment devoted to vilifying Gotti and his relatives, including his minor

nephews. And the onslaught continues throughout the rest of the show, Sliwa maligning them as, for

example, a pack of **"deformed ... degenerates" and "murderers."** To reiterate, Local Rule 23.1(d)(1)

deems such character assassination "**presumptively**" prejudicial. *Compare, e.g., United States v.*

*Cutler*, 58 F.3d 825, 829-31 (2d Cir. 1995) (lawyer violated Rule 23.1's precursor by, *inter alia*,

denouncing government witnesses as "bums" and dubbing prosecutors a "sick and demented lot").

With the indictment's return, Sliwa – claiming on-air to have received fresh death threats – abruptly

left the station under alleged police escort and supposedly went into hiding. After several hours of "stay

tuned" teases and a weekend publicity blitz for his dramatic departure, Sliwa called his show on Monday,

July 27, from a place where "there are more bears than people." Two days later, the "secret location" –

**Japan** – was revealed, with a photo of Sliwa and the Japanese premier mugging for the cameras in

matching Guardian Angels suits.

Yet, despite his purported safety concerns, Sliwa managed to slip back to New York for a

Guardian Angels-sponsored golf outing, whose **exact location was trumpeted nearly a dozen times**

**during his morning show**.

Sliwa's daily rants not only impugn Gotti's "character," "reputation" and "credibility," but also

embrace the specific "merits of the case." Local Criminal Rule 23.1(d)(1), (4), (7). In one recurring riff,

he described being attacked with a baseball bat a few months before the alleged shooting. Though he

unabashedly attributed the attack to Gotti, **the indictment does not even mention it.** On other

occasions, Sliwa claimed to be in contact with the FBI about the investigation, suggesting special inside

knowledge of the case – inadmissible information unavailable to ordinary journalists. *See, e.g., Brown*, 218

F.3d at 427 ("trial participants, like attorneys, are privy to a wealth of information that, if disclosed, could readily jeopardize [a] fair trial") (internal quotes omitted). In turn, that suggestion – coupled with Sliwa's perceived status as a quasi-law enforcement officer – bolsters the credibility of his other disparaging remarks.

Finally, when reports surfaced that Gotti might seek to enforce Rule 23.1, Sliwa exploded in the local tabloids (*see* Exhibit A), promising to defy any gag order and **expand** the daily "Mob Talk" segment from 30 minutes to one full hour. Such willful disobedience all but invites remedial and prophylactic measures. *See, e.g., Brown*, 218 F.3d at 429 (endorsing gag order in the face of parties' "self-proclaimed willingness to seize any opportunity to use the press to their full advantage").

Indeed, during an Oct. 22 television interview, Sliwa not only vowed to flout any gag order, but boasted that **he hoped his violations would help win a conviction**. He has thus opened two new fronts in his war of innuendo, taking the fight from his own radio show to the print and television media. Here is the brazen exchange between Sliwa and host Dan Abrams:

> DA:    The judge may say, look, we need to gag you until the trial happens. What will you do then?

> CS:    Well, I'll tell you. Bullets didn't gag me, baseball bats to my head didn't gag me, and **no judge is going to deprive me of my First Amendment right to free speech. This is not Sicily**. This is America. And if the judge decides in her wisdom that I must stay quiet then **I'm going to have to be shut up in jail** because she's not going to take the 50,000 powerful watts away from me. I've been saying the same thing for 12 years and nobody was listening!

> DA:    But you can recognize that it is different now. Now that the case has been filed, it is different in the sense, you

know, if [s]he were to say, "just shut up until the jury is selected" would you do that?

CS:    **Absolutely not**. Because remember, I am the victim here. And not only that I am speaking for a lot of silent victims who are too afraid to speak about the horrors that have been committed by **John Gotti, Jr. and his kind** from the Gambino Crime Family. I will not rest until he goes **straight to hell without an asbestos suit and if my words help speed up the process, so be it.**

Again, such purposeful misconduct – concededly designed to poison the jury pool and engineer a conviction through inadmissible, *ad hominem* attacks – argues strongly for a prospective gag order. *Compare, e.g., Cutler*, 58 F.3d at 840 ("The defendant's statements were dipped in venom and **deliberately calculated to poison the well from which the jury would be selected**.") (emphasis supplied).

Below are some representative samples of Sliwa's offensive comments, culled from just a few of his daily broadcasts over the past 12 weeks. Substantially identical remarks persist, in various forms, virtually every single day. We mercifully omit Sliwa's slew of diatribes against the rest of Gotti's family.

**Opinions as to Gotti's Guilt and the Case's Merits, Often Based on Inadmissible Information (Local Criminal Rule 23.1(d)(6)-(7))**

**July 22, 2004**

CS:    Could you imagine the staring and glaring contest that will take place when I am in the witness box staring because I am not looking away because I have no Kool Aid pumping through my veins and arteries, right at **John Gotti, Jr. and the rest of the guys that he gave the contract to beat me up with baseball bats and turn me into a vegetable and eventually shoot me and put me 6 feet under**....

9

**July 23, 2004**

CS:   **John Gotti, Sr.** who is not alive any longer **wanted me pushing daisies** under the ground, **tells his son who was then the head of the Gambino Crime Family** because Gotti, Sr. is awaiting sentencing.... I guess they haven't been able to indict Little Nick Corozzo who has taken over the Gambino Crime Family and quite frankly willingly and gleefully **accepted the contract from John Gotti, Jr.** and chose shooter Yanotti, chose the driver D'Angelo and hatched the plot.

**July 25, 2004**

CS:   It was at the time that **John Gotti, Sr. was in jail and was outraged about what I was saying each day ... to his son John Gotti, Jr. who was in charge, that he wants me to be taken care of.** The contract for the shooting was given to little Nick Corozzo's crew and it was Nick who picked the shooter Yanotti and the driver and obviously put the plan into progress.... [T]hese are the same people in '92 that warned me, **"watch your back, the Gottis are going to get you by any means necessary."**

**August 2, 2004**

CS:   **John Gotti, Jr.** ... as you know **tried to whack me** and is now doing time.

**August 19, 2004**

CS:  ˡ Special "Mob Talk" coming up next, ... apparently **John Gotti, Jr. was ready to cop a plea in the attempted murder case that he's facing that was launched against me by him and his sycophants**, incredible story.[4]

---

[4]     Some of the quoted excerpts violate multiple sections of Local Criminal Rule 23.1. For example, the errant assertion that "John Gotti, Jr. was ready to cop a plea in the attempted murder case" also touches the "possibility of a plea of guilty to the offense charged or a lesser offense," contrary to Local Criminal Rule 23.1(d)(6). *See supra* n.1.

* * *

CS:    [Michael DiLeonardo] is one of [John A. Gotti's] henchmen who had a falling out with the Gottis and Gambinos and decided to join Team America and spill the beans about the time I was shot multiple times in the summer of 1992. **Gotti stated that he would agree to do 10 additional years in prison to** put it all behind him, **so he had instructed his lawyer to literally meet with the feds and negotiate a plea deal in the attempted murder and kidnaping case against him before the indictments came down.**

George (WABC Employee): Now what is the potential that he could get, what is the high end of the sentence?

CS:    **Life without parole.**[5] So, he saw this coming. **The moment they heard "Mikey Scars" had flipped** his script and was giving the feds information about this case and other cases **they realized, uh-oh, he could be going away for a long time.** At another point the college educated mob head questioned his father's decision to bring him into the mafia and talked about relocating to Canada with his family if he was able to successfully negotiate the plea bargain with the feds, do his 10 years, probably where he is right now, they wouldn't move him. And just go north of the border probably into Quebec, Montreal, where there is a sizeable, like in Toronto, Italian Canadian population.

* * *

CS:    Well in fact, ... **that's why, uh, they were able to convince a federal judge in Albany to allow the tap to continue** because the guy who has turned on them, "Mikey Scars" DiLeonardo. **They were trying to find dirt on him through a private investigator who would have access to information that he shouldn't have had access to** and Richie Rehbock was sort of the messenger to try and convey that from John Gotti, Jr.

---

[5]    Beyond its basic inadmissibilty at trial, Sliwa grossly misstates Gotti's sentencing exposure, as he is accused of attempted murder and murder conspiracy, not actual murder.  *See* U.S.S.G. § 2A1.5(c)(2) (fixing offense level of 30 for attempted murder).

11

* * *

CS:    We'll give you an update later on John Gotti, Jr. Taped conversations with his attorney, Richie Rehbock, is **ready to take a plea of 10 years as long as they let him go to Canada. Copping a plea on his attempt to murder me. Now if he wasn't guilty, why would he want a plea to do 10 years?**

## Statements Concerning Potential Evidence in the Case (Local Criminal Rule 23.1(d)(7))

### July 23, 2004

CS:    **The Gambino-McLaughlin crew, four of them hit me with like 22 blows to my head with ... aluminum baseball bats signed by Joe DiMaggio.**

### August 2, 2004

CS:    [T]he first time they beat me with baseball bats in '92. **They hit me 22 times and almost turned me into a vegetable.** People said, "Hey, they don't do those kind of things. They don't whack cops or talk show hosts." Then **two months later they shoot me in the back of the cab multiple times** .

* * *

CS:    What about the baseball bat attack? You're gonna let those four guys from the McLaughlin group go through? ... Twenty-two times they hit me, Phil. **Twenty-two times. They could have turned me into a vegetable.**

Phil (WABC Employee): What I want to know is how did you climb the fence with a broken wrist?

CS:    Uh, very fast (laughter) when you're getting clobbered. Thankfully, I even told you the story of how I **was down on the ground and two of them got a little too happy. I wasn't able to block one of the thrusts and my head was wide open to them and they both swung simultaneously, the aluminum bats colliding.** And that really kept me from ending up on natural life support and purgatory.

12

**Statements Concerning Gotti's Character, Reputation and Credibility (Local Criminal Rule 23.1(d)(1), (4))**

### July 23, 2004

CS:     Special shout out to Police Commissioner Raymond Kelly, his aid Sgt. John Clifford for providing me with 'round the clock security ever since the indictments came down ... and **the threats have been coming down ever so fast and furiously**.

* * *

CS:     [W]hen the clock strikes 9:00 today, I will be whisked away and enter the FVPP, Future Victims Protection Program. **Many of you have inquired about my wife and child and I sent them into hiding a while back they are safe and sound** and I will give you more details coming up.

### July 25, 2004

CS:     I am going to make sure I am safe before my return because **I will continue to wage the battle against the Gottis .... they have to be stopped once and for all and if it means that if my case can bring attention to all the thuggery that they have been responsible for** and if I can stand up and look them in the eye with no Kool Aid pumping through my veins.... Don't worry, I will be back **I will make sure that these guys pay the price** not just for what they did to me by trying to close my mouth and putting me six feet under but **everything that I know that they have done to people all through their degenerate years they will pay the price, justice will be done.**[6]

### July 26, 2004

CS:     I'm not going to make a mistake again like I made the first time when **I was being given tips, "the Gottis are gonna get you,**

---

[6]     *See supra* n.4. Here, for example, the comment "everything that I know that they have done to people all through their degenerate years" also communicates prejudicially inadmissible information, presumably gleaned from Sliwa's purported law enforcement contacts. *See* Local Criminal Rule 23.1(d)(6).

the Gambinos are gonna get you,"[7] and I didn't listen and I luckily survived two attacks on my life and can't afford to have that happen again.

**August 2, 2004**

CS:    [W]hile I was there [Japan] I had telephone calls from John Clifford who is the assistant to Police Commissioner Kelly. Uh, was keeping me informed of the **security of my wife and child, little Anthony, who were naturally not staying in New York City**. And what would be the continued security once I got back from the intelligence division of the NYPD. As you can see they've uh, accompanied me here today. And from the FBI, who's done such a great job.

                                    * * *

CS:    I thought the whole idea of the [TV] show [*Growing Up Gotti*] was to get them away from that sort of **Gotti murderer, thug organized crime mentality**... The premise of the series ... was to show America that **the Gottis are not debased, they're not criminals, they're not knuckle draggers**. I mean **they haven't changed at all**.

**August 19, 2004**

CS:    But we grew up in pretty much the same neighborhood, so about 10 years apart I grew up and spent time in East New York, Ozone Park, Howard Beach, so did he as you know. And the Ridgewood Savings Bank was a place where often times you would have your passbook savings account. My mom had it there, my aunt Mary had it there. **The Gottis and Gambinos, they would go there and pass a note [sound of gun clicking] and immediately they'd get their money without having a pass book savings account**. Now, I don't know if it was the Ridgewood Savings Bank that they went to and pulled that caper. [Advertisement for RSB follows.]

---

[7]    *See supra* n.4; Local Criminal Rule 23.1(d)(6)-(7) (opinions as to Gotti's guilt and the case's merits, often based on inadmissible information).

## V.    **THE PERTINENT LEGAL FRAMEWORK**

Rule 23.1's precursor, Local Criminal Rule 7, derived from Supreme Court decisions such as *Sheppard*, *Gentile* and *Neb. Press Assn. v. Stuart*, 427 U.S. 539 (1976). And, significantly, it routinely withstood First Amendment scrutiny. *See, e.g., Dow Jones*, 842 F.2d at 608-09 (Rule 7 gag order regulating extrajudicial comments by trial participants – including prosecutors, defendants and defense counsel – not improper prior restraint on free expression); *In re New York Times Co.*, 878 F.2d 67, 68 (2d Cir. 1989) (gag order permissible where pretrial publicity poses genuine threat to defendant's Sixth Amendment rights and other remedies are futile or impracticable) (citing *Dow Jones*); *United States v. Salameh*, 992 F.2d 445, 447 (2d Cir. 1993) (recognizing that "the speech of an attorney participating in judicial proceedings may be subjected to greater limitations than could constitutionally be imposed on ... the press") (citing *Gentile*); *United States v. Cutler*, 815 F. Supp. 599, 610-17 (E.D.N.Y. 1993) (Rule 7 content neutral, and neither vague nor overbroad, as applied to extrajudicial remarks of attorney), *aff'd*, 58 F.3d 825 (2d Cir. 1995).

More germane, courts outside the Second Circuit,[8] enforcing their "affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity," have regularly endorsed gag orders aimed at trial **witnesses** like Sliwa. *Gannett*, 99 S. Ct. at 2904; *see also, e.g., News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512 (11th Cir. 1991) (trial judge has affirmative duty to assure that defendant is not adversely affected by prejudicial pretrial publicity). Acting on their own initiative or under analogous local rules, these courts typically hold that "potential witnesses" wishing to "discuss their proposed testimony with the media"

---

[8]    We have found no reported decision from the Second Circuit addressing this precise issue.

present "an [un]appealing scenario." *State-Record Co.,* 917 F.2d at 128. In that scenario, they reason,

the "courtroom setting" justifies "placing limits on speech that would not otherwise exist in the general

marketplace." *Carmichael*, 326 F. Supp. at 1279 (citation and internal quotes omitted). Given these

permissible limits, it follows that witness gag orders are not only "not unusual,"[9] but actually the most

"practical and **recommended** procedure"[10] for restricting witnesses from "discussing a pending case with

the press," *State-Recd. Co.*, 917 F.2d at 128 (citation omitted), and thereby "interfer[ing] with the right

of the defendant to a fair trial." *Farr*, 522 F.2d at 468.

A high profile case from the Northern District of Texas illustrates the current state of the law

concerning witness gag orders. In *Pedini v. Bowles*, a federal *habeas* action, the court approved the

issuance of such an order in the notorious drug prosecution of Dallas Cowboys' football star Michael Irvin,

explaining:

> There is a surprising dearth of authority involving constitutional
> challenges to restrictive orders directed to witnesses in criminal cases.
> The most analogous situation is presented by [*In re*] *Russell*[, 726 F.2d
> 1007 (4th Cir. 1984)]. The trial court entered an order prohibiting
> potential witnesses in a racially-motivated murder case from making any
> extra-judicial statement "that relates to, concerns, or discusses ... any of
> the parties or issues such potential witness expects or reasonably should
> expect to be involved in this case ..." *Russell*, 726 F.2d at 1008. The
> trial judge did not conduct a formal evidentiary hearing. Nevertheless, **the
> court of appeals upheld the order**. The court recognized "the
> 'necessity' of some 'speculation' and the weighing of 'factors known and
> unknowable' confronting a trial judge in such a situation." *Russell*, 726
> F.2d at 1011, *quoting Nebraska Press,* 427 U.S. at 561-62. The court
> of appeals concluded that the trial judge "acted **well within
> constitutional limits of specificity in light of the difficult task of**

---

9    *State-Recd. Co.*, 917 F.2d at 128 (citation omitted).

10    *Farr v. Pitchess*, 522 F.2d 464, 468 (9th Cir. 1975) (emphasis supplied).

> drafting an order that sufficiently protected the sixth amendment
> rights of the defendants and at the same time did not unjustifiably
> trammel petitioners' protected speech activities." *Russell*, 726 F.2d
> at 1011.
>
>      The "gag" order in this case is every bit as specific as the order in
> *Russell*. It is apparent that the [trial judge] tried to balance the
> defendants' right to a fair trial with the free speech rights of other trial
> participants. When these interests clash, "**the first amendment must
> yield to the most fundamental of all freedoms – the right to a fair
> trial for the accused**." *News-Journal*, 939 F.2d at 1512, *quoting
> Estes*, 381 U.S. 532. The Court is unable to conclude that the order is
> overly broad or violates the first amendment.

940 F. Supp. at 1025 (emphasis supplied); *accord, e.g., Brown*, 218 F.3d at 423-24 & n.8 (affirming

witness gag order over First Amendment challenge, court sought to prevent dissemination of "inadmissible

evidence" from creating "carnival atmosphere" and biasing jury) (citations and internal quotes omitted);

*United States v. Tijerina*, 412 F.2d 661, 666-67 (10th Cir. 1969) (sustaining witness gag order against

First, Fifth and Sixth Amendment challenges); *United States v. King*, 192 F.R.D. 527, 533-35 (E.D. Va.

2000) (issuing witness gag order in lurid sex and drug case); *Centl. So. Car. Chapter, Soc. of Prof'l

Journalists, Sigma Delta Chi v. Martin*, 431 F. Supp. 1182, 1189 (D.S.C.) (silencing witnesses over

First Amendment objection, court worried that unwitting exposure to "prejudicial inadmissible evidence"

would jeopardize fair trial, observing that jury selection becomes especially "difficult when statements of

trial participants in particular are widely published"), *aff'd as modified*, 556 F.2d 706 (4th Cir. 1977).

     What makes this case so unique is that Sliwa purports to wear two hats as both an important

witness **and** a radio personality – conceivably a member of the media. Despite exhaustive research, we

have found no published opinion squarely confronting such a novel situation. Yet, even giving Sliwa the

benefit of the doubt and assuming he qualifies as a *bona fide* journalist, law and logic dictate that this

17

motion is governed by the less exacting standard for muzzling trial participants, **not** the heightened scrutiny

applicable to prior restraints on reporters. The *Pedini* Court differentiated the dual standards as follows:

> Recent cases have drawn a distinction between restrictive orders directed to the media and those imposed on trial participants. Prior restraints against the press are subject to intense scrutiny and presumptively unconstitutional. *Neb. Press*, 427 U.S. at 569-71, *citing New York Times Co. v. U.S.*, 403 U.S. 713, 715 (1971).... However, **orders imposing restrictions on attorneys, parties, and witnesses are entitled to considerably more deference**.... The Supreme Court has long recognized that **restrictions placed on trial participants are a preferred alternative to restraints on the media**.

940 F. Supp. at 1023 (emphasis supplied); *see, e.g., Dow Jones*, 842 F.2d at 608 ("there is a substantial

difference between a restraining order directed against the press ... and [one] directed solely against trial

participants"); *United States v. Davis*, 902 F. Supp. 98, 102 (E.D. La. 1995) ("a real difference exists

between restraints imposed on trial participants and those that directly obstruct publication or

dissemination"), *aff'd*, 132 F.3d 1454 (5th Cir. 1997); *La. Clinic*, 2002 WL 32850, at *1 ("**less

stringent test**," requiring a "**lesser showing of potential prejudice**," applies to "extrajudicial

commentary by trial participants" including "witnesses") (citation, footnote and internal quotes omitted)

(emphasis supplied).

    Here, the gag order we seek is "directed" at Sliwa in his capacity as a key witness at trial, **not** in

his role as a radio host. *Cf. News-Journal Corp.*, 939 F.2d at 1512 ("The Supreme Court views prior

restraints **directed to the press** with a heavy presumption against their constitutionality.") (citations

omitted). The evil it targets is Sliwa's out-of-court speech concerning the case; the radio show is simply

the vehicle through which that speech is broadcast, enabling it to reach an exceptionally wide audience and

thereby compounding its harm.

18

In other words, we request the gag order **because** of Sliwa's witness status, **not** because of his media membership. *See, e.g., id.* at 1516 (gag order "**not** directed to the press, but to the trial participants") (emphasis supplied); *Pedini*, 940 F. Supp. at 1025 (similar). That Sliwa also hosts a radio program is purely incidental. *Cf. Dow Jones*, 842 F.2d at 608 ("the press' right to receive speech ... is **entirely derivative** of the rights of the trial participants to speak" in the first instance) (emphasis supplied).

Indeed, we would seek the same relief were, for example, Sliwa merely talking to other media outlets about the case – *viz.,* television and newspapers – rather than effectively interviewing himself from his own on-air platform. If Sliwa were an "ordinary" witness giving interviews instead of conducting them, there is no question that this Court could halt his behavior with a gag order. Why should the Court lose that power just because he also serves as a radio personality? Such a result, based on sheer fortuity, would be anomalous at best. *See Gentile*, 501 U.S. at 1072 (contemplating that "**the speech of those participating before the courts could be limited**") (footnote omitted). That Sliwa also happens to **be** the media neither alters the analysis nor affects the conclusion. In sum, we aim to silence Sliwa **not** because he ostensibly belongs to the press corps, but because he is a **central trial witness** with unfettered media access.

Equally critical, the proposed gag order will **not** prevent the press in general – or Sliwa in particular – from "**publishing** or broadcasting accounts" of **all** open court proceedings in this case. *Russell*, 726 F.2d at 1009; *accord News-Journal Corp.*, 939 F.2d at 1514 (order in no way "restrict[ed] press coverage of court proceedings"). Rather, it would merely block Sliwa from continuing to extrajudicially (a) slur Gotti's character, credibility and reputation, (b) discuss the case's merits or the nature and quality of the evidence, (c) circulate prejudicially inadmissible information and (d) opine on Gotti's putative guilt.

Thus, to quote the Supreme Court, the order sought will not remotely impede "the reporting of any facts on the public record. The trial [will not be] closed, and all the proceedings may be reported and commented upon." *KPNX Broadcasting Co.,* 459 U.S. at 1306. In fact, the media at large – and even Sliwa himself if so inclined – will be "accorded" their full "constitutional attendance and reporting rights," *i.e.*, the right to "attend and to report all information regarding the criminal prosecution occurring in court." *News-Journal Corp.*, 939 F.2d at 1515-16. As such, the press can readily fulfill its function as the public's "'eyes and ears' into the criminal justice system." *Brown*, 218 F.3d at 427 (quoting *Houchins v. KQED*, 438 U.S. 1 (1978)).

Finally, the Supreme Court has long recognized that "'a reporter's constitutional rights are no greater than those of any other member of the public.'" *Nixon v. Warner Comms., Inc.*, 435 U.S. 589 (1978) (quoting *Estes*, 381 U.S. at 589 (Harlan, J. concurring)). Hence, if this Court can curb Sliwa's out-of-court speech as a trial witness – and, as demonstrated above, it certainly can – such speech can also be curtailed in his role as witness *cum* radio host.

For all these reasons, and because the Sixth Amendment fair trial guarantee – "the most fundamental of all freedoms" – trumps the First, the lower standard for gagging trial participants, as opposed to the elevated one for journalists, plainly controls here. *Brown*, 218 F.3d at 424 (citations and internal quotes omitted). This is especially true because "'[t]he barest minimum of free speech rights are involved'" where "the speech's benefit runs **only** to the speaker" – in this case, Sliwa himself. *Carmichael*, 326 F. Supp. 2d at 1294 (quoting *United States v. Lehder-Rivas*, 669 F. Supp. 1563, 1567 (M.D. Fla. 1987)) (emphasis supplied). Applying the correct test to the select Sliwa statements compiled above, a restrictive order is both necessary and appropriate. *Cf. La. Clinic*, 2002 WL 32850, at *2 (applying

elastic witness gag test to case-related Internet remarks published by trial participants); *King*, 192 F.R.D. at 535 n.5, 536 (equating "Internet" with "media" for First Amendment and witness gag order purposes).

## VI.    A GAG ORDER IS JUSTIFIED HERE

If ever a case warranted a witness gag order, then surely this one does.

**First**, as detailed above, the constitutionality of Local Criminal Rule 23.1 – both on its face and as applied to trial participants generally and witnesses like Sliwa in particular – is beyond serious dispute.

**Second**, as the penultimate section demonstrates, Sliwa's radio statements are "presumptively" likely to "interfere" with Gotti's right to a "fair trial" within the Rule's meaning. *See* Local Criminal Rule 23.1(d), (h). More precisely, they blight his "character," "reputation" and "credibility" (LCR 23.1(d)(1), (4)); improperly and inaccurately disclose the "possibility of a [guilty] plea" (LCR 23.1(d)(5)); convey inadmissible "inside" information – apparently acquired from top law enforcement sources – that is substantially likely to buttress Sliwa's credibility and prejudice an impartial jury (LCR LCR 23.1(d)(6)); and opine on Gotti's purported "guilt" and the case's "merits" and "evidence" (LCR 23.1(d)(7)).

Nor were the challenged statements rare or "isolated" occurrences. *Dow Jones,* 842 F.2d at 611. To the contrary, they form a persistent and pervasive pattern, admittedly intended to "poison" an immense listening audience filled with potential jurors. *Cutler*, 58 F.2d at 840; *cf. La. Clinic*, 2002 WL 32850, at *2 ("limited [Internet] readership in the insurance industry"). And by his own brash account, Sliwa will not contain himself unless and until this Court throws him in "jail." *See supra* 8; *King*, 192 F.R.D. at 532 ("the Court is **obligated** to consider not only [] past publicity, but also to assess publicity likely to occur between the date of the motion and the date of jury selection") (emphasis supplied). Hence, this is **not** a case where the Court must resort to speculative forecasts to predict the **future** probability of adverse

publicity. *Cf., e.g., Russell*, 726 F.2d at 1010-11. In contrast, we already know what Sliwa has done

and will continue to do unless this Court intervenes to stop him. A stronger case for a gag order is hard

to imagine.

Under these circumstances, we respectfully submit that no "feasible" alternative remedies, "singly

or collectively," would "effectively mitigate the pretrial publicity and bring about a fair trial." Local Rule

23.1(h). To begin, Gotti is expressly entitled, under the Constitution's Sixth Amendment, to try the case

in this District. And, given WABC's vast broadcast range, a "change of venue" would be unavailing in all

events. *Id.* Moreover, as one court cogently explained, switching venue is

> a drastic and extremely inconvenient, as well as expensive, alternative to
> the problem of pretrial publicity. A defendant should not have to flee his
> home community in order to obtain a fair trial.

*United States v. Davis*, 904 F. Supp. 564, 568 (E.D. La. 1995).

Similarly, an **incarcerated** defendant should not be forced to "postpon[e] the trial" (LCR 23.1(h))

– *i.e.*, waive his speedy trial rights – in order to obtain a fair and impartial jury. *See, e.g., Simmons v.

United States*, 390 U.S. 377, 394 (1968) (finding it "intolerable that one constitutional right should ... be

surrendered in order to assert another"). And in any case, a delay without a gag order would only give

Sliwa more time to incite the jury pool. *Cf. Davis*, 904 F. Supp. at 569 ("unlikely that publicity would

abate with additional postponements").

With respect to "cautionary instructions," LCR 23.1(h), jurors bombarded with incessant character

attacks have been known to disregard even the most "emphatic" (*id.*) variety, as a proverbial "bell" cannot

be "unrung." *See, e.g., United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001)

("presumption" that juries follow instructions "fades" when they are "called upon to perform humanly

impossible feats of mental dexterity") (citing *United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980)).

As for jury "sequestration," LCR 23.1(h), it is manifestly prejudicial to an alleged organized crime defendant and would be vigorously opposed in this case. *Cf., e.g., United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994). It can also create "hardship and inconvenience for jurors, who are not at fault, ... which can negatively impact on their concentration." *Davis*, 904 F. Supp. at 569.

Finally, a "searching *voir dire*," LCR 23.1(h) – like sequestration, a premature consideration at this point[11] – could not guarantee truthful or accurate answers and is distinctly inferior to stemming the publicity at its source: Sliwa's mouth.

---

[11]    *See Pedini*, 940 F. Supp. at 1025 & n.5.

23

## VII.    CONCLUSION

For the reasons stated, we respectfully request a gag order compelling Sliwa's compliance with the "Free Press-Fair Trial Directives" of Local Criminal Rule 23.1. Given the irreparable nature of the harm alleged, the lack of adequate alternative remedies and Gotti's substantial arguments on the merits, we further request an expedited hearing consistent with the Court's calendar or, failing that, a temporary restraining order pending the motion's disposition.

Dated:    New York, New York
November 8, 2004

Respectfully submitted,

**LAW OFFICES OF JEFFREY LICHTMAN**

By: _____

**JEFFREY LICHTMAN, ESQ.** (JL6328)
1790 Broadway
Suite 1501
New York, New York 10019
(212) 581-1001

**LAW OFFICE OF MARC FERNICH**

By: _____

**MARC FERNICH, ESQ.** (MF9819)
570 Lexington Avenue
16th Floor
New York, New York 10022
(212) 446-2346

*Attorneys for Defendant John A. Gotti*

*On the Memorandum:*
Marc Fernich, Esq.
Jeffrey Lichtman, Esq.
Seth Ginsberg, Esq.

24

A



# Gotti seeks to silence New York radio host _ legally

By TOM HAYS
Associated Press Writer

October 20, 2004, 7:51 PM EDT



NEW YORK — Lawyers for John A. "Junior" Gotti want a radio host to stop trashing him on a drive-time morning show.

The host, Curtis Sliwa, once was the target of a failed hit allegedly arranged by the son of late mob boss John Gotti. On Wednesday, defense attorneys told a federal judge that Sliwa's on-air rants against their client could poison a jury in his racketeering case.

Each day, Sliwa "denigrates Mr. Gotti," attorney Jeffrey Lichtman said at a pretrial hearing in Manhattan. "He discusses the facts of the case in a highly inflammatory way."

Lichtman argued there were legal grounds to slap a gag order on Sliwa because he's a witness in the case. U.S. District Judge Shira Scheindlin said she would wait for a formal motion before ruling.

Told about the bid to silence him, Sliwa was defiant.

"That's a new approach," he quipped. "Previously, they tried to kill me."

Sliwa estimated he talks about the Gotti case on air about 30 minutes per five-hour show.

"Now I'm going to double it and have a full hour of Gotti mob talk," he said.

Prosecutors allege Gotti, 40, and two soldiers with the Gambino organized crime family conspired to kill Sliwa as payback for his criticizing the elder Gotti on the radio.

Sliwa, who founded the Guardian Angels crime-fighting group, was ambushed on June 19, 1992, after he hailed a cab on Manhattan's Lower East Side.

Authorities say the soldiers _ one posing as the driver and the other slouched in the front seat when Sliwa got into the taxi _ fired several shots before fleeing. Sliwa survived after undergoing surgery for internal injuries and leg wounds.

Besides the Sliwa attack, Gotti has pleaded not guilty to two other murder conspiracies, securities fraud, extortion and loan sharking. He faces a minimum term of 25 to 30 years in prison if convicted.

Earlier this month, a magistrate rejected a defense request to have Gotti released on $10 million bond. No trial date has been set.

## CERTIFICATE OF SERVICE

**MARC FERNICH** declares as follows:

1.      I am a duly licensed attorney, am over 18 years old and am not a party to this action.

2.      On November 8, 2004, I served one copy of the within memorandum, by Federal

Express, on each of the following:

Michael McGovern, Esq.
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Curtis Sliwa
c/o 77 WABC Radio
77 West 66th Street
New York, New York 10023

Dated:      New York, New York
            November 8, 2004

_____
**MARC FERNICH**