LAW OFFICES OF

# JEFFREY LICHTMAN

1790 BROADWAY

SUITE 1501

NEW YORK, NEW YORK 10019

www.jeffreylichtman.com

TELEPHONE

(212) 581-1001

FAX

(212) 581-4999

July 13, 2005

**BY FEDERAL EXPRESS**
Hon. Shira A. Scheindlin
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:** **United States v. John A. Gotti, et al.,** **S1 04 Cr. 690 (SAS)**

Dear Judge Scheindlin:

John A. Gotti moves *in limine* to admit two categories of evidence vital to his defense:
(1) excerpts from the Ray Brook prison tapes – which the government will offer as purported
evidence that he conducted organized crime business while incarcerated – confirming his
withdrawal from the charged conspiracy; and (2) background information regarding the
government's star witness, Michael DiLeonardo, including evidence of a secret second family
that he concealed for years.  In addition, Mr. Gotti seeks to exclude hearsay statements by non-
testifying declarant Thomas "Huck" Carbonaro, which the government intends to offer through
cooperating witness Blas Salvatore "Fat Sal" Mangiavillano.

## I.       THE RAY BROOK TAPES

### A.       Overview of the Corroborative Withdrawal Evidence

The government secretly recorded Mr. Gotti in the visiting rooms at FCI Ray Brook from
March 14, 2003 to May 14, 2004.  A review of these conversations reveals a man not controlling

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 2

or even involved with an organized crime enterprise, but instead completely estranged from the

hierarchy of the Gambino Family.  Time and again, Mr. Gotti is overheard expressing relief for

having put the world of organized crime behind him and a strong desire to remain far from it.

The following excerpts are offered by way of example.

In a conversation recorded March 14, 2003 – the very first day of the Ray Brook

interceptions – Mr. Gotti explains to attorney Richard Rehbock (RR) why he has any interest at

all in "street" happenings despite his long absence from that world.  Mr. Gotti surely could not

have anticipated that this conversation with his lawyer was being taped.  When Rehbock warns

that federal authorities may misunderstand Mr. Gotti's interest in organized crime matters, Mr.

Gotti explains that his interest is only in knowing who may try to falsely incriminate him:

> JAG:  The streets are somebody else's business.  The only thing that is my
> business is when I think that someone is trying to throw me into a case.  I
> gotta be concerned.  **I don't care about anything else.  It's not my
> problem.**

> RR:  I know, but it's a fine line you gotta walk.

> JAG:  **I'm five and half years removed from the street.  I don't want to hear
> about it anymore.  I don't want to hear about it.**  I told these guys over
> and over again, don't come see me and then a week later be sitting by
> Ozone Park.  Don't come back.  I don't want to see you again.  I don't
> want to see you again.  Don't bring any messages from anybody.  **I don't
> want to know.  I don't care.  I'm not interested.**  Nobody cared about
> me four years ago or five years ago or three years ago, so now I don't care
> about them today.  I'm not interested.  My daughter was born, not even a
> card.  I'm not interested now.  They showed me who they are.  **It's got
> nothing to do with me.  The only thing we got in common is the same
> last name.  Nothing else.  I don't want nothing.  I don't want no
> favors, I don't want no help, don't ask me, just leave me be.**  If I'm
> fortunate to walk out of here when they open the gates, Richard, I'm

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 3

> leaving. I'm taking my sons, my daughters, I'm going away. That's it,
> I'm done. **I don't want to be bothered anymore.**

(Emphasis supplied.)

In that same conversation, Mr. Gotti informs Rehbock that his former position in

organized crime has changed dramatically:

> JAG:  Rich, **the bottom line is, whatever I was, I'm no longer.** Parts of it were
> my choice, parts were my father's choice.

(Emphasis supplied.)

In a September 5, 2003 discussion with John Ruggiero (JR) and Steven Dobies (SD), Mr.

Gotti strongly cautions Ruggiero to stay away from members of organized crime:

> JAG:  Please, don't see anybody. I tried to explain in nice terms to Steve to tell
> you, they are not, I repeat myself, they are not our friends, John. They are
> not, I repeat they are not our friends. **Six years they paid us no mind,
> we're through. Six years I had nothing to do with these people** ...
> They don't care about you. I don't want to see you get put through this,
> you understand me. **That's why I don't want you being involved with
> these people. Stay away from them.** They send for you, ignore them,
> stay away from these people.

(Emphasis supplied.)

Later in that conversation, Mr. Gotti sternly repeats his admonition, airing his deep desire

to leave New York – and his previous life – behind:

> JAG:  John, they send for you, don't go. They send for you, you don't go see
> them. They got nothing to do with you anymore ...

* * *

> JAG:  John, listen to me, **they'd do me a favor if they boat me out of here and
> make me leave New York State and send me to Wala Wala,**

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 4

> **Washington, they'd be doing me a big favor, John.  I never want to go back to these people again.  They're garbage.**

* * *

> JAG:    So much treachery, Steve.  I never thought that, my father couldn't have loved me to push me into this life.  I had a good life.  I had good guys around me; we did our own thing, we minded our own business.  I know, I know my father loved me but I got to question how much to put me with all these wolves ...  This is the world you put your kid in.  **Now you want me to recommend you for this world?  Never, John, never.  If that's what you want, if that's what you, if that's what you want then you have to get up and leave and you can't come back here again, you're not welcome anymore.**  When I come home, when I come home, when I come home, you sell whatever you got, we move someplace else.  We'll go to Montreal.  We'll be millionaires.

(Emphasis supplied.)

When Ruggiero seeks advice on how to move on with his life, Mr. Gotti advises him to

just be "legitimate":

> JR:    How do I, how do I do it?

> JAG:    **I'm telling you to be legitimate.  I'm telling you, listen to me kid.  I'm telling you to be legitimate.  I'm telling you to stay away from these people ...**

(Emphasis supplied.)

During that same conversation, Mr. Gotti tells Ruggiero and Steven Kaplan (SK) how he

was seduced and ultimately trapped by his former life and how he regrets his inability to break

from it sooner:

> JAG:    It's fake, John.  There's nothing real about it anymore, believe me.  Any honor and dignity died with my father.  My, my, my father, my father on the street made you want to be a part of it because he was that kind of a guy.  You, you had to be part of it.  You wanted to feel as close as possible

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 5

>       to him.  The only way was by being that.  You, you wanted to be in it.
>       **When he left, John, the picture changed.**

* * *

JAG:    John, I told my, I told my mother, I told my sister-in-law, I told everybody
        else, too, I told 'em 'listen, if I'm fortunate enough to make it out of jail,
        I'm leaving.  You can come with me, or not.  It's your choice.  I'm
        leaving. **There's nothing here.  Nothing in New York.**' ...  Smart, smart
        would have been running away a long time ago, smart would have been ...
        I got trapped.  I got trapped.  All my father had in this world was me and I
        was the only one who could go see him, and he had me for the lawyers,
        running around for the lawyers and so on and so forth.  I got trapped.  I
        couldn't tell him, 'listen, Dad, I don't want to live in New York.  I want to
        leave, I want to move to Carolina.'  He would have looked at me like
        'what do you mean?'

SK:     Did you ever have those thoughts then?  Back then?

JAG:    Honestly, Steve, there was many times that I did.  I didn't want to be
        there.  I wanted to be someplace else.  I wanted to move to Florida at one
        time.  How would I ever tell him that I want to pack up and leave?  My
        father would have said, 'well you enjoyed the beginning of the game now
        in the middle you want to walk away.'  I got trapped, John.  I couldn't
        disappoint the guy, I had to stay.

* * *

JAG:    John, if I make it out, John, and they let me leave I am going to Montreal,
        believe me, I'm leaving the country.  You want to come, you're welcome
        to join me. **I'm getting out of here.  There's nothing here for me
        anymore.**  Too much garbage, too much treachery here for me. ... It's not
        real, it's all fake.

(Emphasis supplied.)

Finally, during that September 5, 2003 visit at Ray Brook, Mr. Gotti again expresses

extreme distaste for the life he once lived:

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 6

> JAG: **If we are stupid enough to raise our children near this then we deserve to die in jail.** I'm sorry but we do. My suggestion, John, to salvage our families you gotta move away, you gotta move away, John, **you gotta stay away from these people.**
>
>                          \* \* \*
>
> JAG: **If you told me my son is involved in the street, I'd rather hang myself, I couldn't do another day in jail. I'd be sick.** If you told me my son was involved in this life, I couldn't do another day in jail. **If you told me my brother got involved in this life, I would disown him, on my father and brother's grave for life, I swear to you I would never say hello to him again.** Ever ...
>
> SK: You don't have to worry about that.
>
> JAG: **Learn from me. Learn from me.** Let me be the sacrificial lamb, learn from me. Go on with your life. ... **Learn to feed your family and be a responsible human being.**

(Emphasis supplied.)

These are hardly the words of a mafia "capo" conducting organized crime business from a jail cell.

Over a month later, on October 10, 2003, Mr. Gotti imparts the same message to John Ruggiero: stay away from organized crime. In this conversation, Mr. Gotti makes clear that he has already moved on with his life:

> JAG: It's not important to me, John. Here's what's important to me, what's important to me, what's important to me, John, is that you and your family are healthy, and you're not gonna be ...
>
> JR: Yeah but John, [UI]
>
> JAG: John, John, your wife, [UI] your wife, you're gonna lose your wife and kids.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 7

JR:       You're right, you're right.

JAG:      You understand me.  **If you get involved in that life–**

JR:       You're right.

JAG:      **– listen, John, you're responsible, just go home, kiss them good night and forget it – it's over.**

JR:       Just accept it, just accept it. [UI]  When you come home we're gonna settle these problems.

JAG:      **No we're not!**

JR:       If you come home, no problems.

JAG:      John, you listen to me–

JR:       If you come home, no problems.

JAG:      [UI] right now.  Lock your family away, John.  [UI]  Go, go to Boston with your family.  Right now, I got good friends there, they'll do anything in the world for you, John.  Any business you want.  I'll be partners with you.  Please, you don't need these people.  It's all fake.

JR:       [UI]

JAG:      John, I finally realized that when my father was here it was a real thing – it meant something, he really, really in his heart, loved and believed it, do you understand.  I wanted to believe and love like him, but then I, **once he went to jail and I seen how some people work, believe me, it was like a thing that I wanted to get away from, you seen, you seen, I wanted to be anywhere else but there, I wanted to raise my children, I wanted to coach football for my kid, I wanted to get away from them,** you understand me.  Now I'm here, here.  Now he's dead, I really realize that it's not real.  **What he loved and what he believed in doesn't exist.**  It may have existed at one time, but it certainly existed in his mind, and probably in the fellas' minds and some other people's **but it doesn't exist anymore**, John.

JR:       You're right.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 8

> JAG: **It doesn't exist**. John, right now, people just like to use people. That's all it means, and they'll run you into the ground [UI] That's all it is. **It's not real. It's just not real. Don't you understand?** What's real is your wife. What's real are your children. That's what's real. Your brothers, they're real. These are the things you gotta protect, you gotta fight to protect. **Never mind getting caught up in that horseshit.**

(Emphasis supplied.)

Months later, during a May 7, 2004 visit by his younger brother Peter (PG) and Dobies,

Mr. Gotti rues the fact that "[a]nybody I ever touched in my life or loved in my life is getting

harassed [by the federal government]." After reiterating to Peter his interest in leaving behind

New York and his former life, the brothers discuss relocation:

> PG: Want me to bring you any real estate brochures?

> JAG: Send me all the brochures you can, Ocala, ah outside of Orlando, you got a Glenville.

Later in the same conversation, Mr. Gotti talks to his brother and Dobies about subpoenas

the government has served on people close to him:

> JAG: Listen to me, as long as you have nothing to hide and as long as you're telling the truth. If you're doing something wrong, Steve, anybody is, shame on them, they pay the piper, that's all you got to do, be a man, pay the piper. If someone out there's done something wrong, don't throw it back onto me. I didn't do it. Pay the piper. Otherwise, **if you are all being legitimate like I told you to be for 6 ½ years, [UI] you are all going to work, you got nothing to worry about.** When they give you their subpoenas, go there, answer their questions truthfully, answer everything they wanna know, answer them. Whatever records you got, give it to them. Don't hide nothing. Tell Steve, like I said, he was my closest, one of my closest friends, **stay away from all these people**, go to work, if you like being with your kids, you like them, you love them, then enjoy them, because if you make the wrong move, they're gonna do this to you, you're not gonna have 'em anymore, you're gonna to go to jail.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 9

(Emphasis supplied.)

One week later, on May 14, 2004, Mr. Gotti was visited by Lewis Kasman (LK). During

their conversation, Mr. Gotti recounts a recent visit in which he adamantly urged Ruggiero to

stay away from organized crime members:

> JAG:   I said, 'John, do me a favor, John.  John, **just stay away from these
> people**.  Just go to work, raise your **family, be legitimate and don't
> bother with these people**.'

(Emphasis supplied.)

Later in the conversation, Mr. Gotti bemoans his daughter's difficulties in school and her

inability to adjust to her father's absence from her life.  He reiterates his desire to leave New

York as soon as possible:

> JAG:   If I am fortunate enough to make it out, I'm just gonna move my family
> away.
>
> LK     Where would you go?
>
> JAG:   Whatever I could salvage I'd like to get out of that [UI].  **I don't have
> nothing here.**
>
> LK:    Where would you go, south?
>
> JAG:   I'm going, honestly, I'm looking to go to Ocala.
>
> LK:    You would go to Florida?
>
> JAG    Yeah, I'm looking to buy a ranch there.

(Emphasis supplied.)

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 10

Kasman repeatedly warns Mr. Gotti about the life he left behind and the dangers of

resuming it upon release from prison. In unequivocal terms, Mr. Gotti makes it abundantly clear

that he has no interest in ever returning to his former life:

LK:    I'm gonna tell you like I told you the last time, if you come home and you
       get back with this shit you might as well say goodbye.

JAG:   **Are you, you listen to me, you listen to me, you listen to me and I'll
       tell you this one time, I told you, I would rather clean up shit in
       Central Park than be involved with this, these mutts, are you crazy?**

                            * * *

JAG:   No problem. I know how to work, listen to me .... **I won't break bread
       with these people. I will never look at these people, they're nothing to
       me, they mean absolutely zero to me. [UI] I don't have an ounce of
       loyalty to them. ... If they came to me, and they were on fire, I
       wouldn't even piss on them to put them out.**

                            * * *

LK:    Please be [UI]. Don't come home and get caught in the same trap again.

JAG:   Lewis, Lewis, you don't get this, do you? I am looking to go to, I actually
       had someone send me literature on Oregon. I swear to god, Pacific Coast
       property in Oregon.

LK:    Good luck, brother.

JAG:   Well, I'm looking to go anywhere, north, north-central Florida is nice,
       that's where I'm looking to go. I'll buy a bunch of horses, I will buy 20
       acres of land out there, I won't get involved [UI]...

(Emphasis supplied.)

Finally, Mr. Gotti encourages Kasman to simply tell the truth should he receive a grand

jury subpoena:

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 11

> JAG:   Like I said, you get a subpoena, you go to the grand jury, you don't, you don't have to hide anything from anybody, you tell the truth and that's the end of it.
>
> LK:    There is nothing to hide.
>
> JAG:   That's it.  Don't mince your words.
>
> * * *
>
> JAG:   You get a subpoena, you go to the grand jury, you answer every question.  You're legitimate. [IA] You're legitimate ... You get a subpoena, you go to the grand Jury, you answer every question.  You're legitimate ...
>
> LK:    You're 100% right.

(Emphasis supplied.)

In conclusion, the Ray Brook tapes make it unmistakably clear that Mr. Gotti is no longer involved with, or even interested in hearing about, his former organized crime activities.  At every turn, he exudes remorse over his past and signals a powerful desire to leave behind forever New York and what it represents in terms of his previous life.  In addition, Mr. Gotti earnestly counsels all who visit to heed the law and steer clear of organized crime.  In the end, one singular and inescapable impression emerges: Mr. Gotti is estranged from his former coconspirators and his prior life of crime and has no interest whatever in returning to them.

**B.    The Proffered Withdrawal Evidence Should Be Admitted**

The representative Ray Brook excerpts are relevant and admissible under Fed. R. Evid. 401.  The government's secret recordings of an unsuspecting inmate provide probative evidence from which the jury may conclude that Mr. Gotti earlier withdrew from the Gambino Family

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 12

enterprise and the RICO conspiracy charged in the indictment. Thus, the evidence goes directly

to the heart of Mr. Gotti's defense to the government's charges.

Further, the out-of-court statements – parts of which the government itself will offer on

its direct case – satisfy the hearsay rule for myriad reasons.

First, the Ray Brook excerpts are not hearsay at all. This is because they are not offered

for the truth of the matter asserted, see Fed. R. Evid. 801(c), but rather as circumstantial

evidence of Mr. Gotti's state of mind. As the Second Circuit recently reaffirmed, "'the mere

utterance of a statement, without regard to its truth, may indicate circumstantially the state of

mind ... of the declarant' and is *not hearsay* (e.g., 'I am Napoleon.')." Smith v. Duncan, _ F.3d

_, 2005 WL 1513160, at * 4 n.4 (2d Cir. June 21, 2005) (quoting William Payson Richardson &

Jerome Prince, Prince-Richardson on Evidence § 8-106 (Richard T. Farrell ed., 11th ed.1995)).

For example, in United States v. Bellomo, 176 F.3d 580 (2d Cir. 1999), a witness was

asked, "What was your understanding of why [a third party] was being killed?" and answered, "I

was told that he was dealing in drugs." The Court of Appeals held the statement was not hearsay

since "[t]he answer bore on [the witness's] state of mind **not** on the truth of the motive for

murder." Id. at 587 (emphasis supplied). See also United States v. Kohan, 806 F.2d 18, 21-22

(2d Cir.1986) (third party statements to defendant about source of checks not hearsay because

not offered for truth but rather to show defendant believed statements and did not know checks

were stolen).

Here, Mr. Gotti does **not** offer the Ray Brook excerpts to prove their truth. After all, it is

wholly irrelevant, for example, that he did not receive greeting cards following the birth of his

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 13

daughter, 3/14/04 Tr. ("My daughter was born, not even a card"), or that he wanted to coach his

son's sports team.  10/10/03 Tr. ("I wanted to coach football for my kid.").  Similarly, Mr. Gotti

will not try to establish that his former coconspirators are actually "mutts," 5/14 Tr.; that he has

literally <u>nothing</u> in New York, 9/5/03 Tr. ("There's nothing here.  Nothing in New York."); or

that he truly wants the government to relocate him to Washington, 9/5/03 Tr. ("they'd do me a

favor if they boat me out of here and make me leave New York State and send me to Wala Wala,

Washington").

  Instead, Mr. Gotti offers the tapes as circumstantial evidence of his state of mind, *i.e.*, his

feelings of distance and estrangement from the world of organized crime and the people alleged

to be his coconspirators.  That state of mind is central to Mr. Gotti's defense since it is evidence

from which the jury may conclude that he had previously withdrawn from the charged criminal

conspiracy.  Accordingly, the Ray Brook excerpts are admissible as non-hearsay under Fed. R.

Evid. 801(c).  <u>See</u>, <u>e.g.</u>, <u>United States v. Ansaldi</u>, 372 F.3d 118, 130 (2d Cir. 2004) (where

document was admitted "not for the truth of its contents, but to show Defendants' state of mind"

there was "no validity to the claim that the evidence was hearsay"); <u>United States v. Salameh</u>,

152 F.3d 88 (2d Cir. 1998) ("Where ... statement is offered as circumstantial evidence of [a

defendant's] state of mind, it does not fall within the definition [of hearsay] because it was not

offered to prove the truth of the matter asserted.") (quoting <u>United States v. Detrich</u>, 865 F.2d

17, 21 (2d Cir.1988)).

  <u>Second</u>, even if offered for the truth – which they are not – Mr. Gotti's statements on the

Ray Brook tapes are admissible under Fed. R. Evid. 803(3)'s state of mind exception to the

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 14

hearsay rule. See, e.g., United States v. Harris, 733 F.2d 994, 1004 (2d Cir. 1984) (statements

admissible either as nonhearsay under Rule 801(c) because offered as circumstantial evidence of

witness's state of mind or, alternatively, under Rule 803(3) state of mind exception).

      For example, in United States v. DiMaria, a defendant charged with possessing stolen

cigarettes asked federal agents, "I thought you guys were just investigating white collar crime;

what are you doing here? I only came here to get some cigarettes real cheap." 727 F.2d 265,

270 (2d Cir. 1984). Finding the statement improperly excluded, the Court of Appeals held that it

fell within the state of mind exception because it provided evidence from which the jury could

conclude that the defendant's "existing state of mind was to possess bootleg cigarettes, not stolen

cigarettes." Id. Distinguishing Shepard v. United States, 290 U.S. 96, 98 (1933) – which held

the state of mind exception inapplicable to a decedent's declaration, "Dr. Shepard has poisoned

me" – the Second Circuit concluded that DeMaria's comment was "not a statement, like Mrs.

Shepard's, of what he or someone else had done in the past. It was a statement of what he was

thinking in the present." 727 F.2d at 271.

      Here, too, Mr. Gotti's statements on the Ray Brook tapes are statements of "what he was

thinking in the present" – i.e., that he was relieved to be divorced from his former organized

crime compatriots and disinclined to rejoin their activities when released from prison. As such,

they are indicia of his then-existing state of mind. Though not contemporaneous with Mr.

Gotti's initial withdrawal from the conspiracy, the statements are "part of a continuous mental

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 15

process"[1] and therefore "squarely within" the state of mind exception. United States v. DiNome, 954 F.2d 839, 846 (2d Cir. 1992) (statements demonstrated "existing and ongoing suspicions") (emphasis supplied).  Mr. Gotti's post-withdrawal statements evidence his continuing state of being removed from the world of organized crime and separated from his former coconspirators.

Finally, any claim that Mr. Gotti's statements are unreliable as a matter of law – and thus inadmissible under the state of mind exception[2] – is entirely unavailing.  To the contrary, the Second Circuit has expressly instructed that "relevant declarations which fall within the parameters of Rule 803(3) are **categorically admissible, even if they are self-serving and made under circumstances which undermine their trustworthiness.**" United States v. Lawal, 736 F.2d 5, 8 (2d Cir.1984) (emphasis supplied).  See also United States v. Torres, 901 F.2d 205, 239-40 (2d Cir. 1990); DiMaria, 727 F.2d at 271 (rejecting contention that defendant's remark constituted "an absolutely classic false exculpatory statement"; "if it fell within Rule 803(3) ... its truth or falsity was for the jury to determine.")

Third, even if the Ray Brook excerpts did not satisfy Rules 801(c) and 803(3) – which they plainly do – they are still admissible under Rule 807's residual hearsay exception.[3]  For one

---

[1]    United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991).

[2]    Cf. Government's Opposition to Defendant John A. Gotti's Motion for Bail Pending Trial at 5 n.4 ("the Ray Brook interceptions are rife with false exculpatory statements").

[3]    A statement is admissible under the residual hearsay exception if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." United States v. Morgan, 385 F.3d 196, 208 (2d Cir. 2004).  See also United States v. Bryce, 208 F.3d 346, 350-51 (2d Cir. 1999).

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 16

thing, they are among the most probative evidence available to establish Mr. Gotti's withdrawal

defense. For another, they are particularly trustworthy; the government itself will vouch for their

reliability by offering excerpts from the very same tapes. Simply put, the government cannot

have it both ways. If the tapes are reliable enough for its own use, they are reliable enough for

Mr. Gotti's. Cf. Morgan, 385 F.3d at 209 (trustworthiness established where "circumstances

surrounding" portions of a statement "provide no reason to suspect" they are "any less

trustworthy than the part ... that directly incriminates the declarant"); United States v. Matthews,

20 F.3d 538, 546 (2d Cir. 1994) ("We see nothing in the contents of the statements or in the

circumstances in which they were made to cause suspicion that only the portions of [the

witness's] statements that dealt with [particular] actions were trustworthy.")

    With respect to trustworthiness, it is highly significant that "the statements were obtained

via a covert wiretap of which" Mr. Gotti was unaware. Bryce, 208 F.3d at 351. See also

Morgan, 385 F.3d at 209 (letter trustworthy where writer had no reason to expect it would ever

find its way into police hands). Indeed, the government's own belief that substantial portions of

the tapes support its direct case vividly illustrates that Mr. Gotti did not know his conversations

were being intercepted.

    Also significant is the fact that Mr. Gotti was speaking "to a person whom [he] believe[d]

is an ally rather than a law enforcement official." Matthews, 20 F.3d at 546. This is a strong

indication of reliability, as the statements were not made under coercive investigation or

circumstances suggesting a motive to curry favor. Morgan, 385 F.3d at 209 (letter to intimate

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 17

acquaintance held trustworthy); <u>United States v. Savoca</u>, 335 F. Supp. 2d 385, 399 (S.D.N.Y.

2004) (Robinson, J.) (statements particularly reliable because, *inter alia*, made to a confidante).

In sum, the Ray Brook excerpts are (a) particularly trustworthy and (b) among the most

probative evidence available of a material fact – Mr. Gotti's earlier withdrawal from the charged

conspiracy.  Their admission is consistent with the rules of evidence and the interests of justice,

and the government received adequate notice.  Accordingly, the tapes are admissible under the

residual hearsay exception.

<u>Fourth</u>, depending on which portions of the taped conversations the government offers,

the doctrine of completeness may require admission of additional excerpts to rebut the

government's interpretation of those conversations.  <u>See</u> Fed. R. Evid. 106; <u>Phoenix Associates</u>

<u>III v. Stone</u>, 60 F.3d 95, 102 (2d Cir. 1995) (where financial statements properly admitted,

underlying work paper erroneously excluded); <u>United States v. Pierre</u>, 781 F.2d 329, 331-33 (2d

Cir. 1986) (prior consistent statement properly admitted under completeness doctrine where

necessary to rebut adversary's theory).

Concededly, the completeness doctrine itself does not render hearsay admissible.  <u>See,</u>

<u>e.g., United States v. Terry</u>, 702 F.2d 299, 314 (2d Cir. 1983).  Still, it is beyond cavil that the

**Constitution** guarantees a "fair opportunity to defend against the State's accusations."

<u>Chambers v. Mississippi</u>, 410 U.S. 284, 285 (1973).  As such, the **Fifth and Sixth Amendments**

may require admission of "critical, corroborative defense evidence" – **even if otherwise**

**inadmissible** – as a matter of "due process" and the basic "right to present a defense": in short,

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 18

when necessary to ensure a "fair trial." DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir.

2001) (citing Chambers, 410 U.S. 284; Washington v. Texas, 388 U.S. 14 (1967)).

In Chambers, for example, the trial court allowed an eyewitness to testify that he saw

someone named McDonald kill the victim, but precluded the defendant from corroborating that

testimony with evidence that McDonald had confessed. 410 U.S. at 302. The Supreme Court

held that "**where constitutional rights directly affecting the ascertainment of guilt are**

**implicated, the hearsay rule may not be applied mechanistically to defeat the ends of**

**justice.**" Id. (emphasis supplied). See also Washington, 388 U.S. at 19 (right to offer

corroborative evidence "is in plain terms the right to present a defense, the right to present the

defendant's version of the facts as well as the prosecution's to the jury so it may decide where

the truth lies"); DePetris, 239 F.3d at 1062-63 (excluding evidence going to "the heart of the

defense" was an error of constitutional dimension).

Here, the government will offer select portions of the Ray Brook tapes to argue that Mr.

Gotti continued to conduct organized crime business from prison.[4] The excerpts we seek to

introduce are "critical" to rebut that interpretation by "corroborat[ing]" Mr. Gotti's earlier

withdrawal from the world of organized crime. DePetris, 239 F.3d at 1062. Hence, even if

technically inadmissible under the rules of evidence – and they are not – the proffered excerpts

---

[4]      See Government's Opposition to Defendant John A. Gotti's Motion for Bail Pending
Trial at 26 n.32 (asserting that the Ray Brook intercepts show at least one alleged Gambino associate
agreeing to carry messages from Mr. Gotti to other members of the Gambino Family, including
"Boss Peter Gotti.")

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 19

go to the "heart" of Mr. Gotti's defense and are key to his receiving a fair trial. Id. at 1062-63.

This being so, they are independently admissible as a matter of Fifth Amendment due process as

construed in Washington, Chambers and their progeny – regardless of any hypothetical

evidentiary bar.

## II.    MICHAEL DiLEONARDO'S TWISTED FAMILY HISTORY

### A.    A Chronic Liar With Motive to Fabricate

Michael DiLeonardo, the government's linchpin witness, led for many years a secret

double life riddled with lies and deception.  Married to Toni Marie Fappiano – with whom he

had a son, Michael Jr. – DiLeonardo nonetheless began an illicit affair with one Madelina

Fischetti.  Fischetti became pregnant and gave birth to an illegitimate son, Anthony.  During the

same period, Toni DiLeonardo had trouble conceiving and suffered several failed attempts at in

vitro fertilization.

Toni suspected an affair but DiLeonardo consistently denied it, even as he continued his

adulterous relationship with Fischetti.  DiLeonardo purchased a home in Fischetti's name and

brazenly moved her and Anthony into the same town where he lived with his first family (Toni

and Michael Jr.).  DiLeonardo lived this double life for quite some time, telling any lies

necessary to fool his wife and son.  He flaunted his deception in the face of Toni's brother, Frank

Fappiano, a member of DiLeonardo's crew who was expected to turn a blind eye to his sister's

public humiliation.

Around Christmas 2000, Toni and Michael Jr. learned the truth when an anonymous card

arrived at the family home congratulating DiLeonardo on the birth of his son.  Both were

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 20

shocked and angry; Michael Jr. (then 14 years old) punched a wall and broke his hand. Toni and

Michael Jr. severed ties with DiLeonardo and he moved into Fischetti's house.

DiLeonardo long suspected that another defendant in this case sent the card to his house;

his hatred for this defendant was palpable immediately before DiLeonardo officially began

cooperating with the government.[5]

DiLeonardo was arrested in 2002. At the time, his relationship with Michael Jr. was

virtually non-existent. Available evidence demonstrates that DiLeonardo despaired in prison

over losing his son and came to hate Toni and her brother, Fappiano, who was under indictment

but did not become a cooperating witness until the fall of 2004. Specifically, the evidence shows

that DiLeonardo detested Fappiano and Toni because (a) he believed they turned Michael Jr.

against him and (b) Toni began to date a friend of Fappiano's. The rage directed at Fappiano,

whom DiLeonardo accused of "pimping" his sister, is especially perplexing considering that he

had destroyed Toni's life and was already divorced from her at the time.

DiLeonardo became severely depressed and, while released on government-engineered

"bail" – a ruse to let him tape unsuspecting coconspirators – tried to kill himself, largely because

his son continued to shun him.

In February 2003, Michael Jr. (then 16) wished to and did visit Mr. Gotti in prison. He

remained furious at his father for his massive deceit and for giving him a half-brother he did not

want. Michael Jr. had always had a good relationship with his "uncle" John, and went to see him

---

[5]    This assertion, and all others herein, can be proved by a variety of sources, all which
we are prepared to submit to this Court *in camera*.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 21

for guidance during a particularly trying period.  DiLeonardo has since claimed he decided to

cooperate with the government because Mr. Gotti (1) invited Michael Jr. to visit without seeking

DiLeonardo's permission, and (2) ostensibly manipulated both him and his son by passing

messages through Michael Jr.  The government has trumpeted this "insidious" allegation as the

"most unsettling of [defendant] Gotti's witness tampering efforts ...."  Government's Opposition

to Defendant John A. Gotti's Motion for Bail Pending Trial at 30.

     **B.**     **Evidence of DiLeonardo's Secret Second Family is Relevant and Admissible
on Multiple Grounds**

     Proof of DiLeonardo's family situation is relevant and admissible at trial for a host of

reasons.

     First, the second family evidence rebuts the government's claim that Mr. Gotti obstructed

justice during his February 2003 visit with Michael Jr.  As noted, the government has repeatedly

touted this meeting as an "insidious" act of witness tampering, and the story of DiLeonardo's

second family and its impact on Michael Jr. – which drove him to visit Mr. Gotti – is crucial to

refute that depiction.  See United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001) ("It is a

bedrock principle that rebuttal evidence may be introduced to explain, repel, contradict or

disprove an adversary's proof.") (internal quotations omitted); United States v. Whitman, 771

F.2d 1348, 1351 (9th Cir. 1985) (once government advances given theory, defendant has

unequivocal "right to rebut it").

     To repeat, Michael Jr. went to visit Mr. Gotti in prison after learning that his father had

long concealed from him a second family – a revelation that caused the boy to punch a wall in

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 22

anger, break his hand and refuse to speak to DiLeonardo. The purpose of their meeting was so

Mr. Gotti – who had always been close to Michael Jr. – could counsel the distraught teen during

a crisis. Without the second family evidence, it will be impossible to explain Michael Jr.'s

estrangement from his father or his need for advice from an old family friend in order to counter

the government's claim of obstruction. See, e.g., United States v. Santos, 201 F.3d 953, 961-62

(7th Cir. 2000) (error to exclude evidence of medical condition since this "prevented [defendant]

from countering ... effectively" the government's argument about the "tone" of her voice on a

critical tape); United States v. Word, 129 F.3d 1209, 1213 (10th Cir. 1997) (vacating conviction

where exclusion of testimony regarding relationship between codefendants left one defendant

"no means to defend against the government's contentions; and the jury did not hear the whole

story about the relationship").

 Second, evidence of DiLeonardo's second family will impeach his testimony that he

decided to cooperate with the government because Mr. Gotti allegedly attempted to manipulate

him through his son. See Government's Opposition to Defendant John A. Gotti's Motion for

Bail Pending Trial at 30; Testimony in United States v. Peter Gotti, 02 CR 743 (RCC) at T.

2426. When a witness "falsely states a specific fact," the adversary "will not be prevented from

proving, either through cross examination or by calling its own witnesses, that he lied as to that

fact." United States v. Garcia, 900 F.2d 571 (2d Cir. 1990) (emphasis in original). See also Fed.

R. Evid. 613 (permitting extrinsic evidence of prior inconsistent statements as long as the

witness has an opportunity to explain or deny them).

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 23

Here, the second family evidence will show that DiLeonardo is lying when he ascribes

his decision to cooperate to anything Mr. Gotti said or did.  Instead, DiLeonardo cooperated due

to the despair he felt over his self-inflicted family situation, including his loss of Michael Jr. and

the fact that the boy wanted nothing to do with Fischetti and Anthony.  He was desperate to get

out of prison and return to Fischetti.[6]  Moreover, DiLeonardo's professed concern about Mr.

Gotti's purported manipulation of his son is belied by DiLeonardo's own years of deceiving and

manipulating Michael Jr. by concealing his second family.  After all, if DiLeonardo was so

preoccupied with his son's welfare, he scarcely would have started that secret family.  See, e.g.,

United States v. Gambino, 951 F.2d 498, 503-04 (2d Cir. 1991) (where witness "attempted to

explain his participation in [a] narcotics sale by testifying that he believed that only phony drugs

were being sold," it was proper to "inquire[ ] about his actual connections with narcotics

traffickers for the purpose of demonstrating that [his] story was a fabrication"); United States v.

Garcia, 936 F.2d 648 (2d Cir. 1991) (once a witness "testified that he had no idea that the white

powder was cocaine, he opened the door" for impeachment "by establishing on cross-

examination that he was familiar with and indeed had used cocaine as recently as the day before

his arrest."); United States v. Bufalino, 683 F.2d 639, 647 (2d Cir.1982) (where witness testified

that his acquaintance with a mob figure was based on "chance meetings," it was proper to

introduce evidence showing his longstanding relationship with organized crime).

---

[6]    Again, Mr. Gotti is prepared to proffer *in camera* the evidence demonstrating
DiLeonardo's deep despair over losing his son and girlfriend, as well as his desperation to get out
of prison.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 24

Third, Fed. R. Evid. 608(b) permits the defense to cross examine DiLeonardo about

concealing his second family since it bears directly on his character for untruthfulness. See

Hynes v. Coughlin, 79 F.3d 285, 293-94 (2d Cir. 1996) (citing, inter alia, 28 Charles A. Wright

& Victor J. Gold, Federal Practice and Procedure: Evidence § 6117 (1993)); United States v.

Jones, 900 F.2d 512, 521 (2d Cir. 1990).

There is a strong presumption in favor of "free cross-examination" of "a government

'star' witness," including his "general character for truthfulness," and courts should not limit this

"important" defense function. United States v. Novaton, 271 F.3d 968, 1006 (11th Cir. 2001).

"Wide latitude should be allowed ... when a government witness in a criminal case is being

cross-examined by the defendant, and the trial judge's discretion cannot be expanded to justify a

curtailment which keeps from the jury relevant and important facts bearing on the

trustworthiness of crucial testimony." United States v. Nelson, 365 F. Supp. 2d 381, 386

(S.D.N.Y. 2005) (Marerro, J.) (quoting United States v. Pedroza, 750 F.2d 187, 195-196 (2d

Cir.1984)). See also United States v. Whitmore, 359 F.3d 609 (D.C.Cir. 2004) (district court

abused its discretion by precluding cross examination of witness as to character for truthfulness

under Fed. R. Evid. 608(b) and 403). In that regard, "[e]vidence of prior frauds perpetrated by

the witness is generally considered probative of the witness's truthfulness." United States v.

Munoz, 233 F.3d 1117, 1135 (9th Cir. 2000). See also United States v. Irizarry, 341 F.3d 273,

311-12 (3d Cir. 2003) (evidence that "tended to show deceit" was "admissible to establish"

witness' "lack of truthfulness.")

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 25

In this case, the story of DiLeonardo's second family reveals a deceit of major
proportions. For an extended period of time, he told Toni and Michael Jr. any lies necessary to
hide the existence of a girlfriend and illegitimate son, even while moving them into the very
same town. The deceit included, among other things, having consecutive dinners at the same
restaurant on the same night with each of his two families. This conduct illustrates an inclination
toward, and a capacity for, deceit that is properly explored on cross. See, e.g., United States v.
Sanders, 343 F.3d 511, 518 (5th Cir. 2003) (reneging on agreement with real estate agent was
probative of truthfulness and properly the subject of cross examination under Fed. R. Evid.
608(b)); United States v. Montani, 204 F.3d 761, 768 (7th Cir. 2000) (witness's "extensive
efforts to hide" his and his wife's involvement in a commercial venture are "probative of his
character for truthfulness.")

Fourth, the second family evidence will reveal a number of true bases for DiLeonardo's
decision to cooperate: his hatred for both Fappiano, who was not yet cooperating, and a
codefendant in this case. As indicated, DiLeonardo vehemently despised Fappiano, Toni's
brother, since he blamed them both for keeping Michael Jr. from him and for Toni's relationship
with a friend of Fappiano's. In addition, DiLeonardo's animus toward a codefendant – due to his
belief that the codefendant sent the anonymous card that alerted Toni to his second family –
clearly shows his bias and motive against the codefendant.

The hostility toward Fappiano and the codefendant manifested itself just before
DiLeonardo incriminated the pair in government debriefings. Thus, the evidence demonstrates a
motive to fabricate and is properly admissible on that ground as well. United States v. Abel, 469

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 26

U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact

and weigher of credibility, has historically been entitled to assess all evidence which might bear

on the accuracy and truth of a witness' testimony."); <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974)

("the exposure of a witness' motivation in testifying is a proper and important function of the

constitutionally protected right of cross-examination"); <u>United States v. Cruz</u>, 894 F.2d 41, 43

(2d Cir. 1990) ("A trial judge abuses his discretion in curtailing cross-examination of a

government witness when the curtailment denies the jury sufficient information to make a

discriminating appraisal of the particular witness's possible motives for testifying falsely in favor

of the government.").

    <u>Fifth</u>, investigation has revealed that DiLeonardo assaulted numerous individuals who

inadvertently mentioned anything relating to Fischetti or Anthony in front of Toni (obviously

before she learned the truth). Without the second family evidence, the defense cannot elicit

these incidents.

    <u>Sixth</u>, the second family evidence – including DiLeonardo's suicide attempt while on bail

and his irrational hatred for Fappiano and Toni because she had the nerve to date someone else

<u>after</u> their divorce – will demonstrate his unbalanced mental state. In turn, his mental state

plainly bears on his ability to perceive and recall relevant events, which the jury is entitled to

consider. <u>See, e.g.</u>, <u>United States v. Sasso</u>, 59 F.3d 341, 347 (2d Cir. 1995) ("Evidence of a

witness's psychological history may be admissible when it goes to her credibility."); <u>United

States v. Paredes</u>, No. 99 Cr. 290 (PKL), 2001 WL 1478810, at *1 (S.D.N.Y. Nov 20, 2001) ("A

psychological condition which exists at the time the witness perceived the events he will testify

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 27

about at trial is more likely to be found probative, because such a condition might affect the

witness's ability to perceive or to recall events or to testify accurately.").

Seventh, and finally, the probative value of the second family evidence far outweighs any

potential prejudice, as it is no more inflammatory than other conduct – including multiple

murders – that DiLeonardo will admit on direct.  Cf. United States v. Baez, 349 F.3d 90, 94 (2d

Cir. 2003) (uncharged conduct "less inflammatory than the murder charged in the indictment");

United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (uncharged background evidence "did

not involve conduct more serious than the charged crime") (emphasis supplied); United States v.

Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (uncharged conduct no "more inflammatory than the

charged crime").

## III.    THE CARBONARO HEARSAY

Lastly, Mr. Gotti moves to exclude hearsay statements by non-testifying declarant

Thomas "Huck" Carbonaro, which the government seeks to offer through cooperating witness

Blas Salvatore "Fat Sal" Mangiavillano.  In an Oct. 8, 2002 debriefing, Mangiavillano claimed

"he was once told by THOMAS CARBONARO, a/k/a 'Huck,' that [codefendants] JOE

D'ANGELO and MIKE YANNOTTI were responsible for the attempted murder of radio talk-

show host CURTIS SLIWA."  According to Mangiavillano, Carbonaro further told him that John

Gotti Sr. (the defendant's father) sanctioned the attempt on Sliwa's life "because he had been

'bad mouthing' John Gotti, Sr."  Mangiavillano neither mentioned Mr. Gotti nor provided any

basis for Carbonaro's purported knowledge.

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 28

The government plainly seeks to offer Carbonaro's out-of-court statements for their truth.

However, no hearsay exception justifies their admission.  While Fed. R. Evid. 801(d)(2)(E)

exempts from the hearsay rule "a statement by a coconspirator of a party during the course and in

furtherance of the conspiracy," Carbonaro's declarations are neither coconspirator statements nor

made in furtherance of any conspiracy with Mr. Gotti.[7]  Consequently, Mangiavillano's second-

hand account of those declarations should be excluded at trial.

To begin, the government has never claimed that either Carbonaro or Mangiavillano was

in any way involved in the alleged attempt to murder Sliwa – or in any other criminal conspiracy

with Mr. Gotti or each other.  In fact, Mangiavillano was not even a member of the Gambino

Family; he associated with other organized crime families and – as he testified at Peter Gotti's

trial – eschewed membership in or alignment with any particular one.  See Gigante, 166 F.3d at

82 ("to admit coconspirator testimony ... [t]he district court in each instance must find the

existence of a specific criminal conspiracy beyond the general existence of the Mafia").

Moreover, even if there were a conspiracy among these men, Carbonaro's statement to

Mangiavillano was made neither during nor in furtherance of it.  The Second Circuit has long

emphasized that "idle chatter among conspirators does not satisfy the 'in furtherance'

requirement of Rule 801(d)(2)(E)." Id.  "To be in furtherance of the conspiracy, a statement

---

[7]        "To admit a statement under the coconspirator exception to the hearsay definition,
a district court must find two factors by a preponderance of the evidence: first, that a conspiracy
existed that included the defendant and the declarant; and second, that the statement was made
during the course of and in furtherance of that conspiracy." United States v. Gigante, 166 F.3d 75,
82 (2d Cir. 1999).

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 29

must be more than a merely narrative description by one co-conspirator of the acts of another."

United States v. Desena, 260 F.3d 150, 157 (2d Cir. 2001) (citations and internal quotes

omitted).

      Carbonaro's purported statement to Mangiavillano was quintessential "idle chatter" – a

"narrative description" of third party acts based on mere gossip of unknown reliability.  Their

putative exchange – occurring years after the alleged murder attempt, between men who even the

government does not contend conspired with each other – was not possibly designed "to prompt

the listener ... to respond in a way that promotes or facilitates the carrying out of a criminal

activity."  Gigante, 166 F.3d at 82 (citing United States v. Maldonado-Rivera, 922 F.2d 934,

958-59 (2d Cir. 1990)).  Nor was it intended to "provide reassurance," "induce a coconspirator's

assistance," "foster trust and cohesiveness, or inform each other as to the progress or status of the

conspiracy."  Id.

      In short, Carbonaro's statements as conveyed by Mangiavillano are not statements of a

coconspirator made "in furtherance of" any conspiracy.  Accordingly, they do not satisfy Rule

801(d)(2)(E) and should be excluded.  Contrast United States v. Russo, 302 F.3d 37, 41 (2d Cir.

2002) (distinguishing Gigante and admitting coconspirator statements where "the defendant and

the declarant were involved together in a conspiracy to maintain an organized crime syndicate,

and the declarant's statement furthered the maintenance of the syndicate by giving associated

persons information about its membership"); United States v. Schlesinger, No. 02-485 (ADS), __

F. Supp. 2d __, 2005 WL 1362588 (E.D.N.Y. June 8, 2005) (admitting "job well done" remark

JEFFREY LICHTMAN

Hon. Shira A. Scheindlin
July 13, 2005
Page 30

where defendant and son were involved in an arson/insurance fraud conspiracy and statement,

made a week after fire, "inform[ed the defendant] as to [conspiracy's] progress or status").

## CONCLUSION

For all these reasons, this Court should admit the Ray Brook and second family evidence

while excluding the Mangiavillano hearsay.

Respectfully submitted,

Jeffrey Lichtman

cc:    Michael G. McGovern, Esq. (by telefax and Federal Express)
       Assistant United States Attorney

       All defense counsel

       Clerk of the Court (SAS)