USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/7/06

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
                            :

**UNITED STATES OF AMERICA**     :

                            :        **OPINION AND**
       - against -       :        **ORDER**

                            :

**JOHN A. GOTTI,**                :        **S3 04 Cr. 690 (SAS)**

                            :

          **Defendant.**       :

                            :
--------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

When the Government indicted John A. Gotti in 2004, Gotti moved to dismiss the new charges, asserting that they were barred by the terms of his April 5, 1999 plea agreement with the Government.[1] I denied the motion, finding that the plea meant what it said and said what it meant.[2] The plea agreement permitted the Government to bring new charges that encompassed events occurring prior to

---

[1] *See* 7/24/04 Indictment, 04 Cr. 690 ("2004 Indictment").

[2] *See United States v. Gotti*, 399 F. Supp. 2d 252, 254 (S.D.N.Y. 2005) (holding that 1999 plea agreement did not bar subsequent prosecution because that agreement stated "[n]othing in this agreement . . . precludes indictment if any additional evidence or information whatsoever comes to the Offices' attention, including but not limited to as a result of any pending investigation."). *Cf.* Theodore Seuss Giesel, Horton Hatches the Egg (1940) ("I meant what I said, and I said what I meant.").

1

the date of that agreement, so long as such charges were based on "additional evidence or information" that had come to the Government's attention.[3]

After two failed attempts to convict Gotti on these new charges,[4] the Government superseded the indictment on May 22, 2006, adding several new charges, including witness tampering, money laundering, and two new racketeering charges alleging that Gotti used the income derived from racketeering to operate two holding companies.[5] Not surprisingly, the Government alleges that all of these newly added crimes occurred or continued after July 1999, which would establish that Gotti's participation as a member of the alleged enterprise, the Gambino Organized Crime Family ("Gambino Family"), falls within the statute of limitations.[6] Gotti now moves to dismiss the new money laundering and racketeering charges on the grounds that they are barred by the 1999 plea

---

[3]    *Gotti*, 399 F. Supp. 2d at 254.

[4]    Both attempts resulted in deadlocked juries, although the first jury acquitted Gotti of several counts of the 2004 Indictment.

[5]    *See* 5/22/06 Indictment, S3 04 Cr. 690 ("2006 Indictment"), Counts 3, 4, 6, and 7.

[6]    The 2004 Indictment was brought on July 21, 2004, requiring the Government to prove that Gotti committed the charged crimes sometime after July 21, 1999. The Government has the burden of proving conduct within the statute of limitations beyond a reasonable doubt. *See United States v. Florez*, 447 F.3d 145, 150 n.2 (2d Cir. 2006).

2

agreement as well as time-barred.

Once again the Court must carefully examine the 1998 Indictment and the 1999 plea agreement.[7] In interpreting indictments and plea agreements, both of which are invariably drafted by the Government, fundamental fairness requires that the Government be held to the highest standards of "both promise and performance."[8] The critical documents – the 1998 Indictment, the 1999 plea agreement, and the 2006 Indictment – speak for themselves.[9] But if there is any ambiguity, the terms of a plea agreement, like the terms of a contract, must be construed against the drafter.[10] In interpreting plea agreements drafted by federal prosecutors, "the courts' concerns run even wider than protection of the defendant's individual constitutional rights – to concerns for the honor of the government, public confidence in the fair administration of justice, and the

---

[7]     *See* 12/8/98 Indictment, S8 98 Cr. 42 ("1998 Indictment"); 4/5/99 Plea Agreement in United States v. Gotti, No. 98 Cr. 42 (BDP) ("1999 Agr.") at 1-2, Ex A. to 7/13/06 Letter from Charles Carnesi, Counsel to Gotti, to the Court ("7/13/06 Carnesi Letter").

[8]     *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (citation and quotation marks omitted).

[9]     *See* 4/5/99 Transcript of Guilty Plea before the Hon. Barrington D. Parker, Jr., United States District Judge ("4/5/99 Tr.") at 26 (Mark Pomerantz, Chief, Criminal Division, United States Attorney's Office for the Southern District of New York, stating that the 1999 plea agreement "speaks for itself").

[10]     *See United States v. Cunningham*, 292 F.3d 115, 117 (2d Cir. 2002).

3

effective administration of justice in a federal scheme of government."[11]

The Government has two theories to support these charges. The first theory, boiled down to its essence, is that Gotti continues to receive income from properties purchased in the 1990s with funds he obtained through his criminal activities. The problem with this theory is that the Government already brought these charges (albeit not *in haec verba*) and dismissed them after Gotti satisfied the terms of his plea agreement.

The plea agreement cannot be both a sword and a shield. When the Government sought to proceed on the 2004 charges, I reviewed the 1999 plea agreement and the plea itself and found that the new charges were not barred. As the Government told the judge in 1999, in response to Gotti's statement that he was seeking closure from the plea agreement, "these are the two sentences that have been agreed upon, and they say what they say."[12] The same is true now. As a well-known maxim commands, "what is sauce for the goose is sauce for the gander."

---

[11]     *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (citation omitted).

[12]     4/5/99 Tr. at 26 (AUSA Pomerantz). Pomerantz also stated "[t]he language of the plea agreement states the agreement of the parties. . . . as everyone here well knows, it is the language of the plea agreement that governs." *Id.*

The second theory is that within the limitations period, Gotti used monies obtained from his racketeering activities – specifically loansharking and construction industry extortion – to operate two corporations he formed in the early 1990s. The problem with this second theory is that it is based on nothing but surmise, speculation, and conjecture.

This case is sui generis both because of the prior plea agreement and because there have already been two trials at which the Government presented its evidence.[13] As a result of this combination of unique circumstances, the charges against Gotti for racketeering activities in violation of section 1962(a) of Title 18 of the United States Code (Counts Three and Four), and money laundering in violation of section 1956(a)(1)(B)(i) of Title 18 of the United States Code (Count Seven) must be dismissed.[14]

## II.  BACKGROUND

---

[13]  *See* 5/25/06 Transcript of Arraignment of John A. Gotti on 2006 Indictment ("5/25/06 Tr.") at 6 (Assistant United States Attorney ("AUSA") Victor Hou stating that with respect to the new charges, "the evidence has come out in the other proceedings. It was disclosed as enterprise evidence at a minimum throughout the trial. . . I think it's fair to say that the rest of the evidence, is – the bulk of it came in through prior proceedings and certainly prior trials."); 7/10/06 Government Letter at 12 ("newly charged money laundering and racketeering violations . . . concern substantially the same evidence and criminal conduct described in the first indictment.").

[14]  *See generally In re Altro,* 180 F.3d 372.

5

Unless otherwise noted, the following facts are drawn from the Government's submissions.[15] The Government alleges that for at least two decades, Gotti occupied a leadership position in the Gambino Family, and that as a result of his rank, Gotti received portions of all proceeds that were generated by the Gambino Family's racketeering activities. Gotti devised a scheme to conceal the illicit origins of these funds through holding companies and real estate investments. In the late 1980s and early 1990s, Gotti used the proceeds of racketeering activities, specifically, construction industry extortion,[16] to purchase real estate in his own name, including: a property on Liberty Avenue in Queens ("Liberty Avenue Property") on August 28, 1987,[17] three parcels of land in Milford Township, Pennsylvania ("Milford Township Property") on May 24, 1988,[18] a property in Massapequa, New York ("Massapequa Property") on May 1,

---

[15]     *See* 7/10/06 Letter from AUSAs Victor Hou and Miriam Rocah, to the Court ("7/10/06 Government Letter"); 8/1/06 Letter from AUSAs Hou and Rocah to the Court ("8/1/06 Government Letter").

[16]     *See* 7/26/06 Hearing Transcript ("7/26/06 Tr.") at 5 (AUSA Hou stating that the properties "were purchased using the proceeds of racketeering activity. More specifically, the bulk of those proceeds came from construction industry extortion and other racketeering activities as well").

[17]     *See* 2006 Indictment ¶ 28(e); 1998 Indictment ¶ 155.

[18]     *See* 2006 Indictment ¶ 28(d); 1998 Indictment ¶ 141.

1990,[19] and a property on 101st Avenue in Jamaica, New York ("101st Avenue

Property") on August 10, 1993.[20] On December 5, 1995, Gotti used the proceeds

of the sale of the Massapequa Property to purchase a property on 1018 Westshore

Drive, Oyster Bay, New York, in his own name ("Mill Neck Residence").[21]

Gotti created two holding companies, JAG Brokerage ("JAG"),[22]

established on or about August 21, 1991, and 216-02 Hempstead Avenue

Corporation ("Hempstead"),[23] established on or about October 26, 1993.[24] Gotti,

using his own name, was the sole shareholder of both corporations from their

formation through 2005.[25] On or about July 22, 1994, Gotti used JAG to purchase

---

[19]    *See* 1998 Indictment ¶ 154; 7/26/06 Tr. at 6.

[20]    *See* 2006 Indictment ¶ 28(f); 1998 Indictment ¶ 156.

[21]    *See* 1998 Indictment ¶ 138; 7/26/06 Tr. at 5-7; 7/26/06 Tr. at 12
(AUSA Hou clarifying that the property at 1019 Westshore Drive was a residence
in Mill Neck, Long Island); 7/28/06 Letter from Carnesi to the Court at 1.

[22]    The indictment refers to "JAG Brokerage Corporation or JAG
Brokerage, Inc., including its subsidiaries and affiliates." 2006 Indictment ¶ 21.

[23]    The indictment refers to "216-02 Hempstead Avenue Corporation,
including its subsidiaries and affiliates." 2006 Indictment ¶ 23.

[24]    JAG is identified as Hempstead's parent corporation in 2002
corporate tax returns.

[25]    In October 2005, Gotti transferred a 49% interest in Hempstead to his
wife and children.

7

commercial real estate located at 216-02 Hempstead Avenue, Jamaica, New York ("Hempstead Avenue Property") with the proceeds of racketeering, and on or about June 13, 1995, Hempstead purchased that property from JAG.[26] The Hempstead Avenue Property has generated rental income for Gotti or his holding companies since the time of its purchase in 1994.

On December 8, 1998, a grand jury in the Southern District of New York returned the 1998 Indictment charging Gotti with several crimes, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), for his role in the Gambino Family. The 1998 Indictment named certain properties as the proceeds of racketeering activities subject to forfeiture under sections 1963(a)(1) and (a)(3) of Title 18 of the United States Code.[27] The forfeiture allegations included the Milford Township Property and all of the assets of Hempstead, including, but not limited to, a bank account in Hempstead's name, the Hempstead Avenue Property, and rental income from that property.[28] The

---

[26]     *See* 1998 Indictment ¶ 139(a).

[27]     *See id.* ¶ 139.

[28]     *See id.* ¶ 139(a)-(c). Sections 1963(a)(1) and (a)(3) provide that whoever violates section 1962 shall forfeit to the United States "any interest the person has acquired or maintained in violation of section 1962" and "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of

8

1998 Indictment also named "substitute assets," including the Massapequa

Property, the Liberty Avenue Property, and the 101st Avenue Property, as subject

to forfeiture in the event that the assets listed in the forfeiture allegations became

unavailable due to Gotti's acts or omissions.[29] On June 5, 1998, those properties

subject to forfeiture were restrained pursuant to a court order.[30]

On April 5, 1999, Gotti and the Offices of the United States Attorneys

for the Eastern and Southern Districts of New York entered into an agreement

pursuant to which Gotti pled guilty to charges of racketeering activity including

bribery, conspiracy to commit extortion, mail fraud, and supervision of gambling

operations, as well as charges of conspiracy to make extortionate extensions of

credit (i.e., loansharking) and filing a false tax return.[31] Gotti admitted the

allegation in the 1998 Indictment that he had acquired "property constituting, and

derived from proceeds which [he] obtained, directly and indirectly, from

---

section 1962."

[29]     *See* 1998 Indictment ¶¶ 153-157.

[30]     A prior restraining order entered January 20, 1998 also restrained the
properties listed as substitute assets. In an Opinion and Order dated March 12,
1998, the district court vacated that order in part on the ground that 18 U.S.C. §
1963(d)(1)(A) does not authorize pre-trial, post-indictment restraint of substitute
assets. *See United States v. Gotti*, 996 F. Supp. 321 (S.D.N.Y.), *aff'd,* 155 F.3d
144 (2d Cir. 1998).

[31]     *See* 1999 Agr. at 1-2.

racketeering activity in violation of Title 18, United States Code, Section 1962, thereby making such interests and property forfeitable to the United States of America."[32]  Gotti agreed to forfeit two properties named in the 1998 Indictment.[33] Gotti did not agree to forfeit the other properties listed by that Indictment, but rather, paid a "liquidated RICO forfeiture judgment in the amount of $1,000,000."[34]  The agreement provided that the United States would have the right to forfeit the Milford Township Property and Hempstead's assets in the event that Gotti failed to pay the judgment.[35]  The plea agreement also provided that the restraining order would remain in effect until payment of the liquidated amount in full.[36]

Subsequent to his plea, Gotti was sentenced to seventy-seven months in custody. On September 9, 1999, while incarcerated, Gotti sold the Mill Neck

---

[32]   1998 Indictment ¶ 135.

[33]   Those properties were 89.2 acres of land located in Milford Township (distinct from the three parcels defined as the Milford Township Property) alleged to be purchased from the proceeds of racketeering activity, *see* 1998 Indictment ¶ 140, and a property in Rockland Township, New York, listed as a substitute asset in the 1998 Indictment, *see id.* ¶ 157. *See also* 4/5/98 Tr. at 32-33 (recitation of property the parties agreed Gotti would forfeit by AUSA Carol Sipperly).

[34]   1999 Agr. at 7.

[35]   *See id.* at 8.

[36]   *See id.*

10

Residence and used the proceeds to make the payment to the Government required by his plea agreement, to pay off an existing mortgage, and to purchase a family residence in Oyster Bay, New York (the "Oyster Bay Residence") in his and his wife's names.[37] Pursuant to the plea, the Government dismissed all remaining counts in the 1998 Indictment,[38] and the restraining order was lifted.[39]

Commercially available databases containing information from the New York Secretary of State indicate that Hempstead was "dissolved by proclamation" on or about December 29, 1999, although Hempstead continued to maintain a bank account and receive rental payments at that time.[40] JAG remains listed as "active."[41] Gotti filed income tax returns for JAG, Hempstead's parent company, for the tax years 2001 and 2002. The Government proffers that the total amount of money deposited in the corporate bank account is less than the amount of rental income declared by JAG and Hempstead in their corporate tax returns

---

[37]  *See* 2006 Indictment ¶ 128(c); 7/26/06 Tr. at 6-7; 7/28/06 Carnesi Letter at 1.

[38]  *See* 1999 Agr. at 2.

[39]  *See* 9/27/99 Order Modifying Post-Indictment Restraining Order, 98 Cr. 42 (BDP).

[40]  7/10/06 Government Letter at 7.

[41]  *Id.*

11

(although the Government reports that the tax return figure is based on estimated rather than actual receipt of income).

Between March 2000 and August 2005, tenants at the Hempstead Avenue Property made cash payments totalling $144,000.[42] During that same time period, $95,000 in cash was deposited into Hempstead's bank account, and at least $113,000 in cash was deposited into Gotti's personal bank account.[43] The Government argues that the unexplained $64,000 discrepancy between total rent income and total cash deposits is circumstantial evidence that Gotti received the proceeds of racketeering activity and used those proceeds to operate JAG and Hempstead (the "enterprises") within the limitations period.

The Government alleges that Gotti used Hempstead's bank account to make thirty-five mortgage payments totaling over $250,000 on the Oyster Bay Residence between 2002 and 2005, to pay real-estate taxes on the Oyster Bay Residence totaling over $25,000, to pay legal fees of over $60,000, to make cash withdrawals exceeding $57,000, and to invest $3,800 in his brother Peter Gotti's business, Uncle Crumm's Bakery, in March and May 2001. On his personal

---

[42]     *See* 8/1/06 Government Letter at 4. The Government's evidence is based on the reports of tenants.

[43]     *See id.*

income tax returns in 2002, Gotti claimed a writeoff in the amount of $96,000 for investments in Uncle Crumm's Bakery.

On July 21, 2004, less than two months before Gotti was to be released from custody, a grand jury in the Southern District of New York returned another indictment bringing new RICO charges against Gotti and three co-defendants ("2004 Indictment"). The 2004 Indictment contained a racketeering count alleging that the means and methods of the Gambino Family included money laundering.[44] That indictment did not contain a separate money laundering count or forfeiture allegations.

On July 27, 2004, Gotti executed a deed purporting to transfer the 101st Avenue Property to Pedro Martinez and Santiago Arias for $150,000, which deed was not recorded with the Queens County Clerk until July 20, 2005. On February 20, 2005, Gotti executed a deed transferring the Milford Township Property to his mother and sister. On April 27, 2005, Gotti proclaimed in a corporate resolution that his wife was authorized to act on behalf of Hempstead to

---

[44]     *See* 2004 Indictment ¶¶ 1, 10. Count One also alleged that the stated purpose of the Gambino Family was to enrich its participants through crimes including money laundering, and that to "conceal their receipt of money generated from their criminal activities, members and associates of the enterprise concealed their ownership of various assets that were purchased with proceeds of their criminal activities." *Id.* ¶ 11(h).

borrow $100,000 from Madison Home Equities secured by the Hempstead Avenue Property. Gotti obtained the $100,000 loan on May 3, 2005, and Hempstead made payments on the loan in 2005.

On May 13, 2005, this Court denied Gotti's motion to dismiss the 2004 Indictment, rejecting Gotti's argument that his 1999 plea agreement barred further charges for conduct occurring before the date of the plea.[45] On June 6, 2005, the grand jury returned a superseding indictment against Gotti seeking forfeiture of assets including $25,000,000, the Hempstead Avenue Property, the Milford Township Property, the 101st Avenue Property, the Oyster Bay Residence, and the Liberty Avenue Property.[46] On August 10, 2005, after his first trial started, Gotti executed a deed transferring the Oyster Bay Residence to his wife for no consideration, and she encumbered that property with an $800,000 mortgage. On February 13, 2006, the day before the commencement of Gotti's second trial, Gotti executed a deed transferring the Liberty Avenue Property to Vincent Spirito for $400,000. Gotti retained an interest in that property in the form of a $190,000 mortgage by Spirito.

---

[45] *See Gotti*, 399 F. Supp. 2d at 254.

[46] 6/6/05 Indictment, S2 04 Cr. 690. Gotti has never challenged the requested forfeiture.

After Gotti's second trial, the Government filed liens against the Oyster Bay, Liberty Avenue, and Hempstead Avenue properties.[47] On April 14, 2006, this Court entered a Stipulation and Order under which Gotti agreed not to engage in further transfers pending the resolution of this case ("Freeze Order"). Gotti reserved his right to seek modification of the Freeze Order in order to pay legal fees pursuant to *United States v. Monsanto*.[48] The Government reserved its rights to pursue its forfeiture claims and other arguments regarding the allegedly improper transfers of the properties at issue.[49]

On May 22, 2006, a grand jury in the Southern District of New York returned the superseding 2006 Indictment against Gotti. Counts Three and Four of this indictment charge Gotti with using and investing income from racketeering activities to acquire, establish, and operate two enterprises, JAG and Hempstead, in violation of section 1962(a) of Title 18 of the United States Code. Count Seven of the 2006 Indictment charges Gotti with money laundering based on his

---

[47] *See* 6/16/06 Letter from AUSAs Hou and Rocah to the Court at 5.

[48] *See* Freeze Order at 5-6. *See also United States v. Monsanto*, 924 F.2d 1186, 1192 (2d Cir. 1991) (requiring an adversarial, post-restraint, pretrial hearing to continue a restraint of assets needed by defendant to retain counsel of choice).

[49] *See* Freeze Order at 6.

15

collection of income from real estate purchased by holding companies created and operated with proceeds derived from racketeering activity. On June 29, 2006, upon submission by Gotti of financial disclosures to the Government, this Court entered a Stipulation and Order allowing Gotti to obtain a mortgage on the Oyster Bay Property in the amount of $500,000 in order to satisfy tax obligations and pay future legal fees. Gotti now moves to dismiss Counts Three, Four, and Seven of the 2006 Indictment.[50]

## III. LEGAL STANDARD

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."[51] The Second Circuit has held that "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged

---

[50]    *See* 6/27/06 Letter from Carnesi to the Court ("6/27/06 Carnesi Letter"); 7/13/06 Carnesi Letter.

[51]    *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)).

16

crime.'"[52] "'An indictment must be read to include facts which are necessarily implied by the specific allegations made.'"[53] However, "'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.'"[54]

Rule 12(b) of the Federal Rules of Criminal Procedure provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." On a motion to dismiss pursuant to Rule 12(b), a court must accept all factual allegations in the indictment as true.[55] Moreover, the Second Circuit has held that, in the rare circumstance in which the government "has made what can fairly be described as a full proffer of the evidence it intends to present at trial," the court may

[52]   *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Stavroulakis*, 952 F.2d at 693).

[53]   *Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir.), *modified*, 439 F.2d 1198 (2d Cir. 1970)).

[54]   *United States v. Coriaty*, 300 F.3d 244, 250 (2d Cir. 2002) (quoting *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). *Accord United States v. Miller*, 471 U.S. 130, 138 (1985) ("[T]he Fifth Amendment's grand jury right is violated by a conviction" where "the offense proved at trial was not fully contained in the indictment.") (citing *Stirone*, 361 U.S. at 213).

[55]   *See United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33 n.2 (1963); *United States v. Collazo*, No. 04 Cr. 297, 2004 WL 2997843, at *2 (S.D.N.Y. Dec. 22, 2004).

appropriately address "the sufficiency of the evidence . . . on a pretrial motion to

dismiss an indictment."[56] In reviewing the sufficiency of the evidence, the court

must view all of the evidence in the light most favorable to the Government and

---

[56]     *Alfonso*, 143 F.3d at 776-77 (reversing district court's dismissal of
indictment where "the government made no detailed presentation of the entirety of
the evidence that it would present to a jury"). *Cf. United States v. Mennuti,* 639
F.2d 107 (2d Cir. 1981) (upholding dismissal of indictment where government had
filed an affidavit making a full proffer of the evidence to be presented at trial).
Other circuits have similarly held that where facts are undisputed, the Court may
dismiss an indictment based on the legal insufficiency of the charges. *See United
States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005) (finding "no error in the district
court's procedure of resolving a legal question in a pre-trial motion to dismiss the
indictment"); *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000)
(court may not address the sufficiency of the government's evidence on a motion
to dismiss unless there is a "stipulated record"); *United States v. Brown*, 925 F.2d
1301, 1304 (10th Cir. 1991) ("[W]here the facts are essentially undisputed" it "is
permissible and may be desirable . . . for the district court to examine the factual
predicate for an indictment to determine whether the elements of the criminal
charge can be shown sufficiently for a submissible case."); *United States v. Risk*,
843 F.2d 1059, 1061 (7th Cir. 1988) ("The district court found no violation and
correctly dismissed the indictment, not because the government could not prove its
case, but because there was no case to prove."). However, there are circuits that
explicitly reject this procedure. *See United States v. Salman*, 378 F.3d 1266,
1267-68 (11th Cir. 2004) (per curiam) ("There is no summary judgment procedure
in criminal cases. Nor do the rules provide for a pre-trial determination of
sufficiency of the evidence.") (citation and quotation marks omitted); *United
States v. Jensen*, 93 F.3d 667, 669-70 (9th Cir. 1996) ("By basing its decision on
evidence that should only have been presented at trial, the district court in effect
granted summary judgment for the defendants. This it may not do."); *United
States v. Marra*, 481 F.2d 1196, 1199-1200 (6th Cir. 1973) ("A motion to dismiss
the indictment cannot be used as a device for a summary trial of the evidence . . .
The Court should not consider evidence not appearing on the face of the
indictment.") (citation and quotation marks omitted).

18

determine if there is any evidence "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."[57] The Government may base its case "entirely on circumstantial evidence," and a defendant's guilt "may be inferred from the evidence," but only if "the inference is reasonable."[58] "[T]he government must do more than introduce evidence at least as consistent with innocence as with guilt."[59] "[A] conviction based on speculation and surmise alone cannot stand."[60]

## IV. APPLICABLE LAW

### A. Money Laundering

The money laundering count is governed by a five-year statute of limitations.[61] The relevant money laundering provision, section 1956(a)(1)(B)(i) of Title 18 of the United States Code, provides:

Whoever, knowing that the property involved in a financial

---

[57] *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (reversing court-ordered judgment of acquittal pursuant to Rule 29 following a guilty verdict).

[58] *United States v. Kim*, 435 F.3d 182, 184 (2d Cir. 2006) (affirming denial of motion to overturn conviction based upon insufficiency of the evidence).

[59] *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citations omitted) (vacating conviction and ordering dismissal of indictment pursuant to Fed. R. Crim. P. 29(c)).

[60] *Kim,* 435 F.3d at 184 (citations and quotation marks omitted).

[61] *See* 18 U.S.C. § 3282(a).

19

> transaction represents the proceeds of some form of
> unlawful activity, conducts or attempts to conduct such a
> financial transaction which in fact involves the proceeds of
> specified unlawful activity . . . knowing that the transaction
> is designed in whole or in part . . . to conceal or disguise
> the nature, the location, the source, the ownership, or the
> control of the proceeds of specified unlawful activity . . .
> [is guilty of a felony].

This section criminalizes transactions designed to vest illegal proceeds with "the

appearance of legitimacy."[62] The proceeds of unlawful activity may remain illegal

proceeds even if they change form through a chain of transactions.[63] The Second

Circuit has held that treatment of money laundering as part of a unified scheme is

"particularly sound because money laundering frequently involves extended

sequences of acts designed to obscure the provenance of dirty money."[64]

---

[62]     *United States v. Napoli*, 179 F.3d 1, 8 (2d Cir. 1999). *See also United States v. Kinzler*, 55 F.3d 70, 73 (2d Cir. 1995) ("the statute is aimed broadly at transactions designed in whole or in part to *conceal* or *disguise* in any manner the nature, location, source, ownership or control of the proceeds of unlawful activity") (citation omitted) (emphasis added).

[63]     *See United States v. George*, 363 F.3d 666, 674-75 (7th Cir. 2004) (where defendant used counterfeit securities to buy computer chips, chips became proceeds of unlawful activity); *United States v. Real Property Identified as Parcel 03179-005R*, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) (where defendant used proceeds of fraud to buy real property, and then used real property as collateral for loan, loan proceeds were proceeds of unlawful activity).

[64]     *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) (several transactions in furtherance of a single scheme are properly aggregated into a single money laundering count).

However, "not every transaction that can be traced to criminal proceeds necessarily qualifies as money laundering."[65] "Subsection (i) of the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity."[66] The "intent to conceal" the illicit origin of funds is the hallmark of money laundering.[67] Thus, "the statute requires proof that a financial transaction . . . was designed *'to conceal or disguise'*" the origin of criminal proceeds.[68] "If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute."[69]

---

[65] *United States v. Johnson*, 440 F.3d 1286, 1292-93 (11th Cir. 2006) ("simple and straight forward banking transactions, easily discovered through a cursory review of [defendant's] bank accounts" were not money laundering). *Accord United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003) ("Cases in which money laundering charges have not succeeded are typically simple transactions that can be followed with relative ease.").

[66] *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999). *Accord United States v. Dobbs*, 63 F.3d 391, 398 (5th Cir. 1995); *United States v. Rockelman*, 49 F.3d 418, 423 (8th Cir. 1995); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476 (10th Cir. 1994).

[67] *Stephenson*, 183 F.3d at 121.

[68] *Id.* (quoting 18 U.S.C. § 1956(a)(1)(B)(i)) (emphasis added). *See also Garcia-Emanuel*, 14 F.3d at 1474 ("Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime.").

[69] *Garcia-Emanuel*, 14 F.3d at 1474.

## B.    Section 1962(a)

The section 1962(a) count is also governed by the five-year statute of

limitations.[70]  Section 1962(a) provides:

> It shall be unlawful for any person who has received any
> income derived, directly or indirectly, from a pattern of
> racketeering activity . . . to use or invest, directly or
> indirectly, any part of such income, or the proceeds of such
> income, in acquisition of any interest in, or the
> establishment or operation of, any enterprise which is
> engaged in, or the activities of which affect, interstate or
> foreign commerce.

Under this section, the enterprise need not be "engaged in a pattern of

racketeering; indeed, it may be a victim of racketeering . . . consistent with

Congress's goal of protecting legitimate businesses from infiltration by organized

crime."[71]

The five-year statute of limitations for prosecutions under this section

begins to run upon the last "use or investment" of the income or proceeds of

---

[70]    *See* 18 U.S.C. § 3282(a).

[71]    *United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir. 1989).  *See
generally United States v. McNary*, 620 F.2d 621, 628-29 (7th Cir. 1980)
(upholding conviction under section 1962(a) of defendant who had invested
money obtained through bribery and extortion in a family-owned travel agency).

22

racketeering in the "establishment or operation" of an enterprise.[72] Where the Government alleges that the enterprise was operated for the purpose of money laundering, "every time tainted funds or assets purchased with tainted funds [are] run into or out of one of the enterprise corporations by or at [the defendant's] direction, this constitute[s] a 'use' by him of those funds or their proceeds in the 'operation' of the enterprise in its intended function, which [is] precisely to serve as a concealing conduit or repository of the funds or assets."[73]

Although the "acts by which the tainted income is acquired need have no logical relationship to the enterprise in which investment will thereafter be made," there must nonetheless be "proof of the specified relationship between the racketeering acts and the RICO enterprise."[74] The statute does not require evidence tracing the income or proceeds invested in the enterprise directly to the racketeering acts, so long as the evidence demonstrates a "sufficient nexus"

---

[72]    *United States v. Vogt*, 910 F.2d 1184, 1199 (4th Cir. 1990) ("Unlike the offense defined in subsection (c), therefore, that defined in subsection (a) is not necessarily consummated by the last predicate act of racketeering activity. Instead, it is only consummated by the quite separate act of use or investment, hence the statute [of limitations] with respect to subsection (a) is only triggered by the last such act charged.").

[73]    *Id.* at 1199 n.7.

[74]    *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989).

23

between the illicit money and the enterprise.[75]

## C.    Interpretation of Plea Agreements

The Second Circuit has "long interpreted plea agreements under principles of contract law . . . but . . . noted that plea agreements are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain."[76]  In interpreting plea agreements according to contract law, courts must be guided by two principles:

> First, the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law.  Second, with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights – to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme

---

[75]    *McNary*, 620 F.2d at 628 (an interpretation of the statute requiring "that the evidence show a direct employment of illicit income" would "ignore the clear proscription of the statute and, as a practical matter, would render the statute ineffective against the use of interim depositories, commingled funds, and other surreptitious accounting techniques designed to create significant obstacles to the tracing of illicit income").  *Accord United States v. Cauble*, 706 F.2d 1322, 1342 (5th Cir. 1983) ("the prosecution need prove only that illegally derived funds flowed into the enterprise; it need not follow a trail of specific dollars from a particular criminal act").

[76]    *In re Altro*, 180 F.3d at 375 (citing *United States v. Rodgers*, 101 F.3d 247, 253 (2d Cir. 1996) and *Ready*, 82 F.3d at 558).

of government.[77]

Consequently, courts are required to "hold the Government to the most meticulous standards of both promise and performance."[78] In keeping with these principles, the Second Circuit has instructed that to interpret a plea agreement, a court should look to the reasonable understanding of the parties as to the terms of the agreement and resolve any ambiguities against the Government.[79] "[A]ware of the Government's advantage in bargaining power and recognizing that the Government usually drafts plea agreements, we construe such agreements *strictly* against the Government."[80]

## V. DISCUSSION

### A. Gotti's Motion Is Not Premature

As an initial matter, the Government argues that the motion should be

[77]     *Ready*, 82 F.3d at 558 (citation omitted).

[78]     *In re Altro*, 180 F.3d at 375 (citation and quotation marks omitted).

[79]     *See United States v. Palladino,* 347 F.3d 29, 33 (2d Cir. 2003) (citations omitted). *See also Stern v. Shalala*, 14 F.3d 148, 150 (2d Cir. 1994) ("Courts enforce what the defendant reasonably understood the plea agreement to mean when the guilty plea was entered.") (quotation marks and citation omitted).

[80]     *Cunningham*, 292 F.3d at 117 (emphasis added). *Accord United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) (plea agreements construed against the Government because "'the Government is usually the party that drafts the agreement, and [because] the Government ordinarily has certain awesome advantages in bargaining power'") (quoting *Ready*, 82 F.3d at 558).

denied as prematurely filed, with leave to renew at the close of the Government's case.[81] The Government argues that a challenge to the sufficiency of the evidence is not properly brought as a motion to dismiss an indictment. But the relevant facts here are essentially undisputed. The question presented by this motion is whether, accepting the Government's version of events, Gotti's conduct after the bar date qualifies as money laundering or racketeering in violation of section 1962(a). For the most part, this analysis turns on the terms of the indictments and 1999 plea agreement, and is clearly a question of law, capable of determination "without the trial of the general issue."[82]

To the extent that disposition of this motion requires the Court to look beyond the terms of the documents and analyze the Government's evidence, it is not premature, because the Government has made a detailed proffer of the evidence that it intends to present at trial. In addition, this case is unique in that the Government has presented its evidence twice at defendant's first and second

---

[81]     *See* 7/10/06 Government Letter at 16 (citing *United States v. Gotti,* 399 F. Supp. 2d 214, 218 (S.D.N.Y. 2005)). On April 12, 2005, before the first trial in this case, this Court denied motions by Gotti's co-defendants to dismiss charges on statute of limitations grounds as premature. At that time, the Government had not presented the Court with a full proffer of the evidence of those defendants' illegal conduct falling within the statute of limitations period.

[82]     Fed. R. Crim. P. 12(b).

26

trials. Although the Indictment has been revised, the Government intends to present substantially the same evidence again. Indeed, in arguing that the new charges should relate back to the 2004 Indictment for purposes of determining the relevant limitations period, the Government conceded that the "newly charged money laundering and racketeering violations . . . concern substantially the same evidence and criminal conduct described in the first indictment."[83] Furthermore, the Government has had the opportunity to describe in detail the evidence it intends to submit at trial, and has in fact submitted thirty-nine pages of argument on this motion.[84] The Government also had the opportunity to clarify its proffer during three telephone conferences, on the record, with the defendant and his counsel in attendance.[85]

Analyzing the Government's evidence, in the light most favorable to the Government, a reasonable jury could not conclude that the Government could prove the charges against Gotti beyond a reasonable doubt. To allow the Government to proceed to trial on these charges would create a risk of unfair

---

[83]     7/10/06 Government Letter at 12. *See also* 5/25/06 Tr. at 6 (statement of AUSA Hou).

[84]     *See id.* at 6-11; 8/1/06 Government Letter at 2, 4-8.

[85]     *See* 7/26/06 Tr.; 7/31/06 Tr.; 8/3/06 Hearing Transcript ("8/3/06 Tr.").

27

prejudice and inevitably result in confusion of the jury.[86]

## B.    Relevant Limitations Period

The parties dispute whether, for Counts Three, Four and Seven of the

2006 Indictment to survive the statute of limitations, the Government must prove

criminal conduct by the defendant after May 22, 2001, five years prior to the filing

of the 2006 Indictment, or after July 22, 1999, five years prior to the 2004

Indictment.  The Government argues that the same criminal conduct that is now

charged separately in the 2006 Indictment was described in the 2004 Indictment to

support elements of other charges, and therefore "the limitations period relates

back to July 22, 1999."[87]  I need not resolve this dispute because assuming

arguendo that the Government has the benefit of the earlier date of July 22, 1999,

the new charges of money laundering and racketeering are nonetheless time-

barred.

## C.    Count Seven Is Barred by the Plea Agreement and Is Time-

---

[86]    Striking these charges, however, does not prevent the Government from offering the evidence admitted at the earlier trials regarding Gotti's financial transactions in support of the existing charge that Gotti engaged in racketeering within the limitations period.

[87]    7/10/06 Government Letter at 12-13 (citing *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003), for the proposition that the "touchstone" for a relation-back analysis is whether the "original indictment fairly alerted the defendant to the subsequent charges against him and the time period at issue").

**Barred**

### 1. Allegations of Money Laundering Through Transactions Related to Holding Companies

Count Seven, consisting of one paragraph, alleges that from 1991

through May 2006, Gotti engaged in money laundering, "to wit," the use of

criminal proceeds derived from the conduct of the affairs of the Gambino Family

"to create and operate holding companies which were then used to purchase real

estate holdings and to collect rents."[88]  The Government alleges that Gotti used

JAG and Hempstead for money laundering after July 22, 1999 by collecting rental

income from the Hempstead Avenue Property,[89] and using that property as

collateral for a loan, which money Gotti used to pay his living expenses and legal

fees, and to invest in his brother's business venture. But, as a matter of law, this

---

[88]     2006 Indictment ¶ 26.

[89]     *See* 7/31/06 Tr. at 3-5 (explaining the chain of transactions
constituting the money laundering charge).  In response to a request for
clarification from the Court, AUSA Hou stated that the only holding companies
referred to by Count Seven are JAG and Hempstead, and the only rent-collecting
property owned by JAG and/or Hempstead is the Hempstead Avenue Property.
*See id.* at 3-4. When asked which allegations pertained specifically to JAG,
AUSA Hou responded "it's confusing because of the relationship between both
companies," and the fact that JAG was disclosed as an operating company on tax
returns. *See id.* at 7-8. A further submission by the Government stated only that
JAG had reported rental income from the Hempstead Avenue Property. *See* 8/1/06
Government Letter at 4. There is thus no relevant distinction between JAG and
Hempstead.

29

does not constitute money laundering within the limitations period for two
reasons. *First*, the April 5, 1999 plea agreement resolved the charge that the funds
used to purchase the Hempstead Avenue Property were the proceeds of
racketeering activity. *Second*, Gotti's activities within the limitations period were
not designed to conceal the illicit source of the funds, and the charges are
therefore time-barred.

Gotti interprets the plea agreement as his admission of the 1998
Indictment's allegations that the Hempstead Avenue Property had been purchased
with the proceeds of racketeering activity, and the Government's acceptance of a
liquidated payment in lieu of forfeiture of that property.[90] The Government argues
that the plea agreement does not bar its new charges as it "did not have the degree
of proof in the 1999 case that it has now to demonstrate the criminal origins" of
the Hempstead Avenue Property.[91] The Government's argument requires an
interpretation of the plea agreement as a limited admission by Gotti that the
monetary value of his income from racketeering was equal to the sum of the
$1,000,000 liquidated payment and the value of the two forfeited properties.

But in interpreting the plea agreement, all ambiguities must be

---

[90]    7/13/06 Carnesi Letter at 5.

[91]    7/10/06 Government Letter at 25-26.

resolved against the Government. The plea agreement provides that Gotti "admits the forfeiture allegations,"[92] including, *inter alia*, the allegations of an expansive racketeering conspiracy.[93] Although the racketeering activities Gotti pled guilty to in 1999 are not charged in the 2006 Indictment, neither indictment specifically identifies the racketeering activities that were the sources of the funds used to purchase these properties. Under the plea agreement, Gotti admitted that he had acquired "property constituting, and derived from, proceeds . . . obtained, directly and indirectly, from racketeering activity."[94] The plea agreement provided for a "liquidated RICO forfeiture judgment in the amount of $1,000,000" and stated that "to the extent required to recover any portion of the $1,000,000 payment not paid by the defendant," the United States had the right to forfeiture of the properties

---

[92] 1999 Agr. at 7 ("It is further agreed and understood that John A. Gotti admits the forfeiture allegations set forth in Indictment S9 98 Cr. 42 (BDP), at ¶¶ 134-135").

[93] *See* 1998 Indictment ¶ 134 (incorporating by reference Counts One, Two, and Three of the Indictment which allege, *inter alia*, an expansive racketeering conspiracy which engaged in extortion, fraud, gambling, and money laundering). Interestingly, Gotti specifically pled guilty to a conspiracy to make extortionate extensions of credit throughout the 1990s. This crime is charged again in the 2004 and 2006 Indictments, with the same starting date, but ending in 2002 rather than 1998.

[94] 1998 Indictment ¶ 135 (incorporated by reference in 1999 Agr. at 7 ("It is further agreed and understood that John A. Gotti admits the forfeiture allegations set forth in Indictment S9 98 Cr. 42 (BDP), at ¶¶ 134-35")).

31

described by paragraphs 138, 139, and 141 of the Indictment, specifically, the Mill Neck Residence, the Hempstead Avenue Property (and rental income therefrom), and the Milford Township Property.[95] Gotti's reasonable understanding was that, through the plea agreement, he admitted that the properties were acquired through income obtained from racketeering activities, and the Government accepted a cash payment in lieu of forfeitures of those specific properties, and dismissed all charges in the indictment, including the forfeiture charges.[96] Under these circumstances, the Government is now estopped from claiming that Gotti is laundering money by exploiting the very asset that it released to him in exchange for a cash payment. Furthermore, it defies logic to allow a defendant to be charged with purchasing the same property twice – first with one source of funds and then with another.

Relying on *United States v. Magluta*, the Government argues that the

---

[95] *See* 1999 Agr. at 8. The plea agreement also provided for the continuation of the Government's restraint of those properties until payment was made. *See id.*

[96] *See id.* at 2 ("In consideration of his plea to the above offenses . . . the Government will move to dismiss any open Counts in Indictment S9 98 Cr. 42 (BDP), as well as any underlying Indictments, as to defendant John A. Gotti").

plea agreement cannot cleanse the money of its "tainted" character.[97] But *Magluta* is easily distinguished. In *Magluta*, an associate of the defendant became a confidential informant and gave proceeds of illegal drug sales to the FBI. The FBI then returned those proceeds *to the informant* to allow him to pass the funds to the defendant, who used those funds to pay his lawyers. The Eleventh Circuit rejected the defendant's argument that "because the proceeds had been under the control of law enforcement before he used them to pay his lawyers, the money had lost its 'tainted' character."[98] The court specifically noted that it was "not asked to decide whether government intrusion into laundering transactions ever could rise to the level that the money no longer qualifies as the 'proceeds of [a] specified unlawful activity' under § 1956(a)(1)."[99]

In light of Gotti's admission in the plea agreement that the Hempstead Avenue Property was purchased with funds traced to racketeering, it strains credulity for the Government to suggest that Gotti is now somehow attempting to

---

[97]   *See* 7/10/06 Government Letter at 26. *See also United States v. Magluta*, 418 F.3d 1166, 1175 (11th Cir. 2005) ("laundered money does not become any less laundered because the government helped the process along or chose not to stop it").

[98]   *Magluta*, 418 F.3d at 1175.

[99]   *Id.* (quoting 18 U.S.C. § 1956(a)(1)).

conceal this fact. Even assuming for the sake of argument that Gotti had not

admitted in 1999 that the Hempstead Avenue Property was purchased with funds

of criminal origin, the transactions within the limitations period bear very little

indicia of concealment or deception, and none have the effect of making the illicit

origin of the funds any less apparent than before.[100]

         Recent transactions involving this property have at best an incidental

relationship to that concealment.[101] In fact, Gotti's use of income and loan

proceeds from the Hempstead Avenue Property to pay living expenses and legal

fees within the limitations period has been open and obvious. These are "typically

simple transactions that can be followed with relative ease."[102] Such transactions,

"engaged in for present personal benefit, and not to create the appearance of

legitimate wealth" do not constitute money laundering.[103]

---

[100] *See Johnson*, 440 U.S. at 191 ("[a]nother important consideration is whether the money is better concealed or concealable after the transaction than before") (quotation and citation marks omitted).

[101] *See Garcia-Emanuel*, 14 F.3d at 1474 (the money laundering statute "is aimed at transactions that are engaged in for the purpose of concealing assets," and the concealment must be more than incidental or "trivial").

[102] *Esterman*, 324 F.3d at 572. *See also Johnson*, 440 F.3d at 1292-93 (straightforward banking transactions are not money laundering).

[103] *Garcia-Emanuel*, 14 F.3d at 1474. *See also id.* at 1476 ("While we acknowledge that all mortgage payments increase the owner's investment in his home, the mere fact that Defendant made the payment with a cashier's check

Gotti's investment in his brother's business venture, Crumm's

Bakery, is a closer question, but in light of the size of the investment ($3,800), the

lapse of time, and the plea agreement, nothing about this transaction suggests an

intention to launder money.[104] Finally, the Government cites no cases in which a

defendant was convicted of money laundering for liquidating assets purchased

with the proceeds of racketeering over a decade ago (not to mention any cases

where there was an intervening indictment and plea during that decade).[105] The

purpose of the statute of limitations – to protect against stale prosecutions – is

---

purchased with drug money is insufficient to sustain a money laundering
conviction."); *Dobbs*, 63 F.3d at 397 (reversing a money laundering conviction
where the defendant deposited funds into his wife's bank account which she used
to pay ordinary household expenses).

[104]    *Cf. Garcia-Emanuel*, 14 F.3d at 1476 (holding that purchase of a
certificate of deposit with proceeds of criminal activity and use of the CD as
collateral for a loan to partially owned corporate defendant was "classic money
laundering where Defendant, through a complex series of transactions,
transformed the cash he received selling drugs into a legitimate business
investment that allowed him to display his wealth without arousing suspicion").

[105]    *Cf. United States v. George*, 363 F.3d 666, 670 (7th Cir. 2004)
(finding money laundering where a counterfeit check was used to purchase
computer chips in June or July of 2000, and in the following "few weeks"
defendant sold the chips and used part of the proceeds to buy a Lincoln
Navigator); *Moloney*, 287 F.3d at 238-39 (defendant pled guilty in 1999 to one
count of money laundering for regular bank deposits of proceeds of ongoing Ponzi
scheme between 1990 and 1999).

clearly implicated here.[106]

### 2. Allegations of Money Laundering Through Transactions Unrelated to the Indictment

The Government also argues that Gotti's money laundering within the limitations period includes attempts to transfer "properties purchased with illegally obtained funds to relatives and associates as Gotti's case proceeded to trial."[107] However, the transactions described by the Government, which pertain to the 101st Avenue Property, the Liberty Avenue Property, and the Oyster Bay Residence, are apparently unrelated to any charges in the Indictment. Count Seven alleges that Gotti's money laundering consisted of his use of criminal proceeds "to create and operate holding companies which were then used to

---

[106] *See United States v. Podde*, 105 F.3d 813, 817-20 (2d Cir. 1997) (finding charges barred by statute of limitations where defendant was originally indicted within the five-year limitations period, pled guilty, withdrew the guilty plea, and was reindicted four years after the statute of limitations had expired, explaining that a statute of limitations is "'designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.'") (quoting *Toussie v. United States*, 397 U.S. 112, 114-15 (1970)).

[107] 7/10/06 Government Letter at 23.

purchase real estate holdings and to collect rents."[108] The only holding companies referenced in the Indictment are JAG and Hempstead, and the only real estate purchased by those companies is the Hempstead Avenue Property.[109] Gotti did not use holding companies to purchase the 101st Avenue Property, the Liberty Avenue Property, or the Oyster Bay Residence, which were purchased by Gotti in his own name.[110] Count Seven, which refers exclusively to the use of "holding companies," cannot be fairly read to encompass this conduct. The Government may not broaden Count Seven to include conduct not charged by the grand jury.

Moreover, the Government does not argue that Gotti attempted to conceal these transactions, or that they bear any more than an incidental relationship to the initial act of concealing the proceeds of racketeering through the purchase of real estate in the 1990s. Indeed, the transactions were the subject of two court-approved stipulations between the parties.

---

[108] 2006 Indictment ¶ 26.

[109] *See* 7/31/06 Tr. at 3-4 (statement of AUSA Hou).

[110] Ignoring the language of the 2006 Indictment, the Government argued that these properties relate to the money laundering charge "insofar as there will be testimony at the forthcoming trial that the properties . . . were all purchased using the proceeds of racketeering activity . . . and that the point of purchasing those properties was to conceal their criminal derivation." 7/26/2006 Tr. at 5 (statement of AUSA Hou). It must be remembered, however, that all of these properties were purchased in the 1990s.

37

## D. Counts Three and Four Are Barred by the Plea Agreement and Time-Barred

Section 1962(a) targets the direct and indirect "use or investment" of

income derived from racketeering in the acquisition, establishment, or operation of

an otherwise legitimate business. Counts Three (JAG) and Four (Hempstead) of

the Indictment are substantially identical, and each consists of only two

paragraphs.[111] These counts charge that Gotti engaged in the following conduct

through May 2006:

> (1) receipt of income through construction industry extortion between 1991 and 2005, and loansharking between 1991 and 2002, and
>
> (2) direct and/or indirect use and/or investment of that income in the (a) acquisition, (b) establishment; and (c) operation of JAG and Hempstead.[112]

The Government concedes that Gotti acquired and established JAG and

Hempstead prior to the limitations period, in the early 1990s. Thus, to

demonstrate that this count is not time-barred, the Government must prove that

---

[111] The first paragraph of each charge alleges that the enterprise engaged in interstate commerce. *See* 2006 Indictment ¶¶ 21, 23.

[112] *Id.* ¶¶ 22, 2[4] (alleging that Gotti "received income, directly or indirectly, from a pattern of racketeering activity . . . as set forth in paragraphs 18 and 20 of Count Two [alleging construction industry extortion and loansharking], and used, invested, directly and indirectly, a part of such income and the proceeds of such income in the acquisition of an interest in, and the establishment and operation of" Hempstead and JAG, respectively).

Gotti has continued to either use or invest illicit income to "operate" Hempstead and JAG at some point after July 22, 1999.[113] The Government argues that it can demonstrate this at trial by showing that illicit income flowed both into and out of Hempstead and JAG after July 22, 1999.[114]

## 1. Allegations of Money Flowing Into JAG and Hempstead

The Government concedes that it has no direct evidence of any transactions in which illicit funds flowed into JAG and/or Hempstead after July 22, 1999.[115] The Government argues instead that it has circumstantial evidence of such transactions, based on accounting discrepancies, cash deposits, and commingling of personal and corporate funds. The Government proffers that Gotti filed tax returns for JAG, along with Hempstead, for 2002, and that the amount of rent deposited in Hempstead's bank account is less than the amount of rental income declared by JAG and Hempstead in their corporate tax returns. But when asked to clarify this statement in a telephone conference on August 1, 2006,

---

[113] The Government has clarified that Counts Three and Four do not pertain to transactions other than those related to the Hempstead Avenue Property. *See* 7/26/06 Tr. at 5.

[114] *See* 7/31/06 Tr. at 6 (statement of AUSA Hou); 8/1/06 Government Letter at 4-8.

[115] *See* 8/1/06 Government Letter at 2.

the Government stated that the tax returns contained only income projections.[116]

The Government also argues that it has evidence of a $64,000 discrepancy between the total rental income from the Hempstead Avenue Property and the combined funds in Gotti's personal bank account and Hempstead's bank account, over a five-year span of time. The Government asserts that the jury can infer from this unexplained income that Hempstead, the owner of the bank account, received the direct or indirect proceeds of racketeering. Gotti responds that although this unexplained income may be relevant in support of Counts One and Two of the Indictment, which allege that the Gambino Family was the RICO enterprise, it is not relevant with respect to Counts Three and Four, which allege JAG and Hempstead as the RICO enterprises. Gotti argues that because the total rental income for the Hempstead Avenue Property ($144,000) was more than the cash deposited into Hempstead's bank account ($95,000), the Government cannot claim that Gotti invested or used *any* unexplained income to operate Hempstead.[117] But the Government alleges that Gotti must have deposited some rental income into his personal account (because the rents exceeded $96,000), and thus, it is

---

[116]    *See* 8/3/06 Tr. at 3 (summarizing AUSA Hou's previous statements during an off-the-record telephone conference held on August 1, 2006).

[117]    *See* 8/1/06 Letter from Sarita Kedia, Esq., Counsel to Gotti, to the Court at 2.

40

possible that some of the unexplained $64,000 was deposited into the Hempstead account.

The Government's theory requires the jury to draw a series of inferences based on this circumstantial evidence: *first,* that tenants of the Hempstead Avenue Property accurately reported the amount of rent payments, and that a $64,000 discrepancy over a five-year period is not an error due to accounting or reporting, *second*, that the $64,000 in cash was the proceeds of construction industry extortion and/or loansharking, and not from any other source, and *third*, that some or all of that $64,000 went into the Hempstead Bank Account, rather than Gotti's personal account.

Although the Court is mindful that it must draw all inferences in favor of the Government on a motion to dismiss, the chain of inferences sought by the Government is simply not reasonable. The Government has not proffered evidence upon which a reasonable juror could infer a "sufficient nexus" between the receipt of illicit money and its investment in JAG and/or Hempstead.[118] This is so for a number of reasons. *First*, a jury may not engage in impermissible

---

[118]  *McNary*, 620 F.2d at 628. This is particularly the case with respect to JAG — the Government has only alleged that JAG is Hempstead's parent corporation and that JAG filed tax returns declaring rental income from the Hempstead Avenue Property.

41

speculation.[119] *Second*, the evidence is "at least as consistent with innocence as with guilt."[120] *Third*, there is simply no proof that Gotti intended to *use* these enterprises to conceal funds.

The Government argues that the jury may infer that Gotti was engaged in money laundering and using a pattern of racketeering to operate two enterprises based on the fact that it cannot account for $64,000 in deposits *over a five-year period*. But "[i]n isolation, the probative value of unexplained wealth may be dubious."[121] Where the unexplained wealth is relatively small, the probative value of such evidence is correspondingly diminished.[122] This

---

[119]     *See Kim*, 435 F.3d at 189.

[120]     *D'Amato*, 39 F.3d at 1256, 1259-60 (reversing mail fraud conviction because, *inter alia*, "there is no evidence that [defendant cooperated in the wrongdoing] in order to further a[n unlawful scheme] rather than because he thought it was a reasonable request by his client"). *Accord United States v. Stewart*, 305 F. Supp. 2d 368, 377 (S.D.N.Y. 2004) (granting judgment of acquittal at the close of the Government's case on securities fraud count, when inferences of scienter and lack thereof were "nearly in equipoise [but] [t]he Government has not offered any evidence that tips the balance in favor of a rational finding of criminal intent beyond a reasonable doubt").

[121]     *United States v. Demosthene*, No. 03 CR 1409, 2004 WL 1243607, at *8 (S.D.N.Y. June 4, 2004).

[122]     *See, e.g., United States v. Cepada*, 768 F.2d 1515 (2d Cir. 1985) (reversing a conviction where the sole evidence of conspiracy to distribute narcotics consisted of possession of drug paraphernalia and $1,151 in unexplained cash, and holding that the small amount of money seized was not "indicative of very much" and "[e]ven assuming that one may build inference on inference" the

42

discrepancy, amounting to roughly $12,000 per year, cannot bear the weight the

Government places on it.[123] Moreover, it is just as likely that the discrepancy

resulted from an accounting error, interest on investments, gifts from relatives or a

wise investment in the stock market. Because it is equally reasonable to infer a

legitimate source for such income, the evidence cannot support a conviction.[124]

Section 1962(a) may not require "rigorous proof of the exact course

of income derived from a pattern of racketeering activity into its 'ultimate use or

investment,'" but it does require more than rank speculation.[125] There is not a

shred of evidence that either JAG or Hempstead were used within the limitations

---

evidence was too thin a reed on which to support a conviction); *United States v. Young*, 745 F.2d 733, 764 (2d Cir. 1984) (reversing conspiracy conviction in part because of insufficiency of the evidence, which consisted primarily of a "relatively small amount of unexplained wealth ($6,000 worth of jewelry and two fur coats)").

[123]     *Cf. United States v. Whites Hill Road*, 916 F.2d 808, 813 (2d Cir. 1990) (in civil forfeiture action, probable cause for arrest established where claimant's after tax income from 1979 to 1987 was reported to be $154,507, and claimant made $300,000 cash payments for real estate in 1986 alone).

[124]     In tax evasion cases, for example, the prosecution often establishes that a defendant's net worth is disproportionate to his reported taxable income. When this is proved, the prosecution must take the next step and show that it investigated and negated the possibility that the net worth was achieved from legitimate sources of income. *See Holland v. United States*, 348 U.S. 121, 136 (1954); *United States v. Todaro*, 744 F.2d 5, 10 (2d Cir. 1984).

[125]     *Vogt*, 910 F.2d at 1194 (affirming denial of challenge to sufficiency of the evidence to support section 1962(a) violation).

period for the purposes of concealing income derived from construction industry extortion or loansharking.[126] Gotti formed these holding companies long ago, in his own name, and the Government has been aware of their existence and ties to Gotti for close to a decade.

In fact, the cases the Government relies on demonstrate why these charges must be dismissed. In *United States v. Vogt*, the Government presented proof that the defendant obtained half a million dollars in smuggling proceeds prior to the limitations period, and within the limitations period engaged in a convoluted "multi-corporation laundering enterprise."[127] Specifically, this enterprise continued for several years and involved defendant's funneling of his smuggling proceeds from Cayman Island bank accounts through several law firm trust accounts, as well as no fewer than five corporate entities, from which defendant and his wife withdrew the money to make "a variety of investments,

---

[126]    The Government also argues that a jury could infer that funds derived from the charged pattern of racketeering were used to operate these enterprises, based on the fact that Gotti dealt in cash, commingled corporate and personal funds, and did not keep good records. For the same reasons just discussed, there is no basis on which a reasonable juror could reach such a conclusion other than by engaging in impermissible surmise and speculation.

[127]    910 F.2d at 1198 (money laundering scheme involved "use of foreign bank accounts, foreign and domestic corporations, and law firm trust accounts to conceal and make available for his personal use and investment the original bribe money in excess of a half million dollars").

44

loans and luxury purchases."[128]  The purchases made by the defendant with the

withdrawn money was far in excess of the income reported on his tax returns in

the relevant period.[129]

Although the Government could not directly trace funds from the

racketeering to the alleged enterprise, the court nonetheless found that there was

sufficient evidence for a jury to find a violation of section 1962(a).  The basis for

the finding was that the Government alleged and proved that the funds were

derived from smuggling, that transactions involving those funds actually occurred,

and that the corporations were merely "dummies" operated for the purpose of

money laundering.[130]

The defendant in *United States v. McNary*, a village mayor, received

$85,000 from various acts of bribery and extortion, depositing some of that money

into his personal account and some into his corporation, B & M Manufacturing

Company.[131]  McNary admitted that over $65,000 that he received from a pattern

---

[128]    *Id.* at 1188. *See also id.* at 1188-91 (describing the money laundering
scheme in great detail); *id.* at 1190 ("As an added concealment device, Vogt used
the alias 'Jim Owens' in a number of [his transactions].").

[129]    *See id.* at 1195.

[130]    *Id.* at 1198.

[131]    *See* 620 F. 2d at 628.

45

of racketeering activity was deposited directly into the B & M account, where it was commingled with legitimately derived funds or otherwise used to help that business.[132] McNary actively worked to prevent the illicit source of specific racketeering profits from being easily traceable by making cash deposits to his B & M account, by directing that checks be made payable to a bank which he then deposited in his B & M account, and having a check made payable to him which was then credited to an outstanding B & M loan.[133] The alleged enterprise was a different corporation — Ports of Call, a family-owned travel agency in which a defendant held a partnership interest. The Government demonstrated that McNary transferred $103,000 in funds from the B & M account to the Ports of Call account. It was not fatal that the Government had no evidence tracing those funds directly to racketeering, because it was "clear that the receipt of over $65,000 in racketeering income invested in B & M permitted [the defendant] to make an equivalent investment in Ports of Call . . . without any depletion of B & M's legitimate assets."[134]

       *McNary*'s interpretation of the nexus requirement of section 1962(a)

---

[132] *See id.*

[133] *See id.* at 625-27.

[134] *Id.* at 628.

46

draws on *United States v. Parness*, a case interpreting section 1962(b) of Title 18 of the United States Code.[135] In *Parness,* the Second Circuit rejected the argument that the Government's failure to precisely trace particular gambling debts to the defendant's corporation, and then to an enterprise he controlled, was fatal to a claim under 1962(b).[136] The Second Circuit reasoned that the requisite nexus between the racketeering activity and the enterprise was established by, *inter alia*, "evidence of numerous and flagrant efforts by [the defendants] to conceal both the source of the funds and the interest of [one defendant] in the various transactions," including false accounting records, false testimony before a grand jury, cover-up efforts, and clandestine transactions.[137] In short, the circumstantial evidence of Parness' guilt was "overwhelming."[138]

But here, the Government has not even *alleged* any efforts by Gotti to conceal the source of his income comparable to those proved in *Vogt, McNary* or *Parness*. Instead, the Government plans to ask the jury to *assume* that the required

---

[135]   *See id.* at 629 (citing *Parness*, 503 F.2d at 436). Section 1962(b) prohibits the use of a pattern of racketeering activity to acquire an interest in, or control of, an enterprise.

[136]   *See Parness*, 503 F.2d at 435-37.

[137]   *Id.* at 436.

[138]   *Id.* at 437

nexus exists based solely on the $64,000 discrepancy in Gotti's accounts.

## 2. Allegations of Money Flowing Out of JAG and Hempstead

Relying on *Vogt*, the Government also argues that Gotti used illicit income to operate JAG and Hempstead in violation of section 1962(a) by withdrawing money from these entities by collecting rental income and loan proceeds from the Hempstead Avenue Property.[139] In *Vogt*, the Fourth Circuit rejected the defendant's argument "that transactions in which enterprise corporations sold assets or transferred funds constituted 'divestments' rather than 'investments'" and were therefore not violations of section 1962(a).[140] The court held that a divestment may constitute a violation of the statute where the function of the enterprise is to serve "as repository or conduit for tainted funds in order to conceal their ultimate source and beneficial ownership."[141]

Here, the funds withdrawn within the limitations period were not

---

[139] *See* 7/10/06 Government Letter at 28-29 (citing *Vogt*, 910 F.2d at 1199) (arguing JAG and Hempstead were used to "to funnel money to Gotti" during the limitations period). The Government has clarified that Counts Three and Four do not pertain to transactions other than those related to the Hempstead Avenue Property. *See* 7/26/06 Tr. at 5.

[140] *Vogt*, 910 F.2d at 1199 n.7.

[141] *Id.*

tainted,[142] and Gotti did not engage in any act of concealment. The Government

was long aware that the Hempstead Avenue Property was purchased through the

use of illegally obtained funds and that it generated rental income for Gotti. The

1999 plea agreement with Gotti severed the nexus between the illicit funds used to

establish these corporations and the currently generated monies (rental income and

loan proceeds). As a result, Gotti did not use the proceeds of "income derived . . .

from a pattern of racketeering activity" by collecting rent from, or taking out loans

against, the Hempstead Avenue Property.[143]

Furthermore, in light of the lengthy lapse between the pattern of

racketeering acts and the use of these corporations within the limitations period,

not to mention the intervening plea agreement, the Government cannot, as a matter

of law, demonstrate that Gotti intended to conceal the source of the funds by

collecting rent and taking out loans.[144]  Section 1962(a) cannot be read so broadly

as to be triggered by any use of an enterprise with any tie to racketeering activity,

---

[142]    This is so based on the plea agreement and the lapse of time between
the purchase of the property and the receipt of the rents.

[143]    18 U.S.C. § 1962(a).

[144]    *Cf. Vogt*, 910 F.2d at 1199.

49

no matter how attenuated.[145] As a matter of law, the Government cannot prevail on its theory that withdrawals of funds from Hempstead and JAG within the limitations period constitute activities in violation of section 1962(a).

## VI.   CONCLUSION

For the foregoing reasons, Gotti's motion to dismiss Counts Three, Four, and Seven of the indictment on the grounds that the charges are barred by the plea agreement and the statute of limitations is granted. The Clerk of the Court is directed to close this motion (Docket No. 211).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 7, 2006

---

[145]      *See Cauble*, 706 F.2d at 1330 (violation of section 1962(a) requires "a nexus between the enterprise, the defendant, and the pattern of racketeering activity").

## - Appearances -

**For the Government:**

Victor Hou
Miriam E. Rocah
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2408

**For Defendant John A. Gotti:**

Charles F. Carnesi, Esq.
1225 Franklin Avenue
Garden City, New York 11758
(516) 512-8914

Seth Ginsberg, Esq.
570 Lexington Avenue
Sixteenth Floor
New York, New York 10022
(917) 885-3375

Sarita Kedia, Esq.
275 Madison Avenue, 35th Floor
New York, New York 10016
(212) 681-0202