UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/16/06

-------------------------------------------------------X
                                        :
UNITED STATES OF AMERICA                :
                                        :     **AMENDED OPINION**
                                        :     **AND ORDER**
        - against -                     :
                                        :
JOHN A. GOTTI,                          :     S3 04 Cr. 690 (SAS)
                                        :
        Defendant.                      :
                                        :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

When the Government indicted John A. Gotti in 2004, Gotti moved to

dismiss the new charges, asserting that they were barred by the terms of his April

5, 1999 plea agreement with the Government.[1] I denied the motion, finding that

the plea meant what it said and said what it meant.[2] The plea agreement permitted

the Government to bring new charges that encompassed events occurring prior to

---

[1]     *See* 7/24/04 Indictment, 04 Cr. 690 ("2004 Indictment").

[2]     *See United States v. Gotti*, 399 F. Supp. 2d 252, 254 (S.D.N.Y. 2005)
(holding that 1999 plea agreement did not bar subsequent prosecution because that
agreement stated "[n]othing in this agreement . . . precludes indictment if any
additional evidence or information whatsoever comes to the Offices' attention,
including but not limited to as a result of any pending investigation."). *Cf.*
Theodore Seuss Giesel, Horton Hatches the Egg (1940) ("I meant what I said, and
I said what I meant.").

1

the date of that agreement, so long as such charges were based on "additional evidence or information" that had come to the Government's attention.[3]

After two failed attempts to convict Gotti on these new charges,[4] the Government superseded the indictment on May 22, 2006, adding several new charges, including witness tampering, money laundering, and two new racketeering charges alleging that Gotti used the income derived from racketeering to operate two holding companies.[5] Not surprisingly, the Government alleges that all of these newly added crimes occurred or continued after July 1999, which would establish that Gotti's participation as a member of the alleged enterprise, the Gambino Organized Crime Family ("Gambino Family"), falls within the statute of limitations.[6] Gotti now moves to dismiss the new money laundering and racketeering charges on the grounds that they are barred by the 1999 plea

---

[3]    *Gotti*, 399 F. Supp. 2d at 254.

[4]    Both attempts resulted in deadlocked juries, although the first jury acquitted Gotti of several counts of the 2004 Indictment.

[5]    *See* 5/22/06 Indictment, S3 04 Cr. 690 ("2006 Indictment"), Counts 3, 4, 6, and 7.

[6]    The 2004 Indictment was brought on July 21, 2004, requiring the Government to prove that Gotti committed the charged crimes sometime after July 21, 1999. The Government has the burden of proving conduct within the statute of limitations beyond a reasonable doubt. *See United States v. Florez*, 447 F.3d 145, 150 n.2 (2d Cir. 2006).

2

agreement as well as time-barred.

Once again the Court must carefully examine the 1998 Indictment and the 1999 plea agreement.[7] In interpreting indictments and plea agreements, both of which are invariably drafted by the Government, fundamental fairness requires that the Government be held to the highest standards of "both promise and performance."[8] The critical documents – the 1998 Indictment, the 1999 plea agreement, and the 2006 Indictment – speak for themselves.[9] But if there is any ambiguity, the terms of a plea agreement, like the terms of a contract, must be construed against the drafter.[10] In interpreting plea agreements drafted by federal prosecutors, "the courts' concerns run even wider than protection of the defendant's individual constitutional rights – to concerns for the honor of the government, public confidence in the fair administration of justice, and the

---

[7] *See* 12/8/98 Indictment, S8 98 Cr. 42 ("1998 Indictment"); 4/5/99 Plea Agreement in United States v. Gotti, No. 98 Cr. 42 (BDP) ("1999 Agr.") at 1-2, Ex A. to 7/13/06 Letter from Charles Carnesi, Counsel to Gotti, to the Court ("7/13/06 Carnesi Letter").

[8] *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (citation and quotation marks omitted).

[9] *See* 4/5/99 Transcript of Guilty Plea before the Hon. Barrington D. Parker, Jr., United States District Judge ("4/5/99 Tr.") at 26 (Mark Pomerantz, Chief, Criminal Division, United States Attorney's Office for the Southern District of New York, stating that the 1999 plea agreement "speaks for itself").

[10] *See United States v. Cunningham*, 292 F.3d 115, 117 (2d Cir. 2002).

3

effective administration of justice in a federal scheme of government."[11]

The Government has two theories to support these charges. The first theory, boiled down to its essence, is that Gotti continues to receive income from properties purchased in the 1990s with funds he obtained through his criminal activities. The problem with this theory is that the Government already brought these charges (albeit not *in haec verba*) and dismissed them after Gotti satisfied the terms of his plea agreement.

The plea agreement cannot be both a sword and a shield. When the Government sought to proceed on the 2004 charges, I reviewed the 1999 plea agreement and the plea itself and found that the new charges were not barred. As the Government told the judge in 1999, in response to Gotti's statement that he was seeking closure from the plea agreement, "these are the two sentences that have been agreed upon, and they say what they say."[12] The same is true now. As a well-known maxim commands, "what is sauce for the goose is sauce for the gander."

---

[11] *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (citation omitted).

[12] 4/5/99 Tr. at 26 (AUSA Pomerantz). Pomerantz also stated "[t]he language of the plea agreement states the agreement of the parties. . . . as everyone here well knows, it is the language of the plea agreement that governs." *Id.*

4

The second theory is that within the limitations period, Gotti used monies obtained from his racketeering activities – specifically loansharking and construction industry extortion – to operate two corporations he formed in the early 1990s.

This case is sui generis both because of the prior plea agreement and because there have already been two trials at which the Government presented its evidence.[13] As a result of this combination of unique circumstances, the charge against Gotti for money laundering in violation of section 1956(a)(1)(B)(i) of Title 18 of the United States Code (Count Seven) must be dismissed.[14] However, Gotti's motion to dismiss the charges of racketeering activities in violation of section 1962(a) of Title 18 of the United States Code (Counts Three and Four) is denied with leave to renew at the close of the Government's case.

## II.    BACKGROUND

---

[13]    *See* 5/25/06 Transcript of Arraignment of John A. Gotti on 2006 Indictment ("5/25/06 Tr.") at 6 (Assistant United States Attorney ("AUSA") Victor Hou stating that with respect to the new charges, "the evidence has come out in the other proceedings. It was disclosed as enterprise evidence at a minimum throughout the trial. . . I think it's fair to say that the rest of the evidence, is – the bulk of it came in through prior proceedings and certainly prior trials."); 7/10/06 Government Letter at 12 ("newly charged money laundering and racketeering violations . . . concern substantially the same evidence and criminal conduct described in the first indictment.").

[14]    *See generally In re Altro*, 180 F.3d 372.

Unless otherwise noted, the following facts are drawn from the Government's submissions.[15] The Government alleges that for at least two decades, Gotti occupied a leadership position in the Gambino Family, and that as a result of his rank, Gotti received portions of all proceeds that were generated by the Gambino Family's racketeering activities. Gotti devised a scheme to conceal the illicit origins of these funds through holding companies and real estate investments. In the late 1980s and early 1990s, Gotti used the proceeds of racketeering activities, specifically, construction industry extortion,[16] to purchase real estate in his own name, including: a property on Liberty Avenue in Queens ("Liberty Avenue Property") on August 28, 1987,[17] three parcels of land in Milford Township, Pennsylvania ("Milford Township Property") on May 24, 1988,[18] a property in Massapequa, New York ("Massapequa Property") on May 1,

---

[15]     *See* 7/10/06 Letter from AUSAs Victor Hou and Miriam Rocah, to the Court ("7/10/06 Government Letter"); 8/1/06 Letter from AUSAs Hou and Rocah to the Court ("8/1/06 Government Letter").

[16]     *See* 7/26/06 Hearing Transcript ("7/26/06 Tr.") at 5 (AUSA Hou stating that the properties "were purchased using the proceeds of racketeering activity. More specifically, the bulk of those proceeds came from construction industry extortion and other racketeering activities as well").

[17]     *See* 2006 Indictment ¶ 28(e); 1998 Indictment ¶ 155.

[18]     *See* 2006 Indictment ¶ 28(d); 1998 Indictment ¶ 141.

6

1990,[19] and a property on 101st Avenue in Jamaica, New York ("101st Avenue Property") on August 10, 1993.[20] On December 5, 1995, Gotti used the proceeds of the sale of the Massapequa Property to purchase a property on 1018 Westshore Drive, Oyster Bay, New York, in his own name ("Mill Neck Residence").[21]

Gotti created two holding companies, JAG Brokerage ("JAG"),[22] established on or about August 21, 1991, and 216-02 Hempstead Avenue Corporation ("Hempstead"),[23] established on or about October 26, 1993.[24] Gotti, using his own name, was the sole shareholder of both corporations from their formation through 2005.[25] On or about July 22, 1994, Gotti used JAG to purchase

---

[19]    *See* 1998 Indictment ¶ 154; 7/26/06 Tr. at 6.

[20]    *See* 2006 Indictment ¶ 28(f); 1998 Indictment ¶ 156.

[21]    *See* 1998 Indictment ¶ 138; 7/26/06 Tr. at 5-7; 7/26/06 Tr. at 12 (AUSA Hou clarifying that the property at 1019 Westshore Drive was a residence in Mill Neck, Long Island); 7/28/06 Letter from Carnesi to the Court at 1.

[22]    The indictment refers to "JAG Brokerage Corporation or JAG Brokerage, Inc., including its subsidiaries and affiliates." 2006 Indictment ¶ 21.

[23]    The indictment refers to "216-02 Hempstead Avenue Corporation, including its subsidiaries and affiliates." 2006 Indictment ¶ 23.

[24]    JAG is identified as Hempstead's parent corporation in 2002 corporate tax returns.

[25]    In October 2005, Gotti transferred a 49% interest in Hempstead to his wife and children.

7

commercial real estate located at 216-02 Hempstead Avenue, Jamaica, New York ("Hempstead Avenue Property") with the proceeds of racketeering, and on or about June 13, 1995, Hempstead purchased that property from JAG.[26] The Hempstead Avenue Property has generated rental income for Gotti or his holding companies since the time of its purchase in 1994.

On December 8, 1998, a grand jury in the Southern District of New York returned the 1998 Indictment charging Gotti with several crimes, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), for his role in the Gambino Family. The 1998 Indictment named certain properties as the proceeds of racketeering activities subject to forfeiture under sections 1963(a)(1) and (a)(3) of Title 18 of the United States Code.[27] The forfeiture allegations included the Milford Township Property and all of the assets of Hempstead, including, but not limited to, a bank account in Hempstead's name, the Hempstead Avenue Property, and rental income from that property.[28] The

---

[26] *See* 1998 Indictment ¶ 139(a).

[27] *See id.* ¶ 139.

[28] *See id.* ¶ 139(a)-(c). Sections 1963(a)(1) and (a)(3) provide that whoever violates section 1962 shall forfeit to the United States "any interest the person has acquired or maintained in violation of section 1962" and "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of

8

1998 Indictment also named "substitute assets," including the Massapequa Property, the Liberty Avenue Property, and the 101st Avenue Property, as subject to forfeiture in the event that the assets listed in the forfeiture allegations became unavailable due to Gotti's acts or omissions.[29] On June 5, 1998, those properties subject to forfeiture were restrained pursuant to a court order.[30]

On April 5, 1999, Gotti and the Offices of the United States Attorneys for the Eastern and Southern Districts of New York entered into an agreement pursuant to which Gotti pled guilty to charges of racketeering activity including bribery, conspiracy to commit extortion, mail fraud, and supervision of gambling operations, as well as charges of conspiracy to make extortionate extensions of credit (i.e., loansharking) and filing a false tax return.[31] Gotti admitted the allegation in the 1998 Indictment that he had acquired "property constituting, and derived from proceeds which [he] obtained, directly and indirectly, from

section 1962."

[29]     *See* 1998 Indictment ¶¶ 153-157.

[30]     A prior restraining order entered January 20, 1998 also restrained the properties listed as substitute assets. In an Opinion and Order dated March 12, 1998, the district court vacated that order in part on the ground that 18 U.S.C. § 1963(d)(1)(A) does not authorize pre-trial, post-indictment restraint of substitute assets. *See United States v. Gotti*, 996 F. Supp. 321 (S.D.N.Y.), *aff'd,* 155 F.3d 144 (2d Cir. 1998).

[31]     *See* 1999 Agr. at 1-2.

9

racketeering activity in violation of Title 18, United States Code, Section 1962,
thereby making such interests and property forfeitable to the United States of
America."[32] Gotti agreed to forfeit two properties named in the 1998 Indictment.[33]
Gotti did not agree to forfeit the other properties listed by that Indictment, but
rather, paid a "liquidated RICO forfeiture judgment in the amount of
$1,000,000."[34] The agreement provided that the United States would have the
right to forfeit the Milford Township Property and Hempstead's assets in the event
that Gotti failed to pay the judgment.[35] The plea agreement also provided that the
restraining order would remain in effect until payment of the liquidated amount in
full.[36]

Subsequent to his plea, Gotti was sentenced to seventy-seven months
in custody. On September 9, 1999, while incarcerated, Gotti sold the Mill Neck

[32]    1998 Indictment ¶ 135.

[33]    Those properties were 89.2 acres of land located in Milford Township
(distinct from the three parcels defined as the Milford Township Property) alleged
to be purchased from the proceeds of racketeering activity, *see* 1998 Indictment ¶
140, and a property in Rockland Township, New York, listed as a substitute asset
in the 1998 Indictment, *see id.* ¶ 157. *See also* 4/5/98 Tr. at 32-33 (recitation of
property the parties agreed Gotti would forfeit by AUSA Carol Sipperly).

[34]    1999 Agr. at 7.

[35]    *See id.* at 8.

[36]    *See id.*

10

Residence and used the proceeds to make the payment to the Government required by his plea agreement, to pay off an existing mortgage, and to purchase a family residence in Oyster Bay, New York (the "Oyster Bay Residence") in his and his wife's names.[37] Pursuant to the plea, the Government dismissed all remaining counts in the 1998 Indictment,[38] and the restraining order was lifted.[39]

Commercially available databases containing information from the New York Secretary of State indicate that Hempstead was "dissolved by proclamation" on or about December 29, 1999, although Hempstead continued to maintain a bank account and receive rental payments at that time.[40] JAG remains listed as "active."[41] Gotti filed income tax returns for JAG, Hempstead's parent company, for the tax years 2001 and 2002. The Government proffers that the total amount of money deposited in the corporate bank account is less than the amount of rental income declared by JAG and Hempstead in their corporate tax returns

---

[37] *See* 2006 Indictment ¶ 128(c); 7/26/06 Tr. at 6-7; 7/28/06 Carnesi Letter at 1.

[38] *See* 1999 Agr. at 2.

[39] *See* 9/27/99 Order Modifying Post-Indictment Restraining Order, 98 Cr. 42 (BDP).

[40] 7/10/06 Government Letter at 7.

[41] *Id.*

11

(although the Government reports that the tax return figure is based on estimated rather than actual receipt of income).

Between March 2000 and August 2005, tenants at the Hempstead Avenue Property made cash payments totalling $144,000.[42] During that same time period, $95,000 in cash was deposited into Hempstead's bank account, and at least $113,000 in cash was deposited into Gotti's personal bank account.[43] The Government argues that the unexplained $64,000 discrepancy between total rent income and total cash deposits is circumstantial evidence that Gotti received the proceeds of racketeering activity and used those proceeds to operate JAG and Hempstead (the "enterprises") within the limitations period.

The Government alleges that Gotti used Hempstead's bank account to make thirty-five mortgage payments totaling over $250,000 on the Oyster Bay Residence between 2002 and 2005, to pay real-estate taxes on the Oyster Bay Residence totaling over $25,000, to pay legal fees of over $60,000, to make cash withdrawals exceeding $57,000, and to invest $3,800 in his brother Peter Gotti's business, Uncle Crumm's Bakery, in March and May 2001. On his personal

---

[42]     *See* 8/1/06 Government Letter at 4. The Government's evidence is based on the reports of tenants.

[43]     *See id.*

12

income tax returns in 2002, Gotti claimed a writeoff in the amount of $96,000 for investments in Uncle Crumm's Bakery.

On July 21, 2004, less than two months before Gotti was to be released from custody, a grand jury in the Southern District of New York returned another indictment bringing new RICO charges against Gotti and three co-defendants ("2004 Indictment"). The 2004 Indictment contained a racketeering count alleging that the means and methods of the Gambino Family included money laundering.[44] That indictment did not contain a separate money laundering count or forfeiture allegations.

On July 27, 2004, Gotti executed a deed purporting to transfer the 101st Avenue Property to Pedro Martinez and Santiago Arias for $150,000, which deed was not recorded with the Queens County Clerk until July 20, 2005. On February 20, 2005, Gotti executed a deed transferring the Milford Township Property to his mother and sister. On April 27, 2005, Gotti proclaimed in a corporate resolution that his wife was authorized to act on behalf of Hempstead to

---

[44] *See* 2004 Indictment ¶¶ 1, 10. Count One also alleged that the stated purpose of the Gambino Family was to enrich its participants through crimes including money laundering, and that to "conceal their receipt of money generated from their criminal activities, members and associates of the enterprise concealed their ownership of various assets that were purchased with proceeds of their criminal activities." *Id.* ¶ 11(h).

13

borrow $100,000 from Madison Home Equities secured by the Hempstead Avenue Property. Gotti obtained the $100,000 loan on May 3, 2005, and Hempstead made payments on the loan in 2005.

On May 13, 2005, this Court denied Gotti's motion to dismiss the 2004 Indictment, rejecting Gotti's argument that his 1999 plea agreement barred further charges for conduct occurring before the date of the plea.[45] On June 6, 2005, the grand jury returned a superseding indictment against Gotti seeking forfeiture of assets including $25,000,000, the Hempstead Avenue Property, the Milford Township Property, the 101st Avenue Property, the Oyster Bay Residence, and the Liberty Avenue Property.[46] On August 10, 2005, after his first trial started, Gotti executed a deed transferring the Oyster Bay Residence to his wife for no consideration, and she encumbered that property with an $800,000 mortgage. On February 13, 2006, the day before the commencement of Gotti's second trial, Gotti executed a deed transferring the Liberty Avenue Property to Vincent Spirito for $400,000. Gotti retained an interest in that property in the form of a $190,000 mortgage by Spirito.

---

[45]    *See Gotti*, 399 F. Supp. 2d at 254.

[46]    6/6/05 Indictment, S2 04 Cr. 690. Gotti has never challenged the requested forfeiture.

14

After Gotti's second trial, the Government filed liens against the Oyster Bay, Liberty Avenue, and Hempstead Avenue properties.[47] On April 14, 2006, this Court entered a Stipulation and Order under which Gotti agreed not to engage in further transfers pending the resolution of this case ("Freeze Order"). Gotti reserved his right to seek modification of the Freeze Order in order to pay legal fees pursuant to *United States v. Monsanto*.[48] The Government reserved its rights to pursue its forfeiture claims and other arguments regarding the allegedly improper transfers of the properties at issue.[49]

On May 22, 2006, a grand jury in the Southern District of New York returned the superseding 2006 Indictment against Gotti. Counts Three and Four of this indictment charge Gotti with using and investing income from racketeering activities to acquire, establish, and operate two enterprises, JAG and Hempstead, in violation of section 1962(a) of Title 18 of the United States Code. Count Seven of the 2006 Indictment charges Gotti with money laundering based on his

---

[47]    *See* 6/16/06 Letter from AUSAs Hou and Rocah to the Court at 5.

[48]    *See* Freeze Order at 5-6. *See also United States v. Monsanto*, 924 F.2d 1186, 1192 (2d Cir. 1991) (requiring an adversarial, post-restraint, pretrial hearing to continue a restraint of assets needed by defendant to retain counsel of choice).

[49]    *See* Freeze Order at 6.

15

collection of income from real estate purchased by holding companies created and operated with proceeds derived from racketeering activity. On June 29, 2006, upon submission by Gotti of financial disclosures to the Government, this Court entered a Stipulation and Order allowing Gotti to obtain a mortgage on the Oyster Bay Property in the amount of $500,000 in order to satisfy tax obligations and pay future legal fees. Gotti now moves to dismiss Counts Three, Four, and Seven of the 2006 Indictment.[50]

## III.   LEGAL STANDARD

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."[51] The Second Circuit has held that "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged

---

[50]   *See* 6/27/06 Letter from Carnesi to the Court ("6/27/06 Carnesi Letter"); 7/13/06 Carnesi Letter.

[51]   *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)).

crime.'"[52] "'An indictment must be read to include facts which are necessarily

implied by the specific allegations made.'"[53] However, "'after an indictment has

been returned its charges may not be broadened through amendment except by the

grand jury itself.'"[54]

Rule 12(b) of the Federal Rules of Criminal Procedure provides that

"[a]ny defense, objection, or request which is capable of determination without the

trial of the general issue may be raised before trial by motion." On a motion to

dismiss pursuant to Rule 12(b), a court must accept all factual allegations in the

indictment as true.[55] Moreover, the Second Circuit has held that, in the rare

circumstance in which the government "has made what can fairly be described as a

full proffer of the evidence it intends to present at trial," the court may

---

[52]    *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Stavroulakis*, 952 F.2d at 693).

[53]    *Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir.), *modified*, 439 F.2d 1198 (2d Cir. 1970)).

[54]    *United States v. Coriaty*, 300 F.3d 244, 250 (2d Cir. 2002) (quoting *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). *Accord United States v. Miller*, 471 U.S. 130, 138 (1985) ("[T]he Fifth Amendment's grand jury right is violated by a conviction" where "the offense proved at trial was not fully contained in the indictment.") (citing *Stirone*, 361 U.S. at 213).

[55]    *See United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33 n.2 (1963); *United States v. Collazo*, No. 04 Cr. 297, 2004 WL 2997843, at *2 (S.D.N.Y. Dec. 22, 2004).

17

appropriately address "the sufficiency of the evidence . . . on a pretrial motion to

dismiss an indictment."[56] In reviewing the sufficiency of the evidence, the court

must view all of the evidence in the light most favorable to the Government and

determine if there is any evidence "upon which a reasonable mind might fairly

---

[56]    *Alfonso*, 143 F.3d at 776-77 (reversing district court's dismissal of
indictment where the government has not made a full proffer). *Cf. United States v.
Mennuti,* 639 F.2d 107 (2d Cir. 1981) (upholding dismissal of indictment where
government had filed an affidavit making a full proffer of the evidence to be
presented at trial). Other circuits have similarly held that where facts are
undisputed, the Court may dismiss an indictment based on the legal insufficiency
of the charges. *See United States v. Flores,* 404 F.3d 320, 325 (5th Cir. 2005)
(finding "no error in the district court's procedure of resolving a legal question in
a pre-trial motion to dismiss the indictment"); *United States v. DeLaurentis,* 230
F.3d 659, 660 (3d Cir. 2000) (court may not address the sufficiency of the
government's evidence on a motion to dismiss unless there is a "stipulated
record"); *United States v. Brown,* 925 F.2d 1301, 1304 (10th Cir. 1991) ("[W]here
the facts are essentially undisputed" it "is permissible and may be desirable . . . for
the district court to examine the factual predicate for an indictment to determine
whether the elements of the criminal charge can be shown sufficiently for a
submissible case."); *United States v. Risk,* 843 F.2d 1059, 1061 (7th Cir. 1988)
("The district court found no violation and correctly dismissed the indictment, not
because the government could not prove its case, but because there was no case to
prove."). However, there are circuits that explicitly reject this procedure. *See
United States v. Salman,* 378 F.3d 1266, 1267-68 (11th Cir. 2004) (per curiam)
("There is no summary judgment procedure in criminal cases. Nor do the rules
provide for a pre-trial determination of sufficiency of the evidence.") (citation and
quotation marks omitted); *United States v. Jensen,* 93 F.3d 667, 669-70 (9th Cir.
1996) ("By basing its decision on evidence that should only have been presented
at trial, the district court in effect granted summary judgment for the defendants.
This it may not do."); *United States v. Marra,* 481 F.2d 1196, 1199-1200 (6th Cir.
1973) ("A motion to dismiss the indictment cannot be used as a device for a
summary trial of the evidence . . . The Court should not consider evidence not
appearing on the face of the indictment.") (citation and quotation marks omitted).

18

conclude guilt beyond a reasonable doubt."[57] The Government may base its case

"entirely on circumstantial evidence," and a defendant's guilt "may be inferred

from the evidence," but only if "the inference is reasonable."[58] "[T]he government

must do more than introduce evidence at least as consistent with innocence as with

guilt."[59] "[A] conviction based on speculation and surmise alone cannot stand."[60]

## IV. APPLICABLE LAW

### A. Money Laundering

The money laundering count is governed by a five-year statute of

limitations.[61] The relevant money laundering provision, section 1956(a)(1)(B)(i)

of Title 18 of the United States Code, provides:

> Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of
> unlawful activity, conducts or attempts to conduct such a

---

[57]   *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (reversing
court-ordered judgment of acquittal pursuant to Rule 29 following a guilty
verdict).

[58]   *United States v. Kim*, 435 F.3d 182, 184 (2d Cir. 2006) (affirming
denial of motion to overturn conviction based upon insufficiency of the evidence).

[59]   *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)
(citations omitted) (vacating conviction and ordering dismissal of indictment
pursuant to Fed. R. Crim. P. 29(c)).

[60]   *Kim*, 435 F.3d at 184 (citations and quotation marks omitted).

[61]   *See* 18 U.S.C. § 3282(a).

19

> financial transaction which in fact involves the proceeds of
> specified unlawful activity ... knowing that the transaction
> is designed in whole or in part ... to conceal or disguise
> the nature, the location, the source, the ownership, or the
> control of the proceeds of specified unlawful activity ...
> [is guilty of a felony].

This section criminalizes transactions designed to vest illegal proceeds with "the

appearance of legitimacy."[62] The proceeds of unlawful activity may remain illegal

proceeds even if they change form through a chain of transactions.[63] The Second

Circuit has held that treatment of money laundering as part of a unified scheme is

"particularly sound because money laundering frequently involves extended

sequences of acts designed to obscure the provenance of dirty money."[64]

        However, "not every transaction that can be traced to criminal

---

[62] *United States v. Napoli*, 179 F.3d 1, 8 (2d Cir. 1999). *See also United States v. Kinzler*, 55 F.3d 70, 73 (2d Cir. 1995) ("the statute is aimed broadly at transactions designed in whole or in part to *conceal* or *disguise* in any manner the nature, location, source, ownership or control of the proceeds of unlawful activity") (citation omitted) (emphasis added).

[63] *See United States v. George*, 363 F.3d 666, 674-75 (7th Cir. 2004) (where defendant used counterfeit securities to buy computer chips, chips became proceeds of unlawful activity); *United States v. Real Property Identified as Parcel 03179-005R*, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) (where defendant used proceeds of fraud to buy real property, and then used real property as collateral for loan, loan proceeds were proceeds of unlawful activity).

[64] *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) (several transactions in furtherance of a single scheme are properly aggregated into a single money laundering count).

20

proceeds necessarily qualifies as money laundering."[65] "Subsection (I) of the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity."[66] The "intent to conceal" the illicit origin of funds is the hallmark of money laundering.[67] Thus, "the statute requires proof that a financial transaction . . . was designed '*to conceal or disguise*'" the origin of criminal proceeds.[68] "If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute."[69]

## B. Section 1962(a)

---

[65] *United States v. Johnson*, 440 F.3d 1286, 1292-93 (11th Cir. 2006) ("simple and straight forward banking transactions, easily discovered through a cursory review of [defendant's] bank accounts" were not money laundering). *Accord United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003) ("Cases in which money laundering charges have not succeeded are typically simple transactions that can be followed with relative ease.").

[66] *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999). *Accord United States v. Dobbs*, 63 F.3d 391, 398 (5th Cir. 1995); *United States v. Rockelman*, 49 F.3d 418, 423 (8th Cir. 1995); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476 (10th Cir. 1994).

[67] *Stephenson*, 183 F.3d at 121.

[68] *Id.* (quoting 18 U.S.C. § 1956(a)(1)(B)(i)) (emphasis added). *See also Garcia-Emanuel*, 14 F.3d at 1474 ("Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime.").

[69] *Garcia-Emanuel*, 14 F.3d at 1474.

21

The section 1962(a) count is also governed by the five-year statute of

limitations.[70] Section 1962(a) provides:

> It shall be unlawful for any person who has received any
> income derived, directly or indirectly, from a pattern of
> racketeering activity . . . to use or invest, directly or
> indirectly, any part of such income, or the proceeds of such
> income, in acquisition of any interest in, or the
> establishment or operation of, any enterprise which is
> engaged in, or the activities of which affect, interstate or
> foreign commerce.

Under this section, the enterprise need not be "engaged in a pattern of

racketeering; indeed, it may be a victim of racketeering . . . consistent with

Congress's goal of protecting legitimate businesses from infiltration by organized

crime."[71]

The five-year statute of limitations for prosecutions under this section

begins to run upon the last "use or investment" of the income or proceeds of

racketeering in the "establishment or operation" of an enterprise.[72] Where the

---

[70]    *See* 18 U.S.C. § 3282(a).

[71]    *United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir. 1989). *See
generally United States v. McNary*, 620 F.2d 621, 628-29 (7th Cir. 1980)
(upholding conviction under section 1962(a) of defendant who had invested
money obtained through bribery and extortion in a family-owned travel agency).

[72]    *United States v. Vogt*, 910 F.2d 1184, 1199 (4th Cir. 1990) ("Unlike
the offense defined in subsection (c), therefore, that defined in subsection (a) is
not necessarily consummated by the last predicate act of racketeering activity.

22

Government alleges that the enterprise was operated for the purpose of money laundering, "every time tainted funds or assets purchased with tainted funds [are] run into or out of one of the enterprise corporations by or at [the defendant's] direction, this constitute[s] a 'use' by him of those funds or their proceeds in the 'operation' of the enterprise in its intended function, which [is] precisely to serve as a concealing conduit or repository of the funds or assets."[73]

Although the "acts by which the tainted income is acquired need have no logical relationship to the enterprise in which investment will thereafter be made," there must nonetheless be "proof of the specified relationship between the racketeering acts and the RICO enterprise."[74] The statute does not require evidence tracing the income or proceeds invested in the enterprise directly to the racketeering acts, so long as the evidence demonstrates a "sufficient nexus" between the illicit money and the enterprise.[75]

Instead, it is only consummated by the quite separate act of use or investment, hence the statute [of limitations] with respect to subsection (a) is only triggered by the last such act charged.").

[73] *Id.* at 1199 n.7.

[74] *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989).

[75] *McNary*, 620 F.2d at 628 (an interpretation of the statute requiring "that the evidence show a direct employment of illicit income" would "ignore the clear proscription of the statute and, as a practical matter, would render the statute ineffective against the use of interim depositories, commingled funds, and other

23

## C. Interpretation of Plea Agreements

The Second Circuit has "long interpreted plea agreements under

principles of contract law . . . but . . . noted that plea agreements are unique

contracts in which special due process concerns for fairness and the adequacy of

procedural safeguards obtain."[76] In interpreting plea agreements according to

contract law, courts must be guided by two principles:

> First, the defendant's underlying 'contract' right is
> constitutionally based and therefore reflects concerns that
> differ fundamentally from and run wider than those of
> commercial contract law. Second, with respect to federal
> prosecutions, the courts' concerns run even wider than
> protection of the defendant's individual constitutional
> rights – to concerns for the honor of the government,
> public confidence in the fair administration of justice, and
> the effective administration of justice in a federal scheme
> of government.[77]

Consequently, courts are required to "hold the Government to the most meticulous

---

surreptitious accounting techniques designed to create significant obstacles to the
tracing of illicit income"). *Accord United States v. Cauble*, 706 F.2d 1322, 1342
(5th Cir. 1983) ("the prosecution need prove only that illegally derived funds
flowed into the enterprise; it need not follow a trail of specific dollars from a
particular criminal act").

[76]     *In re Altro*, 180 F.3d at 375 (citing *United States v. Rodgers*, 101 F.3d
247, 253 (2d Cir. 1996) and *Ready*, 82 F.3d at 558).

[77]     *Ready*, 82 F.3d at 558 (citation omitted).

standards of both promise and performance."[78] In keeping with these principles,

the Second Circuit has instructed that to interpret a plea agreement, a court should

look to the reasonable understanding of the parties as to the terms of the

agreement and resolve any ambiguities against the Government.[79] "[A]ware of the

Government's advantage in bargaining power and recognizing that the

Government usually drafts plea agreements, we construe such agreements *strictly*

against the Government."[80]

## V. DISCUSSION

### A. Gotti's Motion Is Timely as to Count Seven But Is Premature With Respect to Counts Three and Four

As an initial matter, the Government argues that the motion should be

denied as prematurely filed, with leave to renew at the close of the Government's

---

[78]     *In re Altro*, 180 F.3d at 375 (citation and quotation marks omitted).

[79]     *See United States v. Palladino,* 347 F.3d 29, 33 (2d Cir. 2003) (citations omitted). *See also Stern v. Shalala,* 14 F.3d 148, 150 (2d Cir. 1994) ("Courts enforce what the defendant reasonably understood the plea agreement to mean when the guilty plea was entered.") (quotation marks and citation omitted).

[80]     *Cunningham*, 292 F.3d at 117 (emphasis added). *Accord United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) (plea agreements construed against the Government because "'the Government is usually the party that drafts the agreement, and [because] the Government ordinarily has certain awesome advantages in bargaining power'") (quoting *Ready*, 82 F.3d at 558).

25

case.[81] The Government argues that a challenge to the sufficiency of the evidence is not properly brought as a motion to dismiss an indictment, even though the facts here are largely undisputed. The question presented by this motion is whether, accepting the Government's version of events, Gotti's conduct after the bar date qualifies as money laundering or racketeering in violation of section 1962(a).

The analysis of the money laundering charge turns on the terms of the indictments and 1999 plea agreement, and is clearly a question of law, capable of determination "without the trial of the general issue."[82] Even viewing the proffered evidence in the light most favorable to the Government, a reasonable jury could not find Gotti guilty of the money laundering charge because there is no evidence that Gotti attempted to conceal the illicit origins of his funds as is required under section 1956(a)(1)(B)(i). Under these circumstances, to allow the Government to proceed to trial on this charge would create a risk of unfair prejudice and

---

[81]     *See* 7/10/06 Government Letter at 16 (citing *United States v. Gotti,* 399 F. Supp. 2d 214, 218 (S.D.N.Y. 2005)). On April 12, 2005, before the first trial in this case, this Court denied motions by Gotti's co-defendants to dismiss charges on statute of limitations grounds as premature. At that time, the Government had not presented the Court with a full proffer of the evidence of those defendants' illegal conduct falling within the statute of limitations period.

[82]     Fed. R. Crim. P. 12(b).

26

inevitably result in confusion of the jury.[83]

On the other hand, the viability of the new racketeering charges cannot be decided as a matter of law. With respect to these charges, the Court is required to evaluate all of the proffered evidence, some of which the Government has not yet described.

This case is unique in that the Government has presented the bulk of its evidence twice at defendant's first and second trials. Although the Indictment has been revised, the Government intends to present much of the same evidence again. Indeed, in arguing that the new charges should relate back to the 2004 Indictment for purposes of determining the relevant limitations period, the Government stated that the "newly charged money laundering and racketeering violations . . . concern substantially the same evidence and criminal conduct described in the first indictment."[84] The Government has described in detail the evidence it intends to submit at trial and submitted thirty-nine pages of argument

---

[83]     Dismissing this charge, however, does not prevent the Government from offering the evidence of Gotti's financial transactions, admitted at the earlier trials, in support of the remaining racketeering charges.

[84]     7/10/06 Government Letter at 12. *See also* 5/25/06 Tr. at 6 (statement of AUSA Hou).

27

on this motion.[85] The Government also had the opportunity to clarify the evidence

that it will submit during three telephone conferences and a court hearing.[86]

Nonetheless, the Government now asserts that it has additional new evidence with

respect to Counts Three and Four that it will offer at trial. Based on this assertion,

the motion to dismiss these counts is denied as premature.

## B. Relevant Limitations Period

The parties dispute whether the Government must prove that the

defendant engaged in criminal conduct after May 22, 2001, five years prior to the

filing of the 2006 Indictment, or after July 22, 1999, five years prior to the 2004

Indictment. The Government argues that the criminal conduct that is now charged

in the 2006 Indictment was described in the 2004 Indictment to support elements

of other charges, and therefore "the limitations period relates back to July 22,

1999."[87] The Government's new counts charge, *inter alia,* that Gotti received

income from construction industry extortion between 1991 and 2005, and from

---

[85]     *See* 5/26/06 Tr. at 6-11; 8/1/06 Government Letter at 2, 4-8.

[86]     *See* 7/26/06 Tr.; 7/31/06 Hearing Transcript ("7/31/06 Tr."); 8/3/06
Hearing Transcript ("8/3/06 Tr."); 8/10/06 Hearing Transcript ("8/10/06 Tr.").

[87]     7/10/06 Government Letter at 12-13 (citing *United States v.
Salmonese,* 352 F.3d 608 (2d Cir. 2003), for the proposition that the "touchstone"
for a relation-back analysis is whether the "original indictment fairly alerted the
defendant to the subsequent charges against him and the time period at issue").

28

loansharking between 1991 and 2002, and used that money to operate JAG and Hempstead through May 2006,[88] well after the date of the plea agreement[89] and within the limitations period.[90]

I need not resolve this dispute with respect to the relevant limitations period because assuming arguendo that the Government has the benefit of the earlier date of July 22, 1999, the new money laundering charge is nonetheless time-barred. Assuming, arguendo, that Gotti has the benefit of the later limitation date of May 22, 2001 with respect to Counts Three and Four, the indictment alleges that Gotti used the proceeds of his racketeering activities to operate JAG and Hempstead well after that date.

## C. Count Seven Is Barred by the Plea Agreement and Is Time-Barred

---

[88]    2006 Indictment ¶¶ 22, 2[4] (alleging that Gotti "received income, directly or indirectly, from a pattern of racketeering activity . . . as set forth in paragraphs 18 and 20 of Count Two [alleging construction industry extortion and loansharking], and used, invested, directly and indirectly, a part of such income and the proceeds of such income in the acquisition of an interest in, and the establishment and operation of" JAG and Hempstead, respectively).

[89]    The plea agreement permitted the Government to bring new charges that encompassed events occurring prior to the date of that agreement, so long as such charges were based on "additional evidence or information" that had come to the Government's attention. 1999 Agr. at 1-2.

[90]    *See* 7/31/06 Tr. at 6 (statement of AUSA Hou); 8/1/06 Government Letter.

### 1. Allegations of Money Laundering Through Transactions Related to Holding Companies

Count Seven, consisting of one paragraph, alleges that from 1991

through May 2006, Gotti engaged in money laundering, "to wit," the use of

criminal proceeds derived from the conduct of the affairs of the Gambino Family

"to create and operate holding companies which were then used to purchase real

estate holdings and to collect rents."[91]  The Government alleges that Gotti used

JAG and Hempstead for money laundering after July 22, 1999 by collecting rental

income from the Hempstead Avenue Property,[92] and using that property as

collateral for a loan, which money Gotti used to pay his living expenses and legal

fees, and to invest in his brother's business venture. But, as a matter of law, this

---

[91]  2006 Indictment ¶ 26.

[92]  *See* 7/31/06 Tr. at 3-5 (explaining the chain of transactions constituting the money laundering charge).  In response to a request for clarification from the Court, AUSA Hou stated that the only holding companies referred to by Count Seven are JAG and Hempstead, and the only rent-collecting property owned by JAG and/or Hempstead is the Hempstead Avenue Property. *See id.* at 3-4.  When asked which allegations pertained specifically to JAG, AUSA Hou responded "it's confusing because of the relationship between both companies," and the fact that JAG was disclosed as an operating company on tax returns. *See id.* at 7-8.  A further submission by the Government stated only that JAG had reported rental income from the Hempstead Avenue Property. *See* 8/1/06 Government Letter at 4.  There is thus no relevant distinction between JAG and Hempstead.

30

does not constitute money laundering within the limitations period for two reasons. *First*, the April 5, 1999 plea agreement resolved the charge that the funds used to purchase the Hempstead Avenue Property were the proceeds of racketeering activity. *Second*, Gotti's activities within the limitations period were not designed to conceal the illicit source of the funds, and the charges are therefore time-barred.

Gotti interprets the plea agreement as his admission of the 1998 Indictment's allegations that the Hempstead Avenue Property had been purchased with the proceeds of racketeering activity, and the Government's acceptance of a liquidated payment in lieu of forfeiture of that property.[93] The Government argues that the plea agreement does not bar its new charges as it "did not have the degree of proof in the 1999 case that it has now to demonstrate the criminal origins" of the Hempstead Avenue Property.[94] The Government's argument requires an interpretation of the plea agreement as a limited admission by Gotti that the monetary value of his income from racketeering was equal to the sum of the $1,000,000 liquidated payment and the value of the two forfeited properties.

But in interpreting the plea agreement, all ambiguities must be

---

[93]    7/13/06 Carnesi Letter at 5.

[94]    7/10/06 Government Letter at 25-26.

resolved against the Government. The plea agreement provides that Gotti "admits the forfeiture allegations,"[95] including, *inter alia*, the allegations of an expansive racketeering conspiracy.[96] Although the racketeering activities Gotti pled guilty to in 1999 are not charged in the 2006 Indictment, neither indictment specifically identifies the racketeering activities that were the sources of the funds used to purchase these properties. Under the plea agreement, Gotti admitted that he had acquired "property constituting, and derived from, proceeds . . . obtained, directly and indirectly, from racketeering activity."[97] The plea agreement provided for a "liquidated RICO forfeiture judgment in the amount of $1,000,000" and stated that "to the extent required to recover any portion of the $1,000,000 payment not paid by the defendant," the United States had the right to forfeiture of the properties

[95]     1999 Agr. at 7 ("It is further agreed and understood that John A. Gotti admits the forfeiture allegations set forth in Indictment S9 98 Cr. 42 (BDP), at ¶¶ 134-135").

[96]     *See* 1998 Indictment ¶ 134 (incorporating by reference Counts One, Two, and Three of the Indictment which allege, *inter alia*, an expansive racketeering conspiracy which engaged in extortion, fraud, gambling, and money laundering). Interestingly, Gotti specifically pled guilty to a conspiracy to make extortionate extensions of credit throughout the 1990s. This crime is charged again in the 2004 and 2006 Indictments, with the same starting date, but ending in 2002 rather than 1998.

[97]     1998 Indictment ¶ 135 (incorporated by reference in 1999 Agr. at 7 ("It is further agreed and understood that John A. Gotti admits the forfeiture allegations set forth in Indictment S9 98 Cr. 42 (BDP), at ¶¶ 134-35")).

32

described by paragraphs 138, 139, and 141 of the Indictment, specifically, the Mill Neck Residence, the Hempstead Avenue Property (and rental income therefrom), and the Milford Township Property.[98] Gotti's reasonable understanding was that, through the plea agreement, he admitted that the properties were acquired through income obtained from racketeering activities, and the Government accepted a cash payment in lieu of forfeitures of those specific properties, and dismissed all charges in the indictment, including the forfeiture charges.[99] Under these circumstances, the Government is now estopped from claiming that Gotti is laundering money by exploiting the very asset that it released to him in exchange for a cash payment. Furthermore, it defies logic to allow a defendant to be charged with purchasing the same property twice – first with one source of funds and then with another.

Relying on *United States v. Magluta*, the Government argues that the

---

[98]    *See* 1999 Agr. at 8. The plea agreement also provided for the continuation of the Government's restraint of those properties until payment was made. *See id.*

[99]    *See id.* at 2 ("In consideration of his plea to the above offenses . . . the Government will move to dismiss any open Counts in Indictment S9 98 Cr. 42 (BDP), as well as any underlying Indictments, as to defendant John A. Gotti").

plea agreement cannot cleanse the money of its "tainted" character.[100] But *Magluta* is easily distinguished. In *Magluta*, an associate of the defendant became a confidential informant and gave proceeds of illegal drug sales to the FBI. The FBI then returned those proceeds *to the informant* to allow him to pass the funds to the defendant, who used those funds to pay his lawyers. The Eleventh Circuit rejected the defendant's argument that "because the proceeds had been under the control of law enforcement before he used them to pay his lawyers, the money had lost its 'tainted' character."[101] The court specifically noted that it was "not asked to decide whether government intrusion into laundering transactions ever could rise to the level that the money no longer qualifies as the 'proceeds of [a] specified unlawful activity' under § 1956(a)(1)."[102]

In light of Gotti's admission in the plea agreement that the Hempstead Avenue Property was purchased with funds traced to racketeering, it strains credulity for the Government to suggest that Gotti is now somehow attempting to

---

[100]    *See* 7/10/06 Government Letter at 26. *See also United States v. Magluta*, 418 F.3d 1166, 1175 (11th Cir. 2005) ("laundered money does not become any less laundered because the government helped the process along or chose not to stop it").

[101]    *Magluta*, 418 F.3d at 1175.

[102]    *Id.* (quoting 18 U.S.C. § 1956(a)(1)).

34

conceal this fact. Even assuming for the sake of argument that Gotti had not

admitted in 1999 that the Hempstead Avenue Property was purchased with funds

of criminal origin, the transactions within the limitations period bear very little

indicia of concealment or deception, and none have the effect of making the illicit

origin of the funds any less apparent than before.[103]

Recent transactions involving this property have at best an incidental

relationship to that concealment.[104] In fact, Gotti's use of income and loan

proceeds from the Hempstead Avenue Property to pay living expenses and legal

fees within the limitations period has been open and obvious. These are "typically

simple transactions that can be followed with relative ease."[105] Such transactions,

"engaged in for present personal benefit, and not to create the appearance of

legitimate wealth" do not constitute money laundering.[106]

---

[103] *See Johnson*, 440 U.S. at 191 ("[a]nother important consideration is whether the money is better concealed or concealable after the transaction than before") (quotation and citation marks omitted).

[104] *See Garcia-Emanuel*, 14 F.3d at 1474 (the money laundering statute "is aimed at transactions that are engaged in for the purpose of concealing assets," and the concealment must be more than incidental or "trivial").

[105] *Esterman*, 324 F.3d at 572. *See also Johnson*, 440 F.3d at 1292-93 (straightforward banking transactions are not money laundering).

[106] *Garcia-Emanuel*, 14 F.3d at 1474. *See also id.* at 1476 ("While we acknowledge that all mortgage payments increase the owner's investment in his home, the mere fact that Defendant made the payment with a cashier's check

35

Gotti's investment in his brother's business venture, Crumm's

Bakery, is a closer question, but in light of the size of the investment ($3,800), the

lapse of time, and the plea agreement, nothing about this transaction suggests an

intention to launder money.[107] Finally, the Government cites no cases in which a

defendant was convicted of money laundering for liquidating assets purchased

with the proceeds of racketeering over a decade ago (not to mention any cases

where there was an intervening indictment and plea during that decade).[108] The

purpose of the statute of limitations – to protect against stale prosecutions – is

---

purchased with drug money is insufficient to sustain a money laundering
conviction."); *Dobbs*, 63 F.3d at 397 (reversing a money laundering conviction
where the defendant deposited funds into his wife's bank account which she used
to pay ordinary household expenses).

[107]    *Cf. Garcia-Emanuel*, 14 F.3d at 1476 (holding that purchase of a
certificate of deposit with proceeds of criminal activity and use of the CD as
collateral for a loan to partially owned corporate defendant was "classic money
laundering where Defendant, through a complex series of transactions,
transformed the cash he received selling drugs into a legitimate business
investment that allowed him to display his wealth without arousing suspicion").

[108]    *Cf. United States v. George*, 363 F.3d 666, 670 (7th Cir. 2004)
(finding money laundering where a counterfeit check was used to purchase
computer chips in June or July of 2000, and in the following "few weeks"
defendant sold the chips and used part of the proceeds to buy a Lincoln
Navigator); *Moloney*, 287 F.3d at 238-39 (defendant pled guilty in 1999 to one
count of money laundering for regular bank deposits of proceeds of ongoing Ponzi
scheme between 1990 and 1999).

clearly implicated here.[109]

## 2. Allegations of Money Laundering Through Transactions Unrelated to the Indictment

The Government also argues that Gotti's money laundering within the

limitations period includes attempts to transfer "properties purchased with illegally

obtained funds to relatives and associates as Gotti's case proceeded to trial."[110]

However, the transactions described by the Government, which pertain to the

101st Avenue Property, the Liberty Avenue Property, and the Oyster Bay

Residence, are apparently unrelated to any charges in the Indictment. Count

Seven alleges that Gotti's money laundering consisted of his use of criminal

proceeds "to create and operate holding companies which were then used to

---

[109]    *See United States v. Podde*, 105 F.3d 813, 817-20 (2d Cir. 1997)
(finding charges barred by statute of limitations where defendant was originally
indicted within the five-year limitations period, pled guilty, withdrew the guilty
plea, and was reindicted four years after the statute of limitations had expired,
explaining that a statute of limitations is "'designed to protect individuals from
having to defend themselves against charges when the basic facts may have
become obscured by the passage of time and to minimize the danger of official
punishment because of acts in the far-distant past. Such a time limit may also have
the salutary effect of encouraging law enforcement officials promptly to
investigate suspected criminal activity.'") (quoting *Toussie v. United States*, 397
U.S. 112, 114-15 (1970)).

[110]    7/10/06 Government Letter at 23.

37

purchase real estate holdings and to collect rents."[111] The only holding companies referenced in the Indictment are JAG and Hempstead, and the only real estate purchased by those companies is the Hempstead Avenue Property.[112] Gotti did not use holding companies to purchase the 101st Avenue Property, the Liberty Avenue Property, or the Oyster Bay Residence, which were purchased by Gotti in his own name.[113] Count Seven, which refers exclusively to the use of "holding companies," cannot be fairly read to encompass this conduct. The Government may not broaden Count Seven to include conduct not charged by the grand jury.

Moreover, the Government does not argue that Gotti attempted to conceal these transactions, or that they bear any more than an incidental relationship to the initial act of concealing the proceeds of racketeering through the purchase of real estate in the 1990s. Indeed, the transactions were the subject of two court-approved stipulations between the parties.

---

[111]   2006 Indictment ¶ 26.

[112]   *See* 7/31/06 Tr. at 3-4 (statement of AUSA Hou).

[113]   Ignoring the language of the 2006 Indictment, the Government argued that these properties relate to the money laundering charge "insofar as there will be testimony at the forthcoming trial that the properties . . . were all purchased using the proceeds of racketeering activity . . . and that the point of purchasing those properties was to conceal their criminal derivation." 7/26/2006 Tr. at 5 (statement of AUSA Hou). It must be remembered, however, that all of these properties were purchased in the 1990s.

38

## D. Defendant's Motion to Dismiss Counts Three and Four Is Denied With Leave to Renew at the Close of the Government's Case

Section 1962(a) targets the direct and indirect "use or investment" of income derived from racketeering in the acquisition, establishment, or operation of an otherwise legitimate business. Counts Three (JAG) and Four (Hempstead) of the Indictment are substantially identical, and each consists of only two paragraphs.[114] These counts charge that Gotti engaged in the following conduct through May 2006:

> (1) receipt of income through construction industry extortion between 1991 and 2005, and loansharking between 1991 and 2002, and
>
> (2) direct and/or indirect use and/or investment of that income in the (a) acquisition, (b) establishment; and (c) operation of JAG and Hempstead.[115]

The Government concedes that Gotti acquired and established JAG and Hempstead prior to the limitations period, in the early 1990s. Thus, to demonstrate that this count is not time-barred, the Government must prove that

---

[114] The first paragraph of each charge alleges that the enterprise engaged in interstate commerce. *See* 2006 Indictment ¶¶ 21, 23.

[115] *Id.* ¶¶ 22, 2[4] (alleging that Gotti "received income, directly or indirectly, from a pattern of racketeering activity . . . as set forth in paragraphs 18 and 20 of Count Two [alleging construction industry extortion and loansharking], and used, invested, directly and indirectly, a part of such income and the proceeds of such income in the acquisition of an interest in, and the establishment and operation of" Hempstead and JAG, respectively).

39

Gotti has continued to either use or invest illicit income to "operate" Hempstead and JAG at some point after July 22, 1999.[116] The Government argues that it can demonstrate this at trial by showing that illicit income flowed both into and out of Hempstead and JAG after July 22, 1999.[117]

## 1. Allegations of Money Flowing Into JAG and Hempstead

The Government concedes that it has no direct evidence of any transactions in which illicit funds flowed into JAG and/or Hempstead after July 22, 1999.[118] The Government argues instead that it has circumstantial evidence of such transactions, based on accounting discrepancies, cash deposits, and commingling of personal and corporate funds. The Government proffers that Gotti filed tax returns for JAG, along with Hempstead, for 2002, and that the amount of rent deposited in Hempstead's bank account is less than the amount of

---

[116]     The Government had initially represented that Counts Three and Four pertained only to transactions related to the Hempstead Avenue Property. *See* 7/26/06 Tr. at 5. But at a later conference, the Government stated that this characterization is "not accurate" and that the Government intends to support Counts Three and Four by offering evidence of transactions by JAG and Hempstead that are not related to the Hempstead Avenue Property. 8/11/06 Hearing Transcript at 7.

[117]     *See* 7/31/06 Tr. at 6 (statement of AUSA Hou); 8/1/06 Government Letter at 4-8.

[118]     *See* 8/1/06 Government Letter at 2.

40

rental income declared by JAG and Hempstead in their corporate tax returns. But
when asked to clarify this statement in a telephone conference on August 1, 2006,
the Government stated that the tax returns contained only income projections.[119]

The Government also argues that it has evidence of a $64,000
discrepancy between the total rental income from the Hempstead Avenue Property
and the combined funds in Gotti's personal bank account and Hempstead's bank
account, over a five-year span of time. The Government asserts that the jury can
infer from this unexplained income that Hempstead, the owner of the bank
account, received the direct or indirect proceeds of racketeering. Gotti responds
that although this unexplained income may be relevant in support of Counts One
and Two of the Indictment, which allege that the Gambino Family was the RICO
enterprise, it is not relevant with respect to Counts Three and Four, which allege
JAG and Hempstead as the RICO enterprises. Gotti argues that because the total
rental income for the Hempstead Avenue Property ($144,000) was more than the
cash deposited into Hempstead's bank account ($95,000), the Government cannot
claim that Gotti invested or used *any* unexplained income to operate Hempstead.[120]

---

[119]    *See* 8/3/06 Tr. at 3 (summarizing AUSA Hou's previous statements
during an off-the-record telephone conference held on August 1, 2006).

[120]    *See* 8/1/06 Letter from Sarita Kedia, Esq., Counsel to Gotti, to the
Court at 2.

41

But the Government alleges that Gotti must have deposited some rental income

into his personal account (because the rents exceeded $96,000), and thus, it is

possible that some of the unexplained $64,000 was deposited into the Hempstead

account.

## 2. Allegations of Money Flowing Out of JAG and Hempstead

Relying on *United States v. Vogt*, the Government also argues that

Gotti used illicit income to operate JAG and Hempstead in violation of section

1962(a) by withdrawing money from these entities by collecting rental income and

loan proceeds from the Hempstead Avenue Property.[121] In *Vogt*, the Fourth

Circuit rejected the defendant's argument "that transactions in which enterprise

corporations sold assets or transferred funds constituted 'divestments' rather than

'investments'" and were therefore not violations of section 1962(a).[122] The court

held that a divestment may constitute a violation of the statute where the function

of the enterprise is to serve "as repository or conduit for tainted funds in order to

conceal their ultimate source and beneficial ownership."[123]

---

[121] *See* 7/10/06 Government Letter at 28-29 (citing *Vogt*, 910 F.2d at 1199) (arguing JAG and Hempstead were used to "to funnel money to Gotti" during the limitations period).

[122] *Vogt*, 910 F.2d at 1199 n.7.

[123] *Id.*

### 3. The Government's Assertion of New Evidence

On August 10, 2006, the Government argued that in addition to the evidence it had presented at the two prior trials and in its recent proffers to the Court it has additional new evidence with respect to these counts that it intends to offer at trial.[124] "[U]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."[125] In light of the Government's assertion that it has not fully described the evidence that it intends to offer at trial, it would be unfair to assess the sufficiency of the evidence prior to trial with respect to these counts.[126]

## VI. CONCLUSION

[124]    8/10/06 Tr. at 4-5 (AUSA Hou stating that the Government "has new evidence that your Honor has not heard"); *id*. at 5-6 (AUSA Hou stating that the Government thought that its proffers should only answer the Court's "specific questions" by providing examples of its evidence but that the Government did not understand that it was expected to present "the full panoply of new evidence" to show why Counts Three and Four were not barred).

[125]    *Alfonso*, 143 F.3d at 776-77 (reversing district court's dismissal of the indictment where the dispositive "issue was raised for the first time by the district court sua sponte . . . and the government made no detailed presentation of the entirety of the evidence that it would present to a jury").

[126]    Count Seven, by contrast, can be dismissed as a matter of law, based on the prior indictment, the plea agreement and the absence of any evidence of concealment.

43

For the foregoing reasons, Gotti's motion to dismiss Count Seven of the indictment on the grounds that the charge is barred by the plea agreement and the statute of limitations is granted, but the motion to dismiss Counts Three and Four of the Indictment is denied as premature, with leave to renew at the close of the Government's case. The Clerk of the Court is directed to close this motion (Docket No. 211).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 16, 2006

44

## - Appearances -

**For the Government:**

Victor Hou
Miriam E. Rocah
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2408

**For Defendant John A. Gotti:**

Charles F. Carnesi, Esq.
1225 Franklin Avenue
Garden City, New York 11758
(516) 512-8914

Seth Ginsberg, Esq.
570 Lexington Avenue
Sixteenth Floor
New York, New York 10022
(917) 885-3375

Sarita Kedia, Esq.
275 Madison Avenue, 35th Floor
New York, New York 10016
(212) 681-0202